IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CARLOS KING, et al.,

      Plaintiffs,

      v.                      Case No. 19-CV-0338

STEVEN LANDREMAN, et al.,

      Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY PROCEEDINGS PENDING A DECISION IN BY THE UNITED STATES SUPREME COURT IN *MATHENA V. MALVO*, NO. 18-217

## INTRODUCTION

Plaintiffs challenge the Wisconsin parole system as applied to prisoners who were sentenced to life in prison—*with the possibility of parole*—for offenses they committed as juveniles. Their complaint focuses on three Supreme Court decisions—*Graham*, *Miller*, and *Montgomery*[1]—addressing the Eighth Amendment implications of imposing sentences of life *without the possibility of parole* on offenders who committed their crimes while juveniles. Under these cases, according to Plaintiffs, a juvenile cannot be sentenced to

---

[1] *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012); *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016).

life without parole unless his "crime reflects irreparable corruption," and absent such a finding, juveniles sentenced to life must be afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (Dkt. 1:2 ¶ 2 (citing *Graham*, 560 U.S. at 75 and *Miller*, 567 U.S. at 479–80.) Plaintiffs claim that Wisconsin's parole system does not provide this "meaningful opportunity" and, therefore, "ostensibly creat[es] a life-without-parole sentence" in violation of the Constitution. (Dkt. 1:2 ¶ 3.)

The theory for their Eighth Amendment claim—that their life-with-parole sentences have been converted into *de facto* life without parole sentences—forms the basis for Plaintiffs' two other claims. They claim they are entitled to numerous procedural protections under the Fourteenth Amendment because "[p]arole-eligible juvenile lifers who have not been adjudicated irreparably corrupt have a liberty interest, grounded in the Eighth Amendment, to release from imprisonment upon a showing of rehabilitation and maturity." (Dkt. 1:18 ¶ 59.) And they claim that their Sixth Amendment right to a jury trial has been violated because parole officials have increased their sentences based on facts that should have been found by a jury. (Dkt. 1:54–55 ¶¶ 205–209.)

Plaintiffs' complaint should be dismissed. As a threshold matter, the complaint is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). That case holds that a prisoner in state custody cannot use 42 U.S.C. § 1983 to challenge the

"fact or duration of his confinement." *Id*. at 481. While Plaintiffs claim they are not challenging their criminal convictions or sentences, the legal theories upon which their claims are based necessarily challenge both the fact and duration of their sentences. Therefore, their claims are *Heck*-barred.

Plaintiffs also fail to state a constitutional claim. The Supreme Court cases upon which they rely do not support an Eighth Amendment claim in this context. The cases do not apply to juveniles who received sentences of life with parole eligibility. And even if they did, they limit only sentencing—not parole— procedures. In any event, Plaintiffs are all eligible for parole and have received regular and meaningful parole hearings. There is no viable Eighth Amendment claim here.

Plaintiffs' Fourteenth and Sixth Amendment claims are similarly flawed. Both rest on Plaintiffs' Eighth Amendment claim and, therefore, fail for the same reasons.  Beyond that, however, Plaintiffs do not state a viable procedural due process claim because they have no liberty interest in release on parole. And the Sixth Amendment simply does not apply to parole suitability determinations. Plaintiffs' complaint should be dismissed for failure to state a claim upon which relief can be granted.

Even if Plaintiffs' claims survive a motion to dismiss, however, the proceedings should be stayed pending a decision by the United States Supreme Court in *Malvo v. Mathena*, 893 F.3d 265 (4th Cir. 2018) *petition for cert.*

*granted*, *Mathena v. Malvo*, No. 18-217 (March 18, 2019). The Supreme Court's decision in that case may entirely foreclose Plaintiffs' claims.

## BACKGROUND

### I.   Parties.

Plaintiffs are five Wisconsin inmates who were convicted of crimes they committed when they were under 18 and sentenced to life—or to a term of years that extend beyond their life expectancy—with the opportunity to seek parole after serving a statutorily calculated minimum prison term. (Dkt. 1:3 ¶ 7.) They have all reached their parole eligibility dates and have received regular parole reviews since then. (Dkt. 1:4–5 ¶¶ 11–15.) Facts relevant to each Plaintiff are as follows:

- Plaintiff Carlos King was convicted of first-degree intentional homicide and attempted first-degree intentional homicide for crimes he committed in 1997 when he was 16 years old. He was sentenced to life in prison, plus 45 years to be served concurrently, with eligibility to seek parole in 2013. He has received regular parole reviews since then. (Dkt. 1:4, 27–32 ¶¶ 11, 92–113.)

- Plaintiff Thaddeus Karow was convicted of first-degree intentional homicide, armed burglary and armed robbery for crimes he committed in 1987 when he was 14 years old. He was sentenced to life in prison for the homicide, 20 years consecutive for the burglary, and 20 years consecutive for the robbery, with eligibility to seek parole in 2011. He has received regular parole reviews since then. (Dkt. 1:4, 32– 35 ¶¶ 12, 114–129.)

- Plaintiff James Price was convicted of first-degree intentional homicide party to a crime with use of a dangerous weapon for a crime he committed in 1992 when he was 14 years old. He was sentenced to 25 years to life, with eligibility to seek parole in 2018.

He has received regular parole reviews since then. (Dkt. 1:4, 35–39 ¶¶ 13, 130–147.)

- Plaintiff Craig Sussek was convicted of attempted first-degree intentional homicide party to a crime with use of a dangerous weapon, and armed burglary party to a crime for crimes he committed in 1995 when he was 16 years old. He was sentenced to 45 years and 35 years to be served consecutively, with eligibility to seek parole in 2015. He has received regular parole reviews since then. (Dkt. 1:4–5, 40–44 ¶¶ 14, 148–168.)

- Plaintiff Victoriano Heredia was convicted of first-degree intentional homicide party to a crime for a crime he committed in 1997 when he was 17 years old. He was sentenced to life in prison, with eligibility to seek parole in 2010. He has received regular parole reviews since then. (Dkt. 1:5, 45–50 ¶¶ 15, 169–189.)

Defendants are five Wisconsin Department of Corrections (DOC) officials, sued in their official capacities. Defendant Steven Landreman is the former Acting Chairperson and a Commissioner of the Wisconsin Parole Commission; Defendants Danielle LaCost and Douglas Drankiewicz are Parole Commissioners; Defendant Kevin Carr is the DOC Secretary-designee; and Defendant Mark Heise is the former Director of the DOC Bureau of Offender Classification and Movement. (Dkt. 1:5–6 ¶¶ 17–21.)

## II.   Applicable Wisconsin sentencing and parole laws.

Plaintiffs challenge the Wisconsin parole process as applied to their sentences imposed for conduct that occurred before December 31, 1999.[2] (Dkt.

---

[2] Wisconsin's Truth-In-Sentencing (TIS) law went into effect on December 31, 1999. That law created a determinate sentencing system, whereby offenders are

1:15 ¶ 50.) At that time, Wisconsin had an indeterminate sentencing system, whereby offenders, depending on the crime for which they were convicted, were sentenced to either life, or to a term of years, with eligibility for parole after serving a certain number of years.

In this case, four of the Plaintiffs were convicted of first-degree intentional homicide and were sentenced to life with parole. (Dkt. 1:4–5 ¶¶ 11–13, 15.) One of the Plaintiffs—Craig Sussek—was convicted of attempted first-degree intentional homicide and other crimes and was sentenced to an aggregate term of years extending beyond his life expectancy. (Dkt. 1:4–5 ¶ 14.)   This section, therefore, addresses the laws for both life sentences and other sentences and parole for both types of sentences.

### A.    Life sentences.

In Wisconsin, no single crime[3] has ever carried a mandatory sentence of life imprisonment without release. Class A felonies carry a mandatory life

---

sentenced to a fixed term of initial confinement in prison followed by a fixed term of extended supervision in the community. *See* Wis. Stat. § 973.01 (2015–16). Plaintiffs allege that their "class does not include persons sentenced under TIS." (Dkt. 1:15 ¶ 50.)

[3] In 1993 the Legislature enacted the "persistent repeater" sentence enhancer, which requires a person being sentenced for their third consecutive "serious felony" or their second consecutive "serious child sex offense" to receive a sentence of life imprisonment without the possibility of release. Wis. Stat. § 939.62(2m) (1993–94). Given these requirements, it is unlikely any juveniles have been sentenced as persistent repeaters.

sentence. But life without parole is not mandatory. It was not even a sentencing *option* until 1995. Even then, courts had discretion to choose either life with parole or life without parole.

Before 1988, four crimes were designated Class A felonies: first-degree intentional homicide, Wis. Stat. § 940.01 (1985–86); taking hostages, but only if bodily harm or death of a hostage occurred, Wis. Stat. § 940.305 (1985–86); kidnapping for ransom, but only if the victim was not released without permanent injury before trial, Wis. Stat. § 940.31(2) (1985–86); and treason, Wis. Stat. § 946.01(1). In 1988, a fourth offense was designated a Class A felony, tampering with household items causing death, Wis. Stat. § 941.327(2)(b)(4) (1987–88). In 1993, carjacking causing death was designated a Class A felony, Wis. Stat. § 943.23(1r) (1993–94). In 2001, many of these felonies were changed to a lower class.

Before 1988, all offenders sentenced to life terms were eligible for parole by operation of law after they had served "20 years, as modified by the formula under s. 53.11(1)." Wis. Stat. § 57.06(1) (1985–86).[4] If an inmate earned a full deduction for good behavior, this amounted to parole eligibility after serving

---

[4] Chapter 57 of the Wisconsin statutes was amended and renumbered as Chapter 304 in 1989. 1989 Wis. Act 31, § 1699.

13 years and four months of confinement. Wis. Stat. §§ 53.11(1m) and 57.06(1) (1985–86).[5]

In 1988, the Legislature created Wis. Stat. § 973.014, which required a court sentencing a person to life in prison to "make a parole eligibility determination regarding the person and choose one of the following options: "(1) The person is eligible for parole under s. 57.06(1)" or "(2) The person is eligible for parole on a date set by the court." If the court decided to set a parole eligibility date, that date had to be later than "the earliest possible parole date as calculated under s. 57.06(1)." 1987 Wis. Act 412, § 5. Life without the possibility for parole was not a lawful sentence. *State v. Setagord*, 187 Wis. 2d 340, 344, 523 N.W.2d 124 (Ct. App. 1994).

In 1995, the Legislature amended Wis. Stat. § 973.014 and added the *option* for the court to choose life without the possibility of parole for Class A felonies committed after August 31, 1995. 1995 Wis. Act 48, § 5. This option was entirely discretionary, however. Courts were not required to sentence the offender to life without parole.

---

[5] Section 57.06(1) provided that "the department may parole an inmate serving a life term when he or she has served 20 years as modified by the formula under s. 53.11(1)." Section 53.11(1) provided for "mandatory release" for offenders not serving life sentences once they had served two-thirds of the sentence. Inmates serving life sentences were not entitled to mandatory release, Wis. Stat. § 53.11(1m), but under the formula in § 53.11(1) they became eligible for parole after serving two-thirds of 20 years, which amounted to 13 years and four months.

### B.     Other sentences.

Individuals who committed a non-Class A felony before December 31, 1999 were sentenced to an indeterminate term of "not more than" a specific number of years. Wis. Stat. § 973.013(1) (1995–96). Individuals sentenced under this scheme became eligible for parole after serving 25% of their confinement term, or six months, whichever was greater. Wis. Stat. § 304.06(1)(b) (1995–96). For most felonies, a defendant is entitled to mandatory release to parole after serving two thirds of his or her sentence. Wis. Stat. § 302.11(1) (1995–96).

### C.     Parole.

An inmate who has reached his eligibility date, under either of the foregoing sentence types, may apply to the Parole Commission for release to parole. Wis. Stat. § 304.06(1)(b). Wisconsin Stat. § 304.06 has detailed notice provisions requiring the Commission to notify the sentencing court, the district attorney's office, and victims about parole hearings and allow them to attend. It requires the Commission to consider any statement by any of those offices or persons. Wis. Stat. § 304.06(1)(e). The statute also mandates that no prisoner may be paroled until the parole Commission is satisfied that the prisoner has adequate plans for suitable employment or other means to sustain himself. Wis. Stat. § 304.06(2).

9

The Parole Commission has discretion to determine whether an inmate should be released on parole. In reaching its decision, the Commission considers the factors enumerated in Wis. Admin. Code § PAC 1.06(16). That provision reads as follows:

> **(16)** A recommendation for a parole grant . . . may be made after consideration of all the following criteria:
> **(a)** The inmate has become parole . . . eligible under s. 304.06, Stats., and s. PAC 1.05.
> **(b)** The inmate has served sufficient time so that release would not depreciate the seriousness of the offense.
> **(c)** The inmate has demonstrated satisfactory adjustment to the institution.
> **(d)** The inmate has not refused or neglected to perform required or assigned duties.
> **(e)** The inmate has participated in and has demonstrated sufficient efforts in required or recommended programs which have been made available by demonstrating one of the following:
> **1.** The inmate has gained maximum benefit from programs.
> **2.** The inmate can complete programming in the community without presenting an undue risk.
> **3.** The inmate has not been able to gain entry into programming and release would not present an undue risk.
> **(f)** The inmate has developed an adequate release plan.
> **(g)** The inmate is subject to a sentence of confinement in another state or is in the United States illegally and may be deported.
> **(h)** The inmate has reached a point at which the commission concludes that release would not pose an unreasonable risk to the public and would be in the interests of justice.

Wis. Admin. Code § PAC 1.06(16).

## III.   Plaintiffs' lawsuit.

On April 30, 2019, Plaintiffs filed this 42 U.S.C. § 1983 action, challenging the Wisconsin parole system as applied to prisoners who were sentenced to life in prison with the possibility of parole for offenses they

committed as juveniles. In addition to their individual claims, they seek to certify "a class consisting of all persons currently incarcerated who were convicted of crimes committed when they were children under the age of 18 and sentenced to life, sentences for terms of years longer than their life expectancy, with the possibility of parole." (Dkt. 1:50 ¶ 190.)

Plaintiffs raise three claims: an Eighth Amendment claim, a Fourteenth Amendment procedural due process claim, and a Sixth Amendment claim.

First, they claim that the Eighth Amendment "forbids a statutory scheme that mandates life imprisonment for juvenile offenders or permits the imposition of life sentences on juveniles who have not been adjudicated irreparably corrupt without providing them with a realistic and meaningful opportunity for release upon demonstrated maturity and rehabilitation." (Dkt. 1:52 ¶ 194.) Plaintiffs claim that Defendants have denied them a "meaningful opportunity for release" in violation of the Eighth Amendment. (Dkt. 1:52 ¶ 195.)

Second, they claim that "Defendants' conduct and actions in conducting the parole consideration process deny Plaintiffs, and other Class Members, due process of law to secure their liberty interest in parole release, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." (Dkt. 1:53 ¶ 200.) They contend that their liberty interest derives from the Eighth Amendment, which, they claim, "confers upon juvenile

lifers a legitimate expectation of parole upon a showing of maturation and rehabilitation." (Dkt. 1:53 ¶ 199.)

Finally, they claim that their Sixth Amendment right to a jury trial has been violated because parole officials have increased their sentences based on facts that should have been found by a jury. (Dkt. 1:54–55 ¶¶ 205–209.)

As for relief, Plaintiffs ask the Court to certify the class and to declare "that Defendants are operating a parole scheme that violates the prohibition against cruel and unusual punishment in the Eighth Amendment, violates the Due Process Clause in the Fourteenth Amendment, and violates the right to a jury trial in the Sixth Amendment to the U.S. Constitution by denying Plaintiffs, and other Class Members, a meaningful and realistic opportunity for release upon a showing of rehabilitation and maturation, including by . . . [f]ailing to release on parole juvenile lifers who have demonstrated rehabilitation and maturity" and failing to provide ten other procedural protections. (Dkt. 1:55–56.)

They further seek to enjoin "Defendants immediately from continuing practices that violate the U.S. Constitution and to take remedial steps to address their past illegal conduct by granting Plaintiffs, and Class Members, a meaningful and realistic opportunity to demonstrate their rehabilitation, maturity, and readiness for release." (Dkt. 1:56–57.) Specifically, they ask the Court to order Defendants to "alter the Parole Commission's operating

procedures and DOC administrative regulations to enable Defendants to meaningfully analyze the questions of whether maturity and rehabilitation have been demonstrated, including by requiring that Defendants:"  (1) provide class members an opportunity to demonstrate maturity and rehabilitation in support of parole; (2) provide class members an opportunity to see and confront any evidence used against them; (3) permit class members to obtain counsel, at state expense, in preparation for parole interviews and to have counsel present and make statements at parole interviews; (4) allow the submission of evidence and arguments in support of a request for parole; (5) allow class members to present testimony from expert witnesses, at state expense; (6) establish and apply objective and non-arbitrary standards and procedures for use in parole decisions; (7) provide explanations as to what additional steps class members must take to obtain parole; (8) rely solely on facts related to class members' crimes that were found by a jury; and (9) reduce caseloads for commissioners so they have sufficient time to read and evaluate materials submitted by offenders. (Dkt. 1:57.)

Finally, Plaintiffs ask for "new release consideration interviews to all class members using a lawful standard and lawful procedures." (Dkt. 1:57–58.)

This Court screened the lawsuit and allowed Plaintiffs to proceed on all three claims. (Dkt. 3; 6.) Defendants now move to dismiss Plaintiffs' complaint for failure to state a claim upon which relief may be granted.

## LEGAL STANDARDS GOVERNING MOTIONS TO DISMISS

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the plaintiff alleges sufficient facts that would allow a court to reasonably infer that the defendant is liable for the alleged misconduct, but a court may decline to accept as true any allegations that "are no more than conclusions." *Id.* at 678–79. Although the question whether a complaint states a "plausible" claim for relief is context-dependent, a complaint must be dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

## ARGUMENT

I. **Plaintiffs' 42 U.S.C. § 1983 claims are barred by *Heck v. Humphrey* because a judgment in their favor would necessarily demonstrate the invalidity of the fact or duration of their sentences.**

Plaintiffs contend that their life with parole sentences have been unlawfully converted into *de facto* life without parole sentences. (Dkt. 1:2 ¶ 3.) This assertion forms the basis for all three of their constitutional claims and

14

necessarily involves a challenge to both the fact and duration of their sentences. As such, Plaintiffs' claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

In *Heck*, the Supreme Court held that a prisoner in state custody cannot use 42 U.S.C. § 1983 to challenge the "fact or duration of his confinement." *Id*. at 481. *Heck* bars a plaintiff's suit under § 1983 where "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence" unless the plaintiff can show that the conviction or sentence has already been invalidated. *Id*. at 487. The *Heck* bar applies to a state prisoner's § 1983 action "no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 80–81 (2005).

*Heck* not only bars § 1983 challenges to the substance of a conviction or sentence; it also bars challenges to procedures where "the nature of the challenges to the procedures could be such as necessarily to imply the invalidity" of the conviction or sentence. *Edwards v. Balisok*, 520 U.S. 641, 645 (1997). In *Edwards*, the Supreme Court held that *Heck* barred a prisoner's § 1983 challenge to the procedures used in his disciplinary hearing because his

claim that the decisionmaker was biased necessarily implied the invalidity of the discipline and subsequent loss of good-time credits. *Id*. at 646.

Procedural claims that necessarily imply the invalidity of a conviction or sentence are *Heck*-barred; but procedural claims that do not call into question the lawfulness of the prisoner's continued confinement are not. For example, in *Wilkinson*, the Supreme Court held that a challenge to state parole procedures under § 1983 was not *Heck*-barred because the prisoners were not seeking "an injunction ordering [their] immediate or speedier release into the community." *Wilkinson*, 544 U.S. at 82. Rather, if successful the prisoners would at most obtain a speedier or new parole hearing at which the parole board would have discretion to shorten their prison terms. *Id*. "Because neither prisoner's claim would necessarily spell speedier release," the Court concluded that § 1983 relief was available. *Id*.

Plaintiffs claim they "do not challenge their criminal convictions [or] seek to invalidate their sentences." (Dkt. 1:3 ¶ 8.) But their pleadings belie this assertion. They challenge both the fact and duration of their sentences.

First, Plaintiffs challenge their sentences themselves as unconstitutional. They claim that the procedures used in considering parole of juveniles serving life sentences "ostensibly creat[e] a life-without-parole sentence" in violation of the Constitution. (Dkt. 1:2 ¶ 3.) This claim—that their life with parole sentences have been unlawfully converted into *de facto* life

without parole sentences—is a direct challenge to Plaintiffs' sentences themselves. Such a claim, if successful, would necessarily render their sentences unconstitutional and invalid. *Heck* bars such a challenge.

Second, Plaintiffs challenge the duration of their sentences and seek immediate or speedier release. Plaintiffs repeatedly claim they are *entitled* to release upon a showing of maturity and rehabilitation. They claim they have a "legitimate expectation of parole upon a showing of maturation and rehabilitation." (Dkt. 1:53 ¶ 199.) And they seek a declaration that the Defendants violated the Constitution by "[f]ailing to release on parole juvenile lifers who have demonstrated rehabilitation and maturity." (Dkt. 1:56.)

Unlike the plaintiffs in *Wilkinson* who sought new parole hearings where the parole board retained its discretion to grant or deny parole, Plaintiffs here want to eliminate the Parole Commission's discretion. They explicitly state that while discretionary parole is acceptable for adult offenders, parole officials "must provide juvenile offenders with more." (Dkt. 1:11 ¶ 40.) They seek procedural changes requiring a presumption of parole when certain factors— maturity and rehabilitation—are present. Plaintiffs claim that each of them has already demonstrated maturity and rehabilitation. If this Court agrees with Plaintiffs' legal premise, and they can prove their factual allegations, it follows that they must be released. On their own theory then, a judgment in

Plaintiffs' favor would necessarily affect the duration of their confinement. Therefore, this case is barred by *Heck*.

## II.     The complaint fails to state an Eighth Amendment claim because none of the plaintiffs were sentenced to life without parole, and all are receiving regular and meaningful parole hearings.

Plaintiffs claim that the Eighth Amendment forbids "a statutory scheme that mandates life imprisonment for juvenile offenders or permits the imposition of life sentences on juveniles who have not been adjudicated irreparably corrupt without providing them with a realistic and meaningful opportunity for release upon demonstrated maturity and rehabilitation." (Dkt. 1:52 ¶ 194.) Plaintiffs claim Wisconsin's parole system does not provide a "meaningful opportunity for release" and, therefore, creates a *de facto* life without parole sentence in violation of the Eighth Amendment. (Dkt. 1:2, 52 ¶¶ 3, 195.)

Plaintiffs' Eighth Amendment claim fails for three reasons: (1) the relevant Supreme Court cases restrict only life without parole sentences for juvenile offenders; (2) the relevant cases are limited to restricting sentencing procedures and do not dictate how states must administer their parole programs; and (3) even if the case holdings reach beyond sentencing, Plaintiffs are receiving regular and meaningful parole hearings. The Eighth Amendment claim raised by the four Plaintiffs convicted of homicide fails for the additional

reason that the relevant cases restrict only *mandatory* life without parole sentencing schemes, which Wisconsin has never had.

## A.     The relevant Supreme Court decisions on juvenile sentencing.

The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The concept of proportionality is central to the Eighth Amendment." *Graham*, 560 U.S. at 59. In a series of recent decisions—*Graham*, *Miller*, and *Montgomery*—the Supreme Court has addressed what sentences the Eighth Amendment's proportionality principle permits for juvenile offenders.

*Graham* categorically barred life imprisonment without parole as a sentence for offenders who committed non-homicide crimes as juveniles. 560 U.S. at 82. No penological theory could justify a life sentence without parole for a juvenile offender who had not committed murder. *Id.* at 71–74. Significantly, "[a] State is not required to guarantee eventual freedom" because some "who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives." *Id.* at 75. But a state must "give [juvenile] defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* The Court did not purport to dictate how a state must

provide that opportunity, stating that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." *Id.*

*Miller* held that a juvenile offender convicted of homicide cannot receive a mandatory sentence of life without parole. "Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Miller*, 567 U.S. at 476. A sentencer must have the opportunity to consider mitigating circumstances, *see id.* at 489, and "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. *Miller* did not adopt "a categorical bar on life without parole for juveniles." *Id.* at 479. It reserved the possibility that a sentencer could properly impose such a sentence on "the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 479–80 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005)).

In *Montgomery*, the Court considered whether its decision in *Miller* applied retroactively, that is, to convictions final before *Miller* was rendered. The Court concluded that it should. *Montgomery*, 136 S.Ct. at 734. Accordingly, convictions that were already final were subject to the principle that a mandatory sentence of life without parole for a juvenile is prohibited by the Eighth Amendment. *Id. Montgomery* addressed how a postconviction court might resolve a claim under *Miller*. Giving *Miller* retroactive effect did not

20

require a state to relitigate the sentence, much less the conviction, in a case in which a juvenile homicide offender received a mandatory sentence of life without parole. A state could comply with *Miller* either by re-sentencing the defendant or by providing him with parole consideration. *Id*. at 736. *Montgomery* reiterated that "prisoners who have shown an inability to reform will continue to serve life sentences." *Id.* However, "prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." *Id.*at 736–37.

## B. The cases on which Plaintiffs rely do not apply to juveniles who received sentences of life with parole eligibility.

Plaintiffs' two central premises upon which all their claims are based are stated in paragraph 194 of the complaint. Neither premise, though, was established by the Supreme Court in the cases on which Plaintiffs rely.

First, Plaintiffs claim that "[t]he Eighth Amendment to the U.S. Constitution forbids a statutory scheme that mandates life imprisonment for juvenile offenders." (Dkt. 1:52 ¶ 194.) That is wrong.

There is no dispute that *Miller* established that the Eighth Amendment prohibited sentencing schemes that mandated lifetime incarceration without the possibility of parole for juveniles. But as used in the Wisconsin statutes, "imprisonment" means the total sentence, including time spent on parole or

21

other community supervision. *See* Wis. Stat. §§ 973.013(1) (1991–92). Neither *Graham* nor *Miller* prohibited life sentences *with parole* for juveniles, mandatory or otherwise. *Graham* prohibited only sentencing juvenile nonhomicide offenders to life *without the possibility for parole*. *Graham*, 560 U.S. at 82. *Miller*, likewise, prohibited only sentencing schemes that *mandated life without parole* sentences for juvenile homicide offenders. *Miller*, 567 U.S. at 479.

Wisconsin does not now have and never had a sentencing scheme that mandated a life without parole sentence for any crime, and none of the Plaintiffs received a life without parole sentence.

Second, Plaintiffs claim the Eighth Amendment prohibits "the imposition of life sentences on juveniles who have not been adjudicated irreparabl[y] corrupt without providing them with a realistic and meaningful opportunity for release upon demonstrated maturity and rehabilitation." (Dkt. 1:52 ¶ 194.) That is also wrong. "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility." *Montgomery*, 136 S.Ct. at 736.

The Eighth Amendment does not prohibit life sentences *with* the possibility for parole for juveniles, and as discussed in section II.C. none of the cases on which Plaintiffs rely even arguably dictate to the states how they must

administer their parole programs. The complaint should be dismissed on this ground alone.

**C.     The relevant Supreme Court cases restrict only the *sentencer's* ability to impose a sentence of life without parole on a juvenile offender. None of the plaintiffs received such a sentence.**

Even assuming *Graham*, *Miller*, and *Montgomery* apply to juveniles who received life sentences with parole eligibility, Plaintiffs have failed to state a claim. These cases are limited to restricting states' sentencing procedures. None of the cases dictate how states must administer their parole programs. Plaintiffs here were all *sentenced* to life with the opportunity for parole. They have received regular parole reviews through the normal parole process. That is all that is required by the Eighth Amendment.

*Graham*, *Miller*, and *Montgomery* limit sentencing—not parole—practices. *Graham* held that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids *the sentence* of life without parole." 560 U.S. at 74 (emphasis added). *Miller* held that "the Eighth Amendment forbids *a sentencing scheme* that mandates life in prison without the possibility of parole for juvenile offenders." 567 U.S. at 479 (emphasis added). And *Montgomery* teaches that "[a] hearing where 'youth and its attendant characteristics' are considered *as sentencing factors* is necessary to separate

those juveniles who *may be sentenced to life without parole* from those who may not." 136 S.Ct. at 735 (emphasis added) (quoting *Miller*, 567 U.S. at 479).

These cases establish, at most, that the sentencer must have discretion to consider the mitigating characteristics of youth before sentencing a juvenile to life without parole. *See Montgomery*, 136 S.Ct. at 736; *Miller*, 567 U.S. at 483 *Graham*, 560 U.S. at 74. A sentence of life without parole assumes at the outset that the offender will never be fit to reenter society. *Graham*, 560 U.S. at 75. Thus, the sentencer must consider the offender's youth and attendant characteristics and reserve a life without parole sentence to only the rare juvenile offender whose crime reflects "irreparable corruption" or "permanent incorrigibility." *Miller*, 567 U.S. at 479–80; *Montgomery*, 136 S.Ct. at 734.

None of these cases dictate how states must administer their parole programs. They do not require states to implement special parole procedures for juvenile offenders. Nor do they raise the inference that the normal parole process is inadequate. In fact, they state the opposite. *Montgomery* teaches that states "may remedy a *Miller* violation" simply "by permitting juvenile homicide offenders to be considered for parole." *Montgomery*, 136 S.Ct. at 736. And *Graham* states that "[i]t is for the State, in the first instance, to explore the means and mechanisms for a compliance." 560 U.S. at 75.

Here, none of the plaintiffs were sentenced to life without parole. They all received parole eligibility dates well within their lifetime—indeed, only one

Plaintiff even reached 40 years old before being considered for parole, (Dkt. 1:4–5 ¶¶ 11–15)—and all are actively being considered for parole on a regular basis through Wisconsin's normal parole procedures. The fact that they have not yet been paroled does not render their sentences unconstitutional.

### D. Even if the relevant cases reach beyond sentencing, Plaintiffs are receiving regular and meaningful parole hearings.

Based on existing law, the Eighth Amendment requires, at most, that the sentencer consider a juvenile offender's youth and attendant characteristics before sentencing him to life without parole. *Miller*, 567 U.S. at 483. But even if the cases reach beyond sentencing, Plaintiffs' Eighth Amendment claim still fails because they have a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 479.

An "opportunity for release" does not mean automatic release. When a juvenile offender is sentenced to life with the opportunity for release, the "State is not required to guarantee eventual freedom" to that offender, nor is it required "release that offender during his natural life." *Graham*, 560 U.S. at 75.

"Opportunity for release" does not mean a presumption of parole upon a showing of maturity and rehabilitation, as Plaintiffs' suggest. (Dkt. 1:18 ¶ 15.) Had the Supreme Court meant that a juvenile *must* be released upon demonstrating maturity and rehabilitation, it would not have used the phrase

"opportunity to obtain release based on" those factors. *See Miller*, 567 U.S. at 479; *Montgomery*, 136 S.Ct. at 736. It would have said juvenile offenders who have matured and rehabilitated must be released. But it did not.

Relatedly, "opportunity for release" does not mean that the gravity of the crime must be deemed irrelevant when considering a juvenile offender for parole. (*See* Dkt. 1:16–17 ¶¶ 53, 56.)  Indeed, the Court in *Graham* explicitly stated that it had to consider the gravity of the offense when determining what punishment the Eighth Amendment permitted for juveniles. *Graham*, 560 U.S. at 68–69 ("The age of the offender and the nature of the crime each bear on the analysis."). Further, *Miller* expressly allows juveniles to be sentenced to life without parole due to the gravity of committing murder. The Court distinguished murder from all other offenses "based on both moral culpability and consequential harm." *Miller*, 567 U.S. at 473. And again, all these cases were about ensuring that juveniles do not serve sentences that are "disproportionate to the crime." *Graham*, 560 U.S. at 59. Proportionality works both ways: the punishment may not be disproportionately severe, but neither is the state required to release an offender before he or she has served a sentence proportionate to the gravity of the offense and the culpability of the offender. The severity of the offense is therefore a perfectly legitimate factor to consider when determining whether parole is appropriate.

Having dispensed with what "opportunity for release" does not mean, what it does mean is relatively simple. "Opportunity" means "a good chance for advancement or progress."[6] In other words, the Supreme Court indicated that juveniles must be given the *chance* to go to the parole authorities, show that they have matured and been rehabilitated, and advance toward release. *See Montgomery*, 136 S. Ct. at 736–37 ("prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored.")

Plaintiffs' own allegations show that they have all had an opportunity to go before the Parole Commission to show that they have matured and been rehabilitated.[7] They are all moving through the parole process and toward release.

Plaintiff King has been considered for parole four times. (Dkt. 1:30 ¶ 107.) The Commission is taking his efforts at rehabilitation seriously: it recognized that he had not had a major ticket in 14 years, his institutional

---

[6] *Opportunity*, Merriam–Webster Online¸ https://www.merriam-webster.com/dictionary/opportunity (last visited July 13, 2019)

[7] While the applicable administrative rule—Wis. Admin. Code § PAC 1.06—does not use the precise terminology of "demonstrated maturity and rehabilitation," the rule includes consideration of maturity and rehabilitation within other factors. Wis. Admin. Code § PAC 1.06(16)(b)–(e).

conduct was satisfactory, and he completed "all recommended needs." (Dkt. 1:30–31 ¶ 108.) The Commission also recognized that he was working toward getting an education but could not graduate until 2021. (Dkt. 1:31 ¶ 109.) The Commission determined, however, that he had not served sufficient time for punishment yet and denied release. (Dkt. 1:31 ¶ 108.)

The Commission told Plaintiff Sussek that at his next parole hearing "they could talk about a potential endorsement to a secure minimum facility . . . Then, Mr. Sussek could go to community custody and work release" for another 18 to 24 months. (Dkt. 1:43 ¶ 163.) The Commission told Sussek after that, Sussek "would realistically be considered for parole." (Dkt. 1:43 ¶ 163.)

The Commission also told Plaintiff Karow that he is "on the right track" for parole. (Dkt. 1:33 ¶ 118.) Karow was informed of the same job and community work release requirements as Sussek. (Dkt. 1:35 ¶ 126.) Karow also has been placed in minimum security at the Oakhill Correctional Institution supervised living facility. (Dkt. 1:35 ¶ 127.) He is moving toward fulfilling the requirements for release.

The complaint shows that the Commission is also taking plaintiff Price's efforts seriously: it "applauded Mr. Price's positive attitude, educational endeavors, willingness to help others through tutoring, and work ethic." (Dkt. 1:39 ¶ 144.) They told Price that "due to the senseless loss of life" additional time for punishment was warranted, but they also told him what he would

need to do to obtain release: he "would need to spend at least 24 months at a secure minimum-security facility, prove himself there, and then spend another 24 months at a work-release site." (Dkt. 1:39 ¶ 144.) That is far from making "its own sentencing determination" that he would *never* be paroled, as Plaintiffs' claim. (Dkt. 1:39 ¶ 145.)

Finally, Heredia's complaint is merely that he was not released at the earliest possible opportunity because, according to him, he "has accepted full responsibility for his actions" and "is no longer the follower he was as a teenager." (Dkt. 1:47 ¶¶ 180–81.) The Commission recognized that Heredia "continued to make progress" and that his "conduct has remained positive" but he had served only 13 years and 4 months—the lowest possible amount of incarceration time for killing a person. (Dkt. 1:48 ¶ 185.) It determined he needed to serve more time so not to depreciate the gravity of the offense. (Dkt. 1:48 ¶ 185.) Heredia then received a major disciplinary ticket that extended his parole review deferment. (Dkt. 1:49 ¶ 187.) He now complains that he is not receiving the programming he wants that "would help him further demonstrate his rehabilitation and readiness for release," but that is not a viable claim. (Dkt. 1:49 ¶ 188.) Heredia has no constitutional entitlement to participation in any particular prison program, and he has not shown that Wisconsin refuses to put him in programming—it simply is not doing so on Heredia's preferred timeline. And at any rate, completion of programming is

not required for an inmate to be recommended for release. Wis. Admin. Code § PAC 1.06(16)(e).

In sum, the facts alleged in the complaint show that all of the plaintiffs are being provided an opportunity—a good chance for progress toward— release, as required. They have not yet completed Wisconsin's parole requirements. But that does not mean that they never will or that Wisconsin has made it impossible for them to do so. Plaintiffs have failed to state a viable Eighth Amendment claim.

### E. The Eighth Amendment claim raised by the four Plaintiffs convicted of homicide fails for the additional reason that *Miller* restricts only *mandatory* life without parole sentencing schemes, which Wisconsin has never had.

Four of the Plaintiffs—King, Karow, Price, and Heredia—were convicted of homicide, which carries a mandatory life sentence. But they were sentenced to life *with parole*, as Wisconsin does not have a mandatory life without parole sentencing scheme. *Miller* restricts only *mandatory* life without parole sentencing schemes for juvenile homicide offenders. *Miller*, 567 U.S. at 479. Therefore, these four Plaintiffs' Eighth Amendment claims should be dismissed for this additional reason.[8]

---

[8] *Miller* does not apply to Plaintiff Sussek, as a non-homicide offender.

III.   **The complaint fails to state a procedural due process claim because there is no liberty interest in release on parole.**

Plaintiffs next assert a procedural due process claim, which they say springs from their Eighth Amendment claim. They allege that "[p]arole-eligible juvenile lifers who have not been adjudicated irreparably corrupt have a liberty interest, grounded in the Eighth Amendment, to release from imprisonment upon a showing of rehabilitation and maturity." (Dkt. 1:18 ¶ 59.) From this they claim they are entitled to a myriad of procedural protections,[9] untethered from the Supreme Court's Eighth Amendment cases from which their liberty interest supposedly derives. While *Graham*, *Miller*, and *Montgomery* do not support the procedural protections Plaintiffs seek, their due process claim fails for a more basic reason: they do not have a protected liberty interest in release on parole.

A.   **Plaintiffs have no liberty interest grounded in the Fourteenth Amendment or in state law.**

The Fourteenth Amendment provides, in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S.

---

[9] Plaintiffs claim they are entitled to an opportunity to demonstrate maturity and rehabilitation in support of parole; to see and confront any evidence used against them; to obtain counsel, at state expense, in preparation for parole interviews and to have counsel present and make statements at parole interviews; to submit evidence and arguments in support of a request for parole; to present testimony from expert witnesses, at state expense; to objective and non-arbitrary standards and procedures for use in parole decisions; to explanations as to what additional steps they must take to obtain parole; and to reduced caseload for commissioners to they have sufficient time to read and evaluate materials submitted by offenders. (Dkt. 1:55–57.)

Const. amend. XIV. Procedural due process claims involve a two-step analysis: first, the court must determine whether there is a liberty or property interest that has been interfered with by the state; and second, the court must determine whether the procedures attendant upon the deprivation were constitutionally sufficient. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). Without a protected liberty or property interest, the plaintiff is not entitled to any procedural protections. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). Thus, if a plaintiff fails on the first step of the analysis, the court need not reach the second step.

Liberty interests protected by the Fourteenth Amendment "may arise from two sources—the Due Process Clause itself and the laws of the States." *Thompson*, 490 U.S. at 460 (quoting *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)). The Due Process Clause itself does not create a liberty interest in release on parole. *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7 (1979). "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Id*. State law can create a liberty interest in the parole release decision, but only if it is framed in mandatory language. *Id*. at 11; *Board of Pardons v. Allen*, 482 U.S. 369, 377–78 (1987). In both *Greenholtz* and *Allen*, the Supreme Court found the parole statutes at issue created a liberty interest in parole release because they contained mandatory language—the use of the word "shall"—

32

that created a presumption that if certain criteria were satisfied, the prisoner would be released. *Greenholtz*, 422 U.S. at 12; *Allen*, 482 U.S. at 377–78.

Wisconsin, in contrast, has a discretionary parole system, which does not create a protectible liberty interest in release on parole. *Grennier v. Frank*, 453 F.3d 442, 444 (7th Cir. 2006) ("Grennier lacks a liberty or property interest" in release on parole under Wisconsin's discretionary parole system); *State ex rel. Gendrich v. Litscher*, 2001 WI App 163, ¶ 7, 246 Wis. 2d 814, 632 N.W.2d 878. ("Wisconsin's discretionary parole scheme does not create a protectible liberty interest in parole."). Plaintiffs have no liberty interest grounded in the Fourteenth Amendment or state law.

### B.    Plaintiffs have no liberty interest grounded in the Eighth Amendment.

Perhaps recognizing that they do not have a protected liberty interest derived from the only two sources identified by the Supreme Court, Plaintiffs propose a new source: the Eighth Amendment. There is no legal basis for Plaintiffs' assertion that the Eighth Amendment is the source of their liberty interest.

Plaintiffs rely on the same Supreme Court cases— *Graham*, *Miller*, and *Montgomery*—for their Fourteenth Amendment claim as they do for their Eighth Amendment claim. Their Fourteenth Amendment claim, therefore, fails for the same reasons as their Eighth Amendment claim. Plaintiffs are all

parole-eligible and have received regular parole reviews. That is all that is required by the holdings of those cases. *See supra*, 19–30.

Even if Plaintiffs have stated a valid Eighth Amendment claim, they have not stated a valid Fourteenth Amendment claim. The relevant Supreme Court cases do not include Fourteenth Amendment due process claims. The holdings of those cases—that certain punishments are disproportionate when applied to minors—are grounded solely in the Eighth Amendment. *Graham*, 560 U.S. at 58–75, 82; *Miller*, 567 U.S. at 479–80; *Montgomery*, 136 S. Ct. at 732–737. Those cases simply do not address whether juvenile offenders have a liberty interest in release on parole.

Nor do those cases implicitly create a liberty interest. The language used by the Supreme Court in describing the required opportunity for parole does not contemplate a liberty interest. In fact, the Court is very clear that juvenile offenders are not entitled to release; they are entitled only to an opportunity to be considered for release. In *Graham*, the Court explained that in providing an opportunity for parole, the state "is not required to guarantee eventual freedom." *Graham*, 560 U.S. at 75. The Eighth Amendment "does not require the State to release [the juvenile] offender during his natural life." *Id*. All that is required is "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. Significantly, the Court

34

emphasized that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." *Id*.

In *Montgomery*, the Court suggested that a state could remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole. *Montgomery*, 136 S. Ct. at 736–37. They "must be given the opportunity to show that their crime did not reflect irreparable corruption," but they are not entitled to release upon such a showing. *Id*. As an example of an appropriate remedy, the Court cited a Wyoming statute that does not provide a presumption of release for juvenile homicide offenders. It does not even provide for additional parole consideration beyond what is given to other offenders. *See id*. at 736 (citing Wyo. Stat. Ann. § 6-10-301(c) (2013)).

Plaintiffs conflate an entitlement to consideration for release on parole with an entitlement to release on parole. The latter creates a liberty interest; the former does not and is all that is required by *Graham*, *Miller*, and *Montgomery*. The relevant Supreme Court cases do not require mandatory parole for juvenile offenders. Nor does the Court mandate a presumptive parole system whereby the juvenile offender must be released if certain criteria are satisfied. Nothing in Supreme Court jurisprudence confers a liberty interest in release on juvenile offenders sentenced to life with the possibility of parole.

Plaintiffs, therefore, fail on the first step of the due process analysis, and their Fourteenth Amendment claim must be dismissed.[10]

## IV.   The complaint fails to state a Sixth Amendment claim because prisoners are not entitled to Sixth Amendment protections during parole reviews.

Citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, Plaintiffs claim that their Sixth Amendment right to a jury trial has been violated because parole officials have increased their sentences based on facts that should have been found by a jury. (Dkt. 1:54–55 ¶¶ 205–209.) This claim fails for two basic reasons: the Sixth Amendment does not apply to parole, and even if it did, parole officials have not exceeded Plaintiffs' life sentences. This claim must be dismissed for these and additional reasons.

### A.   The Sixth Amendment and the *Apprendi* line of cases do not apply to parole.

The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . to be informed of the nature and cause of the accusation; to be confronted with the

---

[10] This argument is not at odds with Defendants' argument that this case is *Heck*-barred. *Wilkinson* never addressed or superseded the liberty interest analysis; it merely identified parole claims that are not barred by *Heck*. Here, Plaintiffs cannot have it both ways. If they have a a "legitimate expectation of parole" creating a protectible liberty interest—as they claim—then their claim is barred by *Heck*. If, on the other hand, all they seek is a new parole hearing where the Parole Commission retains its discretion, then they have no protectible liberty interest. Plaintiffs' claim should be dismissed because one of those two reasons necessarily apply.

witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel in his defense." U.S. Const. amend. VI.

In a line of cases beginning with *Apprendi*, the Supreme Court imposed procedural limits on imposing certain enhancements of criminal punishments at sentencing. In *Apprendi*, the Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 530 U.S. at 489; *see also Ring v. Arizona*, 536 U.S. 584, (2002) (holding that facts increasing punishment beyond the maximum authorized by a guilty verdict must be proven beyond a reasonable doubt). The "'statutory maximum'" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington*, 542 U.S. 296, 303 (2004). Notably, *Blakely* teaches that indeterminate sentencing schemes do not violate the Sixth Amendment by invading the province of the jury, so long as the defendant is sentenced within the statutory maximum. *Id*. at 308–309. Finally, *Alleyne* extended the *Apprendi* rule to mandatory minimum sentencing, holding that any fact that "aggravates the legally prescribed range of allowable sentences" is an element that must submitted to the jury. *Alleyne v. United States*, 570 U.S. 99, 114–15 (2013).

Neither the Sixth Amendment nor the *Apprendi* line of cases apply to parole. By its express terms, the Sixth Amendment applies in "all criminal prosecutions." U.S. Const. amend. VI. But parole is not part of a criminal prosecution. *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). "Parole arises after the end of the criminal prosecution, including the imposition of sentence." *Id*. And there is no right to a jury trial or to proof beyond a reasonable doubt in a parole hearing. *See United States v. Knights*, 534 U.S. 112, 120 (2001) ("trial rights of a jury and proof beyond a reasonable doubt" inapplicable in probation revocation proceedings). There is no authority for extending *Apprendi* to parole. In fact, courts that have addressed the issue have held that the that Sixth Amendment does *not* apply in this context. *See Rush v. Kane*, No. C 05-4143 CRB, 2007 WL 4166032, at *7 (N.D. Cal. Nov. 19, 2007) (Sixth Amendment and *Apprendi* inapplicable to parole denial based in part on board's characterization of offense); *Genniro v. Salazar*, No. SA CV 08-543-JVS(E), 2008 WL 4962861, at *8–9 (C.D. Cal. Oct. 20, 2008 (collecting cases); *Villareal v. Swarthout*, No. CIV S-11-2499 GEB, 2011 WL 5104472, at *2 (E.D. Cal. Oct. 26, 2011).

Here, Plaintiffs' claim fails because the Sixth Amendment does not apply to parole. Even if it did, however, the *Apprendi* line of cases do not apply to indeterminate sentencing within the permitted sentencing range. *Blakely*, 542 U.S. at 308–09. Plaintiffs here all received indeterminate sentences to life or,

in Plaintiff Sussek's case, to a term of years exceeding his life expectancy. (Dkt. 1:4–5 ¶¶ 11–15.) Life is therefore Plaintiffs' maximum term, subject only to the power of the Parole Commission to release them from confinement sooner. *See* Wis. Stat. § 973.013(1) (1991–92). In denying Plaintiffs release on parole, then, Defendants did not increase Plaintiffs' sentences beyond the maximum life term imposed at sentencing.

Nor did Defendants increase Plaintiffs' minimum sentence. Plaintiffs once again confuse parole eligibility with parole suitability. The sentencing judge establishes the former, within statutory limits, whereas the Parole Commission determines the latter. There is no dispute that Plaintiffs all received parole eligibility dates and have had regular parole reviews. (Dkt. 1:4–5 ¶¶ 11–15.) With indeterminate sentences, a prisoner has no *right* to a lesser sentence by release on his parole eligibility date; he is simply entitled to a parole hearing where the Parole Commission, in its discretion, determines whether the offender is suitable for release. *See Blakely*, 542 U.S. at 309. Defendants have not used any fact to increase Plaintiffs' sentences beyond the minimum or maximum imposed at sentencing. *Apprendi* and its progeny do not apply here, and Plaintiffs' fail to state a claim for a violation of the Sixth Amendment.

**B.     Plaintiff's Sixth Amendment claim is built on numerous faulty propositions.**

Even if Plaintiffs could overcome the basic problems outlined above, their Sixth Amendment claim is built on numerous faulty propositions, any one of which is fatal to their claim.

First, their Sixth Amendment claim rests on their faulty Eighth Amendment claim. As discussed in section II above, the relevant Supreme Court cases do not apply to juveniles who were sentenced to life with parole eligibility, and even if they did, they do not apply beyond sentencing and do not require different parole procedures for juvenile offenders. *See supra,* 19–30. Plaintiffs' Sixth Amendment claim, therefore, fails for the same reasons as their Eighth Amendment claim.

Second, Plaintiffs' claim assumes that "irreparable corruption" must be found by a jury before a juvenile can be sentenced to life without parole. No federal case supports this assumption. In fact, the Supreme Court says just the opposite: *Montgomery* expressly states that the sentencing court is *not* required to make this finding. *Montgomery*, 136 S.Ct. at 736 ("*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility."). Plaintiffs appear to concede this, as their only support is an Oklahoma Court of Criminal Appeals case, which provides no reasoning for its conclusion. (Dkt.

5:6 n.5 (citing *Stevens v. State*, 422 P.3d 741, 750 (Okla. Crim. App. 2018); 6:2 n.1.)

They also attempt to analogize their situation to death penalty cases, where the Supreme Court has held that statutorily "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'" and must be found by a jury. (Dkt. 5:6–7 (citing *Ring*, 536 U.S. at 609.) But the death penalty cases have no applicability here. The Supreme Court has specifically said that death penalty jurisprudence may not be extended outside the capital context because of the qualitative difference between death and all other penalties. *See Harmelin v. Michigan*, 501 U.S. 957, 993–94 (1991). "[W]e have held that 'death is different,' and have imposed protections that the Constitution nowhere else provides. We would leave it there, but will not extend it further." *Id*. at 994 (citations omitted). The Court has drawn a sharp distinction between capital and non-capital cases, due to the gravity, uniqueness, and irrevocability of a death sentence. *Lockett v. Ohio*, 438 U.S. 586, 603–04 (1978). Accordingly, defendants in capital sentencing proceedings are afforded far greater constitutional procedural rights than in non-capital proceedings. *Id*. at 603–04; *Harmelin*, 501 U.S. at 994 (collecting cases). There is no support for extending those procedural protections beyond death penalty cases.

Finally, Plaintiffs' Sixth Amendment claim assumes that they will not be paroled in their lifetimes. The complaint does not support this assumption. Plaintiffs have had, and continue to have, regular opportunities to demonstrate their suitability for release. There is no allegation that the Parole Commission has found them to be irreparably corrupt or indicated that they will never be paroled. Just the opposite. The allegations in the complaint show that Plaintiffs are all advancing through the parole process toward release. (Dkt. 1:27–50 ¶¶ 92–189.) The Commission has determined that they are not yet appropriate for release, but that does not mean that they never will be. Plaintiffs' Sixth Amendment fails as a matter of law.

**V.  In the alternative, this Court should stay this case pending a decision by the United States Supreme Court in *Mathena v. Malvo*, Case No. 18-217.**

If this Court does not dismiss this case for failure to state a claim, the case should be stayed pending the Supreme Court's decision in *Mathena v. Malvo*, No. 18-217, because *Malvo* may entirely foreclose Plaintiffs' claims.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time an effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In deciding whether to grant a stay, courts "must weigh competing interests and maintain an even balance." *Id.* at 254–55. Notably, "[a] stay pending the outcome of the litigation in another court . . .

involving the same or controlling issues is an acceptable means of avoiding unnecessary duplication of the judicial machinery." *Aetna State Bank v. Altheimer*, 430 F. 2d 750, 755 (7th Cir. 1970).

In the alternative, this Court should stay this case pending the Supreme Court's decision in *Malvo* because a decision in that case may completely foreclose any arguable claim here. The question presented in *Malvo* is: Did the Fourth Circuit err in concluding that a decision of the Supreme Court (*Montgomery*) addressing whether a new constitutional rule (from *Miller*) applies retroactively on collateral review may substantively expanding the very rule whose retroactivity is in question. That Fourth Circuit ruling was in direct conflict with Virginia's highest court and other courts.[11]

*Miller* held that a juvenile offender convicted of homicide cannot receive a mandatory sentence of life without parole. *Miller*, 567 U.S. at 479. In their attempt to use *Miller*, Plaintiffs' claims here require multiple analytical steps to be true. One of those steps is the assumption that *Montgomery* expanded *Miller* such that it restricts non-mandatory sentencing schemes, like Wisconsin's, and that *Miller* and *Montgomery* hold that they must be

---

[11] It is important to note the procedural posture of *Malvo*. Typically, a habeas case, like that one, would be reviewed under the highly deferential standard under 28 U.S.C. § 2254(d), assessing only whether a state court's decision was objectively unreasonable. But there, because of some procedural irregularities, the Supreme Court is addressing the claim de novo and directly on the merits.

adjudicated irreparably corrupt or released at the earliest possible opportunity. But the Supreme Court this term may very well hold that *Miller* did no more than what it purported to do: invalidate mandatory life without parole sentencing schemes—which, again, Wisconsin has never had.

If the *Malvo* Court rules in that way, it would foreclose one of the analytical hurdles necessary for Plaintiffs to prevail here. To be clear, and as discussed above, that is not the only analytical hurdle Plaintiffs must overcome; rather, this Court should dismiss outright because there are multiple problems with their theory. But, if the Court does not, a decision in *Malvo* may inject another, fatal barrier. It may definitively remove even the possibility that the Eighth Amendment requires anything more than what Wisconsin has always provided: discretion for the sentencing court to consider a juvenile defendant's youth and attendant characteristics at sentencing.

Further, a stay will clarify and streamline any subsequent litigation, and will not unduly prejudice the Plaintiffs. This case is in a very early stage of litigation. Defendants' motion to dismiss is pending, they have not yet answered the complaint, and there is no scheduling order. The delay caused by the stay will therefore not interfere with discovery or briefing deadlines and will likely be insubstantial given that briefing in *Malvo* is well underway and oral argument is scheduled for October 16, 2019. Thus, if this Court does not

dismiss the case outright, this Court should stay this case pending a decision in *Malvo*.

## CONCLUSION

This Court should dismiss the complaint in its entirety. In the alternative, the Court should stay the case pending a decision by the United States Supreme Court in *Mathena v. Malvo*, Case No. 18-217.

Dated this 9th day of August, 2019.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Karla Z. Keckhaver
KARLA Z. KECKHAVER
Assistant Attorney General
State Bar #1028242

LISA E. KUMFER
Assistant Attorney General
State Bar #1099788

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6365 (KZK)
(608 267-2796 (LEK)
(608) 267-2223 (Fax)
keckhaverkz@doj.state.wi.us
kumferle@doj.state.wi.us