## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

VICTORIANO HEREDIA, DONTAE
DOYLE, JUMAR JONES, BARNEY
GUARNERO, DUJUAN NASH, JOSEPH
OROSCO, BRIAN PHEIL, and DENG
YANG on behalf of themselves and all
others similarly situated,

                     Plaintiffs,

            -against-

JOHN TATE II, AS CHAIRPERSON AND
COMMISSIONER OF THE WISCONSIN
PAROLE COMMISSION; JENNIFER
KRAMER, AS COMMISSIONER OF THE
WISCONSIN PAROLE COMMISSION;
DOUGLAS DRANKIEWICZ, AS
COMMISSIONER OF THE WISCONSIN
PAROLE COMMISSION; KEVIN CARR,
AS SECRETARY-DESIGNEE OF THE
WISCONSIN DEPARTMENT OF
CORRECTIONS; and ANGELA HANSEN,
AS DIRECTOR OF THE BUREAU OF
CLASSIFICATION AND MOVEMENT, all
in their official capacities,

                     Defendants.

Case No. 19-cv-338

## TABLE OF CONTENTS

CLASS ACTION COMPLAINT...................................................................... 1

INTRODUCTION ......................................................................................... 1

JURISDICTION AND VENUE ...................................................................... 3

PARTIES ...................................................................................................... 3

    A.    PLAINTIFFS ...................................................................... 3

    B.    DEFENDANTS ................................................................... 6

FACTUAL ALLEGATIONS ......................................................................... 8

I.    JUVENILES HAVE DIMINISHED CULPABILITY AND GREATER
PROSPECTS FOR REFORM THAN ADULTS, AND THE STATE MUST
PROVIDE LIFE-SENTENCED JUVENILES A MEANINGFUL
OPPORTUNITY FOR RELEASE BASED ON DEMONSTRATED MATURITY
AND REHABILITATION. ........................................................................ 8

    A.    THE RELEVANT SCIENTIFIC COMMUNITIES HAVE
RECOGNIZED THAT CHILDREN ARE CATEGORICALLY
DIFFERENT FROM ADULTS. .......................................................... 8

    B.    THE LAW REQUIRES DIFFERENT TREATMENT OF CHILDREN. ........... 10

    C.    LIFE SENTENCES IMPOSED ON CHILDREN ARE
UNCONSTITUTIONAL ABSENT A PAROLE SCHEME THAT
PROVIDES A MEANINGFUL AND REALISTIC OPPORTUNITY TO
OBTAIN RELEASE BASED ON DEMONSTRATED MATURITY AND
REHABILITATION. ...................................................................... 12

II.    WISCONSIN SUBJECTS JUVENILE LIFERS TO UNCONSTITUTIONALLY
DISPROPORTIONATE PUNISHMENT BY DENYING THEM A
MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE BASED
ON DEMONSTRATED MATURITY AND REHABILITATION. .............................. 13

    A.    APPLICABLE WISCONSIN SENTENCING LAW MANDATED LIFE
SENTENCES WITH THE POSSIBILITY OF PAROLE FOR JUVENILE
OFFENDERS AS YOUNG AS 10 YEARS OLD. .............................. 13

    B.    THE WISCONSIN PAROLE COMMISSION DOES NOT EVALUATE
JUVENILE LIFERS FOR PAROLE RELEASE UNDER THE
STANDARD OF DEMONSTRATED MATURITY AND
REHABILITATION. ...................................................................... 17

    C.    THE PROCEDURES OF THE WISCONSIN PAROLE COMMISSION
FAIL TO AFFORD JUVENILE LIFERS A MEANINGFUL AND
REALISTIC OPPORTUNITY FOR RELEASE UPON
REHABILITATION. ...................................................................... 20

       1.       THE DEPARTMENT OF CORRECTIONS ADMINISTRATIVE RULES, IN COMBINATION WITH THE PAROLE COMMISSION'S RELIANCE ON CLASSIFICATION AND PROGRAMMING DECISIONS MADE BY OTHER ENTITIES, DENIES JUVENILE LIFERS A MEANINGFUL OPPORTUNITY FOR RELEASE. ........................................................ 21

       2.       THE PAROLE COMMISSION'S RULES AND PRACTICES PROHIBIT JUVENILE LIFERS FROM PRESENTING EVIDENCE OF MATURITY AND REHABILITATION. .................... 27

   D.     DEFENDANTS ROUTINELY DENY PAROLE BASED ON FACTS THAT WERE NOT FOUND BY A JURY OR ADMITTED BY THE PAROLE APPLICANT. ...................................................................... 32

   E.     PLAINTIFFS HAVE REPEATEDLY BEEN DENIED A MEANINGFUL OPPORTUNITY FOR RELEASE BASED ON DEMONSTRATED MATURITY AND REHABILITATION. ........................................... 34

CLASS ACTION ALLEGATIONS ................................................................................ 99

CAUSES OF ACTION ............................................................................................... 101

FIRST CAUSE OF ACTION ..................................................................................... 101

SECOND CAUSE OF ACTION .................................................................................. 102

THIRD CAUSE OF ACTION ..................................................................................... 103

PRAYER FOR RELIEF .............................................................................................. 104

## CLASS ACTION COMPLAINT

Plaintiffs VICTORIANO HEREDIA, DONTAE DOYLE, JUMAR JONES, BARNEY GUARNERO, DUJUAN NASH, JOSEPH OROSCO, BRIAN PHEIL, and DENG YANG (referred to hereinafter as "Named Plaintiffs" or "Plaintiffs"), on behalf of themselves and those similarly situated, by and through their attorneys, as and for their Complaint, allege the following:

## INTRODUCTION

1.      The U.S. Supreme Court has recognized that, "children are constitutionally different from adults for purposes of sentencing." *Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016) (quoting *Miller v. Alabama*, 567 U.S. 460, 471 (2012)).

2.      Accordingly, the Supreme Court has held that the Eighth Amendment categorically prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. *Graham v. Florida*, 560 U.S. 48 (2010). The Court made the rule a categorical one "to prevent the possibility that life without parole sentences will be imposed on juvenile non-homicide offenders who are not sufficiently culpable to merit that punishment." *Id.*

3.      The Supreme Court has held that it is also unconstitutional to sentence juveniles, even those who commit heinous crimes, including homicide, to life without parole, unless the child is the "rare juvenile offender whose crime reflects irreparable corruption." *Montgomery*, 136 S. Ct. at 734 (2016) (*quoting Miller*, 567 U.S. at 479–80); *Graham v. Florida*, 560 U.S. 48, 82 (2010). Absent a finding of irreparable corruption, therefore, states must offer all child offenders a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham,* 560 U.S. at 75.

4.      Wisconsin's system for the parole of juvenile offenders fails to provide this meaningful opportunity; thus, it violates the U.S. Constitution.

5.      Defendants consistently deny release on parole to juvenile lifers who demonstrate unmistakable maturity, rehabilitation and reform, and a low risk to public safety, in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

6.      Defendants regularly rely on purported "facts" that were neither found by a jury nor admitted by the person at the time to enhance the penalty imposed on juvenile lifers, in violation of the Sixth Amendment's right to a jury determination of facts affecting sentence.

7.      On information and belief, only a minuscule number of parole-eligible juvenile lifers have been paroled during the past 15 years.

8.      Plaintiffs are individuals who were convicted of crimes committed when they were children under the age of 18 and sentenced to life—or to terms of years that extend beyond their life expectancy—with the opportunity to seek parole after serving a statutorily calculated minimum prison term. They have been, continue to be, or will be subject to punishment disproportionate to their diminished juvenile culpability and deprived of due process of law as Defendants deny them a realistic and meaningful opportunity for release based upon demonstrated maturity and rehabilitation.

9.      This is an action for declaratory and injunctive relief. Named Plaintiffs do not challenge their criminal convictions nor seek to invalidate their sentences. Rather, they seek an order that Defendants must afford them, and all of those similarly situated—a group of more than 120 individuals—a meaningful opportunity to obtain release as of their parole eligibility date, based on the constitutionally mandated standard of demonstrated maturity and rehabilitation.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3). The controversy arises under the Sixth, Eighth, and Fourteenth Amendments to the

U.S. Constitution.

11.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2)

because each of the Defendants reside and have their principal place of business in the Western

District of Wisconsin, a majority of Plaintiffs are or were incarcerated within the Western

District of Wisconsin, and Defendants have conducted parole interviews and taken other actions

leading to the denial of Plaintiffs' rights, as alleged further herein, within the Western District of

Wisconsin.

## PARTIES

### A.    Plaintiffs

12.    Plaintiff Victoriano Heredia is an inmate at Fox Lake Correctional Institution, in

Fox Lake, Wisconsin. He was convicted of first-degree intentional homicide party to a crime; he

committed this crime at the age of 17. In 1997, he was sentenced to life in prison, with eligibility

to seek parole in 2010. He has served 21 years in prison and has been denied parole four times,

most recently on October 20, 2020. He has been repeatedly denied lower security classification

status and access to programming despite his excellent institutional record.

13.    Plaintiff Dontae Doyle is currently incarcerated at Redgranite Correctional

Institution in Redgranite, Wisconsin. Despite his assertions of innocence, on October 20, 2000,

Mr. Doyle was convicted of eight counts of armed robbery, second degree recklessly

endangering safety, attempted armed robbery, and eluding an officer in a vehicle. Mr. Doyle was

sentenced to 87 years. In 2018, Mr. Doyle successfully challenged his sentence, and received a

sentence modification which reduced his sentence from 87 years to 50 with a consecutive 20-

year term of probation which has a 45-year imposed and stayed sentence. This sentence modification made him immediately parole eligible. He has been incarcerated for 20 years and was denied parole once.

14.     Plaintiff Jumar Jones is incarcerated at Redgranite Correctional Institution in Redgranite, Wisconsin. In 1996, he pled guilty to three counts of armed robbery party to a crime and one count of felony murder for a series of armed robberies he committed in the company of older peers in 1995 and 1996 when he was 17 years old. He was sentenced to 105 years with eligibility to seek release to parole supervision in 2022. He has served 24 years in prison and has been denied a lower security classification status and access to programming which the Wisconsin Parole Commission requires him to have achieved in order to be released at his upcoming parole eligibility date.

15.     Plaintiff Joseph Orosco is incarcerated at Stanley Correctional Institution in Stanley, Wisconsin. In 1997, he pled guilty to 1st degree intentional homicide for a murder he committed in 1996 when he was just 16 years old. He was sentenced to life with eligibility to seek release to parole supervision in 2018. He has served 23 years in prison and has been denied a lower security classification status which the Wisconsin Parole Commission requires him to have achieved in order to be released at his upcoming parole eligibility date.

16.     Plaintiff Dujuan Nash is incarcerated at the Waupan Correctional Institute in Waupan, Wisconsin, where he is completing the Trinity Bachelor's program. In 1999, Plaintiff Nash pled guilty in adult court to reckless homicide and mutilating a corpse; crimes he committed at the age of 17 years old. He was sentenced to 50 years. He has served over 21 years in prison and has been denied parole three times.

17.     Plaintiff Brian Pheil is incarcerated at New Lisbon Correctional Institution in Superior, Wisconsin. He was convicted of being a party to first-degree murder, armed robbery, burglary, and theft; he was a party to these crimes at the age of 17. In 1988, he was sentenced to life in prison, plus 35 years to be served concurrently, with the retributive portion of his sentence set at 17 years and eligibility for parole thereafter. He has served 33 years in prison, 16 years beyond the retributive portion of his sentence, and has been denied parole seven times.

18.     Plaintiff Barney Guarnero is incarcerated at the Oshkosh Correctional Institution in Oshkosh, Wisconsin. In 1997, at the age of 17, he was charged with first-degree reckless homicide and first- degree reckless injury with a dangerous weapon at the age of 17. He agreed to take a plea deal of forty-five years with eligibility for parole after serving 12 years, but at sentencing the judge disregarded the plea deal and he was sentenced to a total of 60 years with eligibility for parole after serving 15 years. He has now served 23 years in prison and has been denied parole three times.

19.     Plaintiff Deng Yang is incarcerated at Stanley Correctional Institution in Stanley, Wisconsin serving a life sentence for a crime he committed at the age of 15. In 1998, Mr. Yang was sentenced to life in prison after pleading guilty to attempted first-degree intentional homicide, with eligibility to seek parole in 2011. Although his plea deal was based on being eligible for parole after serving 13 years and 4 months, he has served nearly 23 years in prison and has been denied parole seven times.

20.     Plaintiffs bring this action individually and on behalf of a class consisting of all persons who are or will become eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to life or a term of

years exceeding their life expectancy in the custody of the Wisconsin Department of Corrections ("DOC") ("juvenile lifers" or "Class Members").[1]

**B.    Defendants**

21.    Defendant John Tate II is the chairperson and a commissioner of the Wisconsin Parole Commission ("Parole Commission" or "Commission"). As chairperson, Defendant Tate is responsible for the administrative functions and supervision of "the [parole] commission and its activities and shall be the final parole-granting authority . . . ." Wis. Stat. § 304.01(1). The chairperson must approve or disapprove of any other commissioner's recommendation for release. Wis. Adm. Code § 1.07(1), (4) (commissioner "shall make the recommendation of release to the chairperson," and if the chairperson "disagrees with a recommendation of the commissioner, the chairperson shall inform the inmate."). The chairperson must also approve any deferral of more than one year for subsequent parole consideration. Wis. Adm. Code § PAC 1.06(9). As a parole commissioner, Defendant Tate is responsible for conducting "release consideration interviews" and making decisions to deny parole and determining the length of time, up to one year, before the applicant may seek parole again (the "deferral period"). Wis. Adm. Code §§ PAC 1.06(5), (7)–(9); § PAC 1.07(1) (commissioner "may deny release and defer consideration for a specified period of time"). The time period for renewed consideration is called a deferral period. Commissioners may also make "recommendations" to the chair that a prisoner be released (§ PAC 1.07(1)), but the chair makes the final decision when release is recommended. *Id.* at 1.07(4); Wis. Stat. § 304.01(1) (chairperson is "final parole-granting authority"). Defendant Tate is sued in his official capacity.

---

[1] This case challenges the parole system as applied to people convicted of crimes committed as minors prior to January 1, 2000. Truth-in-Sentencing eliminated parole in Wisconsin for crimes committed on or after January 1, 2000.

22.     Defendant Jennifer Kramer is a parole commissioner. Defendant Kramer conducts "release consideration interviews," makes decisions to deny parole, determines the deferral period, and also may make recommendations for release to the chair. Wis. Adm. Code §§ PAC 1.06(5), (7)–(9). Defendant Kramer is sued in her official capacity.

23.     Defendant Douglas Drankiewicz is a parole commissioner. Defendant Drankiewicz conducts "release consideration interviews," makes decisions to deny parole, determines the deferral period, and also may make recommendations for release to the chair. Wis. Adm. Code §§ PAC 1.06(5), (7)–(9). Defendant Drankiewicz is sued in his official capacity.

24.     Defendant Kevin Carr is the Secretary of the Wisconsin DOC, and in that capacity carries out the DOC's obligation to "[a]dminister parole, extended supervision, and probation matters, except that the decision to grant or deny parole to inmates shall be made by the parole commission." Wis. Stat. § 301.03(3). The DOC under Defendant Carr must also, "provide . . . to the parole commission: (a) Records relating to inmates which . . . are necessary to the conduct of the [parole] commission's responsibilities. (b) Scheduling assistance for parole interviews . . . (c) Clerical support related to parole interviews. (d) Appropriate physical space . . . to conduct the parole interviews." Wis. Stat. § 304.01(2). Defendant Carr also has supervisory authority over the DOC's Bureau of Classification and Movement ("BOCM"), which determines prisoners' security classification, housing status and program access. Defendant Carr is sued in his official capacity.

25.     Defendant Angela Hansen is Director of the BOCM within the Division of Adult Institutions in the Wisconsin DOC and is sued in his official capacity. The BOCM, with input from institution-level reclassification or Program Review Committees, determines the security

7

classification, the assignment of inmates to different institutions within the Wisconsin prison

system, and eligibility for certain work assignments needed for parole. Wis. Adm. Code § DOC

302.17.

26.     In practice, the Parole Commission denies release to any person with a security

classification above minimum security. In addition, the Parole Commission requires inmates to

participate in work "outside the fence" before granting parole. Yet, the BOCM and Program

Review Committees control eligibility for such work while the Parole Commission can only

recommend it.

## FACTUAL ALLEGATIONS

I.     **JUVENILES HAVE DIMINISHED CULPABILITY AND GREATER PROSPECTS FOR REFORM THAN ADULTS, AND THE STATE MUST PROVIDE LIFE-SENTENCED JUVENILES A MEANINGFUL OPPORTUNITY FOR RELEASE BASED ON DEMONSTRATED MATURITY AND REHABILITATION.**

   A.     **The relevant scientific communities have recognized that children are categorically different from adults.**

27.     Scientific and psychological studies confirm that children are fundamentally

different from adults and as a result their culpability is diminished.

28.     The first characteristic of youth that diminishes the culpability of juvenile

offenders is their lack of maturity and an underdeveloped sense of responsibility. *See* Laurence

Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental

Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist

1009, 1011–14 (2003).

29.     Children's lack of maturity often results in impetuous and ill-considered actions

and decisions (*i.e.*, impulsive conduct), which explains why "adolescents are overrepresented

statistically in virtually every category of reckless behavior." Jeffrey Arnett, *Reckless Behavior

*in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339, 339 (1992); *see also* Laurence Steinberg & Robert G. Schwartz, *Developmental Psychology Goes to Court*, in *Youth on Trial: A Developmental Perspective on Juvenile Justice* 9 (Thomas Grisso & Robert G. Schwartz eds. 2000).

30.     Developmental research shows that juveniles engage in impulsive decision-making because they are unable to fully perceive and evaluate risks. Melinda G. Schmidt et al., *Effectiveness of Participation as a Defendant: The Attorney-Juvenile Client Relationship*, 21 Behav. Sci. & L. 175, 180 (2003). Another explanation for their impulsive behavior is that juveniles think more about immediate gains as opposed to long-term consequences. *Id.*; *see also* Kristin N. Henning, *Loyalty, Paternalism, and Rights: Client Counseling Theory and the Role of Child's Counsel in Delinquency Cases*, 81 Notre Dame L. Rev. 245, 271–72 (2005).

31.     A second characteristic difference between adults and adolescents is that juveniles are more vulnerable to negative influences and outside pressures, including peer pressure. Steinberg & Scott, *supra*, at 1014.

32.     Children's susceptibility to outside pressure is explained, at least in part, by the fact that they have less control, or less experience with control, over their own environment than adults. *Id.*

33.     It is no surprise, therefore, that psychologists have concluded that juveniles "lack the freedom that adults have to extricate themselves from a criminogenic setting." *Id.*

34.     A third characteristic difference between adults and adolescents is that the character of a juvenile is not as well formed as that of an adult. Specifically, psychologists and psychoanalysts have recognized that the personality traits of juveniles are more transitory than

those of adults. *See generally*, Erik H. Erikson, *Identity: Youth and Crisis* (1968); *see also* Steinberg & Scott, *supra*, at 1014.

35.     Psychologists have recognized that most adolescents' impulsive and risky behaviors "cease with maturity" as their identities become settled, they learn to consider long-term consequences of potential actions prior to making choices, and they gain the resources and capacities to extricate themselves from negative influences. Steinberg & Scott, *supra*, at 1014.

36.     As adolescents mature into adults, they gain an improved perspective on long-term consequences, become more risk averse and gain the self-regulatory capacities to conform their actions to moral evaluation. Kristin Henning, *supra*, at 272. They "also come to regret decisions they made in earlier years." *Id.*

37.     The behavior of adolescents evolves so much as they grow up that studies recognize that "[o]nly a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood." Steinberg & Scott, *supra*, at 1014 (citations omitted).

**B.     The law requires different treatment of children.**

38.     Courts and legislatures have long recognized that children are not fully psychologically and socially developed, are susceptible to persuasion and abuse, and are marked by judgmental inexperience such that it is appropriate to limit their ability as a class to vote, marry, serve on juries, drink alcohol, gamble, leave school and otherwise exercise full autonomy under the law. *See J.D.B. v. North Carolina*, 564 U.S. 261, 272–77 (2011).

39.     The inherent characteristics of children have also been recognized in the area of criminal punishment in a series of U.S. Supreme Court decisions. Specifically, the U.S. Supreme Court has recognized three distinctive attributes of juveniles that mitigate their culpability: juveniles have transient immaturity; they are vulnerable to external forces; and their character

10

traits are still being formed. *Montgomery*, 136 S. Ct. at 733; *Miller*, 567 U.S. at 470–71;

*Graham*, 560 U.S. at 68; *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005).

40.     By recognizing the psychological and social characteristics of children, these

decisions established constitutional limitations on the punishment that can be imposed on

children, even for very serious crimes, reasoning that "children are constitutionally different

from adults for purposes of sentencing," because they have "diminished culpability and greater

prospects for reform." *Montgomery*, 136 S. Ct. at 733 (*quoting Miller*, 567 U.S. at 471 (*citing

Roper*, 543 U.S. at 569–70; *Graham*, 560 U.S. at 68)).

41.     *Graham v. Florida* set out a categorical prohibition against imposing a life

without parole sentence on children for non-homicide crimes, finding that "a clear line is

necessary to prevent the possibility that life without parole sentences will be imposed on juvenile

nonhomicide offenders who are not sufficiently culpable to merit that punishment." *Graham*, 560

U.S. at 74–75. This categorical rule was established specifically because the "discretionary,

subjective judgement by a judge or jury that the offender is irredeemably depraved" was deemed

"insufficient to prevent the possibility that the offender will receive a life without parole sentence

for which he or she lacks moral culpability." *Id*. at 77. A categorical rule," said the *Graham*

court, "gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform,"

*Id*. at 79. "

42.     The *Graham* court was emphatic that a "juvenile offender should not be deprived

of the opportunity to achieve maturity of judgment and self-recognition of human worth and

potential." *Id.*

43.     Taken together, these cases establish that Eighth Amendment proportionality

principles forbid a sentencing scheme and administrative practices that together (i) impose life

sentences upon minors and (ii) fail to provide a meaningful and realistic opportunity for release for those whose crimes reflect unfortunate yet transient immaturity. Wisconsin law fails this test on both counts.

**C.    Life sentences imposed on children are unconstitutional absent a parole scheme that provides a meaningful and realistic opportunity to obtain release based on demonstrated maturity and rehabilitation.**

44.    "The Eighth Amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions. That right . . . flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller*, 567 U.S. at 469 (internal quotation marks and citations omitted).

45.    Accordingly, the U.S. Supreme Court has held that "sentencing a child to life without parole is [unconstitutionally] excessive for all but the 'rare juvenile [homicide] offender whose crime reflects irreparable corruption.'" *Montgomery*, 136 S. Ct. at 734 (*quoting Miller*, 567 U.S. at 479–80).

46.    Thus, while States may make parole decisions discretionary for adult offenders, as Wisconsin has, *State ex re. Gendrich v. Litscher*, 2001 WI App 163, ¶ 7, 246 Wis. 2d 814, 632 N.W.2d 878, they must provide juvenile offenders with more: a "meaningful opportunity for release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 50.

47.    Proceedings bearing on life sentences for juvenile offenders must, in order to avoid being categorically unconstitutional, afford juvenile lifers who have evolved from troubled, misguided youth to model inmates, a meaningful opportunity to demonstrate that, even if they have committed heinous crimes as children, they have changed. *Montgomery,* 136 S.Ct. at 724.

12

48.     Courts across the country have recognized that parole decisions for juvenile lifers must incorporate the principles of *Roper*, *Graham*, *Miller*, and *Montgomery*, lest those principles become illusory in practice. *See, e.g.*, *Flores v. Stanford,* No. 18-CV-2468, 2019 WL 4572703 (S.D.N.Y. Sept. 20, 2019); *Hawkins v. New York State Dep't of Corr. & Cmty. Supervision*, 140 A.D.3d 34, 38 (3d Dep't 2016); *see also*, *Brown v. Precythe*, No. 2:17-cv-04082, 2018 WL 4956519, at *7 (W.D. Mo. Oct. 12, 2018); *Greiman v. Hodges*, 79 F. Supp. 3d 933, 943 (S.D. Iowa 2015); *Atwell v. State*, 197 So. 3d 1040, 1041–42 (Fla. 2016), *reh'g denied*, No. SC14-193, 2016 WL 4440673 (Fla. Aug. 23, 2016); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015), *appeal dismissed sub nom. Hayden v. Butler*, 667 Fed. App'x 416 (4th Cir. 2016); *Md. Restorative Justice Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, at *20– 21 (D. Md. Feb. 3, 2017).

## II.     WISCONSIN SUBJECTS JUVENILE LIFERS TO UNCONSTITUTIONALLY DISPROPORTIONATE PUNISHMENT BY DENYING THEM A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE BASED ON DEMONSTRATED MATURITY AND REHABILITATION.

### A.     Applicable Wisconsin sentencing law mandated life sentences with the possibility of parole for juvenile offenders as young as 10 years old.

49.     Under Wisconsin sentencing law applicable to class members, courts were *required* to sentence defendants, including juveniles, to a life sentence for a first-degree intentional homicide (and five other crimes[2]) that occurred prior to December 31, 1999. *See* Wis. Stat. §§ 939.50(3)(a), 940.01(1) (1995–1996). If the crime was committed prior to July 1, 1988, the defendant became eligible for parole after serving 25% or six months of his or her sentence, whichever was greater. Wis. Stat. §57.06(1)(b) (1987–1988). For a sentence of life, 25% was

---

[2] Additional Class A felonies other than homicide during this time period were (1) taking hostages, (2) kidnapping causing permanent physical injury, (3) causing death by tampering with household products, (4) causing death by carjacking, and (5) treason.

deemed to be 13 years and 4 months. *See*, *e.g.*, *State v. Borrell*, 167 Wis.2d 749, 765 n.6 (1992) (2/3 of 20-year minimum prison term). If the crime was committed between July 1, 1988 and December 31, 1999, the sentencing court had the option of: (1) allowing parole eligibility after 20 years in prison; (2) setting a date after 20 years in prison at which the person becomes parole eligible; or (3) denying parole eligibility altogether. Wis. Stat. § 973.014 (1993–1994). During this timeframe, children as young as 14 years old could be sentenced to life in prison for first-degree intentional homicide. *See* Wis. Stat. § 48.18(1) (1993–1994). Beginning on July 1, 1996, children as young as 10 years old were required to be tried as adults for first-degree intentional homicide and sentenced to a term of life imprisonment if convicted. *See* Wis. Stat. § 940.01, a Class A felony; *see id.* at § 939.50 & § 938.183(1)(am). For example, James Price[3] ("Mr. Price") and Thaddeus Karow[4] ("Mr. Karow") were sentenced to life for crimes they committed when they were 14 years old.

50.     Also as of July 1, 1996, children as young as 10 years old were required to be tried as adults for first-degree reckless homicide, and if convicted could receive a sentence of up to 60 years of imprisonment. *See id.* at § 940.02, a Class B felony; § 939.50; § 938.183(1)(am). Other crimes could similarly result in sentences to terms of years that could exceed a person's life expectancy.

51.     Persons convicted of felonies other than Class A felonies that occurred on or before December 31, 1999, are sentenced to a term of a specific number of years. *See* Wis. Stat. §973.01 (1995–1996). For Class B felonies, the maximum sentence was 20 years, and for Class

---

[3] Although now released on parole, James Price's experience while incarcerated is illustrative of Defendants' parole process as applied to juvenile-lifers.

[4] Although now released on parole, Thaddeus Karow's experience while incarcerated is illustrative of Defendants' parole process as applied to juvenile-lifers.

C felonies, the maximum sentence was 10 years. *See* Wis. Stat. § 939.50(3)(b)–(c) (1993–1994). The aggregate imprisonment term for multiple convictions for felonies *other* than Class A felonies can total to more than an estimated lifespan if sentences are imposed to run consecutively. Mr. Sussek, for example, was sentenced to 45 years and 35 years to be served consecutively for attempted first-degree intentional homicide and armed burglary, aggregating to a term of years far exceeding his life expectancy.

52.     In most instances, a person sentenced for a crime committed on or before December 31, 1999, is eligible for parole when "he or she has served 25% of the sentence imposed for the offense, or 6 months, whichever is greater." Wis. Stat. §304.06(1)(b) (1993–1994). Persons convicted of a designated subset of "serious felonies," including most homicides, most sex assaults, most sex crimes against children, and armed robberies, among others, committed after April 21, 1994, but before December 31, 1999, are sentenced, at the option of the court, to an indeterminate sentence with the option of setting a parole eligibility date later than service of 25% of the sentence but before service of two-thirds of the sentence. Wis. Stat. § 973.0135(1) & (2).

53.     For most felonies, a defendant is entitled to mandatory release to parole after serving two-thirds of his or her sentence. Wis. Stat. § 302.11(1) (1995–1996). But, for a defendant who committed a "serious felony" between April 21, 1994, and December 31, 1999, that mandatory release is merely "presumptive." Wis. Stat. § 302.11(1g)(am) (1995–1996). Serious felonies under the nonsensically termed "presumptive mandatory release" scheme are listed in § 302.11(1g)(a) and include most homicides, most sex assaults, most sex crimes against children, and armed robberies, among others.

54.     All plaintiffs in this action have either (a) no release date (those serving life

sentences) or (b) a "mandatory" or "presumptive mandatory" release date and received life

sentences or terms of years that amount to *de facto* life sentences as defined by the U.S.

Sentencing Commission5, and, therefore absent release to parole supervision, each plaintiff has,

what *Graham* describes as "no chance for fulfillment outside prison walls, no chance for

reconciliation with society, no hope."  *Graham,* 560 U.S. at 79.

55.     When a mandatory release is presumptive, the Parole Commission must decide,

before the defendant reaches the presumptive mandatory release date, whether to deny

mandatory release, based upon the need for protection of the public or upon refusal to

participate in treatment while in prison. Wis. Stat. § 302.11(1g)(b) (1995–1996). If the Parole

Commission denies mandatory release, the Commission must schedule "regular reviews to

consider whether to parole" the defendant. Wis. Stat. § 302.11(1g)(c). Under Wisconsin law,

there is no date when the Parole Commission *must* parole persons under the "presumptive

mandatory release" scheme.

56.     In this action, Plaintiffs challenge the Wisconsin parole process as applied to their

sentences for conduct that occurred on or before December 31, 1999. After 1999, Wisconsin's

"Truth in Sentencing" ("TIS") law went into effect, requiring judges to impose "bifurcated"

sentences of a fixed time in prison followed by a fixed period of "extended supervision" in the

community. Although extended supervision, like parole, is subject to revocation, people

---

[5]  According the U.S. Sentencing Commission a life sentence is a sentence of 470 months or more, which is just short of 40 years. *See* U.S. SENTENCING COMMISSION, LIFE SENTENCES IN THE FEDERAL SYSTEM 10 (February 2015), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf.

sentenced under TIS are not eligible for parole release consideration by the Parole Commission. The plaintiff class does not include persons sentenced under TIS.

**B.    The Wisconsin Parole Commission does not evaluate juvenile lifers for parole release under the standard of demonstrated maturity and rehabilitation.**

57.    The only opportunity juvenile lifers in Wisconsin have for release prior to death is the opportunity to be released by the Parole Commission. Therefore, it must be commissioners who apply the standard of "demonstrated maturity and rehabilitation." *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75).

58.    Wisconsin statutes do not provide *any* evaluative standard whatsoever against which parole commissioners must evaluate candidates when making release determinations. *See generally* Wis. Stat. ch. 304. Nor does the administrative agency's enabling statute require the Commission to consider any specific evidence or factors, much less evidence relevant to the constitutionally mandated standard of maturation, rehabilitation and reform, when evaluating candidates for release suitability. *Id*.

59.    Nor has the agency filled in the gaps in this broad grant of discretion by promulgating rules requiring commissioners to conform their decision-making powers to the constitutional requirement to provide life-sentenced juveniles with a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. The Parole Commission's administrative rules allow commissioners to deny parole to juvenile lifers if, for example, the Commissioner subjectively believes that releasing the applicant would "depreciate the seriousness of the offense," Wis. Admin. Code. § PAC 1.06(16)(b), even though the applicant has served the minimum time authorized by the legislature and imposed by the sentencing judge under the existing parole regime.

60.    Nothing in the administrative rules requires the Commission to base its parole release decisions on whether a juvenile lifer demonstrates maturity and rehabilitation. Wis. Admin. Code. §§ PAC 1.04; 1.06.

61.    In practice, when considering parole applications of juvenile lifers, the Parole Commission does not base its release determination on whether the applicant has demonstrated maturity and rehabilitation and therefore now presents a low risk to society.

62.    Instead, the Commission denies parole *despite* clear records and explicit findings of rehabilitation and maturation on the grounds that, in their subjective judgment, release would "depreciate the seriousness of the crime" or simply that, often in the view of a single commissioner, the parole applicant needs to serve "more time" in prison. For example:

- On November 17, 2016, former Parole Commissioner LaCost denied parole release to Plaintiff Yang, stating "You have NOT served sufficient time for punishment." However, Mr. Yang had, in fact, already served years beyond the retributive portion of his sentence and LaCost also concluded that Mr. Yang "[had] served [his] time in a productive manner and [had] made the most of the available opportunities."

- On November 15, 2018, then-chairperson Steven Landreman commended formerly incarcerated Carlos King[6] ("Mr. King") for his completion of programming and institutional adjustment and for becoming a "role model" for other inmates, but nevertheless denied him release to parole

_____

6 Although now released on parole, Carlos King's experience while incarcerated is illustrative of Defendants' parole process as applied to juvenile-lifers.

supervision because "[21 years is] certainly on the low end of time that lifers are serving before release."

- On January 9, 2018, then-chairperson Landreman denied parole release to formerly incarcerated Mr. Karow not because he had not demonstrated rehabilitation and reform, but because he found that imposing "additional time for punishment is warranted," and that Mr. Karow had simply "NOT served sufficient time for punishment" for the crime.

- On September 13, 2018, then-chairperson Landreman denied formerly incarcerated Craig Sussek[7] ("Mr. Sussek") release to parole supervision, stating: "You have NOT served sufficient time for punishment" even after explicitly acknowledging that Mr. Sussek *had* "matured" and had "successfully completed all needs *and more*."

- On March 14, 2018, Defendant Drankiewicz denied Plaintiff Doyle release to parole supervision stating, "more time is warranted so as not to depreciate the severity of your offending behaviors." Chairperson Gabler extended Drankiewicz's deferral recommendation stating, "the time you have served thus far is grossly insufficient. To release you to parole in the near future would greatly depreciate the seriousness of your crimes."

- On September 2, 2020 Defendant Tate denied Plaintiff Heredia release to parole supervision (on a "file review" conducted in response to the global pandemic) without stating *any* reasons whatsoever, except to note the

---

7 Although now released on parole, Thaddeus Karow's experience while incarcerated is illustrative of Defendants' parole process as applied to juvenile-lifers.

"victim impact statements [that] were received in opposition to early release." Defendants have refused to provide even identifying-information redacted copies of this adverse testimony relied upon in response to Plaintiffs' counsel repeated requests and pointing out that reliance on secret evidence is a due process denial.

63.     Under this regime, parole is rarely granted to *any* person seeking parole for a crime committed as a child, even those not sentenced to life. On information and belief, fewer than 10 parole-eligible juvenile lifers from a population of more than 120 have been released from prison in the past 15 years, and at least one of them was released because he was exonerated of the crime after serving 17 years in prison. Most recently, a handful of parole-eligible persons have been released due to the Coronavirus Pandemic ("COVID-19") and the pressure of this lawsuit, but without structural reform that the Constitution and case law require.

> **C.    The procedures of the Wisconsin Parole Commission fail to afford juvenile lifers a meaningful and realistic opportunity for release upon rehabilitation.**

64.     The Due Process Clause of the Fourteenth Amendment prohibits the state from depriving any person of "life, liberty, or property without due process of law." The procedural component of the Due Process Clause prohibits the government from depriving an individual of liberty interests without first providing adequate notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

65.     By establishing a categorical rule that, no matter the nature of their crime, juvenile non-homicide offenders may not be deprived of the opportunity to demonstrate maturity and rehabilitation and so earn their release from imprisonment *Graham v. Florida* vested in juvenile non-homicide offenders a liberty interest in release from imprisonment upon a showing of rehabilitation and maturity. *Graham*, 560 U.S. 48 (2010).

20

66.     Likewise, parole-eligible juvenile lifers who have not been adjudicated irreparably corrupt have a liberty interest, grounded in the Eighth Amendment, to release from imprisonment upon a showing of rehabilitation and maturity.

67.     In determining what procedures are required to provide "meaningful" protection of a liberty or property interest, a court must balance "three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

68.     The administrative rules of the DOC and the Parole Commission's consideration process fail, individually and collectively, to provide adequate procedural protections for juvenile lifers' substantive right to release upon a showing of rehabilitation and maturation.

        **1.     The Department of Corrections administrative rules, in combination with the Parole Commission's reliance on classification and programming decisions made by other entities, denies juvenile lifers a meaningful opportunity for release.**

69.     Defendants' parole review process systematically prevents applicants, including Plaintiffs, from being released on their parole eligibility date.

70.     Commissioners do not entertain the possibility of release to parole supervision until a person has been assigned for a significant time—usually at *least* half a decade—to a minimum-security prison and a work release assignment. The Notice of Parole Commission Consideration the Defendants provide to parole applicants specifies that "security classification" is a factor in assessing "institutional adjustment," one of the criteria for parole consideration.

Wis. Adm. Code § PAC 1.06(16)(c). BOCM is the sole entity empowered to determine custody classifications.

71.    DOC administrative regulations prevent a life-sentenced person from even being *considered* for a minimum-custody classification or work release until the date of parole eligibility. Wis. Admin. Code § DOC 302.12; Wis. Stat. § 303.065.

72.    Because the initial parole review occurs two months *before* the parole eligibility date, under no circumstance, no matter how unmistakably maturity and rehabilitation have been demonstrated, can an applicant obtain release to parole supervision after their first parole interview.

73.    In addition, Defendant Hansen, the director of the BOCM, and committees at each institution that make recommendations on prisoner classification (called Program Review Committees or reclassification committees, hereafter "PRCs") in many cases effectively prevent an inmate from obtaining parole from the Parole Commission by denying them minimum-security classification and access to programming the Parole Commission considers necessary for release.

74.    "Access to the very programming that enables juvenile offenders to make [] a showing of rehabilitation—and that can play a significant role in parole hearings—is an important component of a meaningful opportunity." *Hill v. Whitmer*, No. 10-14568, 2020 WL 2849969, at *1 (E.D. Mich. June 2, 2020). Here, as in *Hill v. Whitmer*, class members are being denied timely access to programming and are then denied release to parole supervision because they haven't completed that programming. "The fact that some class members are thereafter provided a later opportunity to obtain parole is of no moment, as states must ensure that all opportunities to obtain release are meaningful." *Id.*

75.     For example, the Parole Commission requires an inmate to participate in supervised and then unsupervised work "outside the fence" before granting parole. Yet, the BOCM and PRCs control eligibility for this work, not the Parole Commission, which can only recommend it.

76.     Moreover, BOCM's security classification procedure is independent from the Parole Commission. The institutional PRCs make recommendations to the BOCM director regarding any change in security classification for an inmate; the director of the BOCM makes the final decision on classification. *See* Wis. Admin. Code §§ DOC 302.17(1), (5) & (6) (reclassification committee review and recommendations); § DOC 302.17(10) (BOCM director review and final decision); § DOC 302.03(45) (citing Wis. Stat. § 302.113(9g)(2), defining the Program Review Committee as an institutional committee that reviews security classifications and programming needs).

77.     Although the Parole Commission may make security classification and programming recommendations to the DOC, the BOCM is not required to base its classifications or grants of work release on the Commission's recommendations, much less on current risk or demonstrated rehabilitation and reform. In fact, administrative rules instruct BOCM to consider, among other things, length of the sentence being served, the nature of the crime of incarceration, age, and "criminal record and juvenile delinquency adjudications," all fixed factors possibly prejudicial to juvenile lifers. Wis. Admin. Code § DOC 302.11.

78.     BOCM also systematically overrides Plaintiffs' COMPAS risk ratings assigning them a higher risk rating due to Plaintiffs' original crime and length of sentence under their own "discretionary" guidelines than that recommended by the state's risk assessment instrument. In January 2019 BOCM explicitly overrode Plaintiff Yang's COMPAS Risk Level

Recommendation of "low" and instead determined his risk rating to be "Moderate Risk," due only to his original offense and his life sentence.

79.     BOCM does in fact give substantial weight to static factors, such as the nature of the crime of conviction and the length of the sentence being served, in making security classifications. On September 21, 2017, for example, the BOCM denied minimum-security classification to Mr. King despite finding that his "adjustment has been positive" with "last major conduct report on 12/12/03." The Committee based its decision on his juvenile crime and the sentence imposed for that crime, writing: "While noting positive adjustment … additional monitoring at current custody level is appropriate based on the heightened risk associated with his assaultive offense dynamics and lengthy sentence structure. A custody reduction with such a significant amount of time remaining to serve and with no indication from Parole that release may be imminent would create an unreasonable amount of risk when considering the dynamics of his offense."

80.     In January 2019, the BOCM denied Plaintiff Yang minimum security classification even though he had not had any conduct violations *at all* for more than ten years, had completed his programming requirements, was assessed at a COMPAS Risk Level Recommendation of "low," and "[had] maintained positive adjustment and employment for a significant amount of time." PRC explained that it would not reduce his security classification, even though he had long passed his parole eligibility date, because of the "potential time remaining to serve" and the "assaultative offense dynamics" of his crime of conviction when he was 15 years old.

81.     Likewise, on February 12, 2020, the BOCM denied minimum-security classification to Plaintiff Jones due to his "lengthy sentence structure" even though his parole

eligibility date is in two years and the Parole Commission has indicated that it requires applicants for parole supervision to have served at least half a decade in minimum custody before being considered for release. BOCM also deferred Plaintiff Jones' "evaluation for program needs" saying that he had too much "time left to serve" again referring not to his quickly approaching parole eligibility date in 2022, but to his "scheduled release date" in 2066 when Mr. Jones will be 88 years old.

82.     On February 12, 2020 the BOCM internal staff recommended that Plaintiff Guarnero's custody classification be reduced to minimum "noting time served with positive conduct, parole's request to see transition" and that "it would be highly beneficial for Mr. Guarnero to obtain employment skills he can utilize upon release." BOCM denied that minimum custody classification because of his offense, "sentence structure with PMR status," and the fact that BOCM had themselves kept Plaintiff Guarnero in a maximum facility for 22 years even though he had no conduct reports for violence, escape, disturbance or other behaviors indicating a security risk and had only recently transferred him to medium—all facts that Plaintiff Guarnero has no control over.

83.     On March 25, 2020, the BOCM denied minimum-security classification and a transfer to Plaintiff Doyle based on "the severity of his offense dynamics, offense history, conduct history, time served, and the lengthy sentence structure." The BOCM disregarded Plaintiff Doyle's "demonstrated excellent institutional adjustment", "positive program motivation", "positive program work assignment evaluations" and low risk of recidivism as evaluated by the state's risk assessment instrument to assign a minimum custody classification. The PRC indicated that it would not reduce his security classification to minimum because

"currently there is no endorsement or information from parole that would indicate any recommendation for changes in his custody."

84.     On September 17, 2020 Defendant BOCM Director Angela Hansen refused to even consider Plaintiff Heredia's request for minimum custody classification, noting that at his most recent "file review" even though Defendant Tate reduced the three year deferral imposed in April 2018 by four months, the "amendment does not mean that parole will or should be granted at your next review".

85.     Commissioners also make extensive use of other institutional records prepared by the DOC and the BOCM in making their parole release decisions and assign great weight to programming and employment, which are under the exclusive control of the DOC and BOCM. Wis. Stat. § 304.01(2). The Parole Commission often recommends that prisoners be transferred to minimum-security institutions, obtain programming, or participate in work release programs, but the BOCM, sometimes on the recommendation of the institutional PRC, thwarts the prisoner's ability to satisfy those recommendations.

86.     Furthermore, the possibility of a meaningful and realistic opportunity for parole release is effectively dependent upon the availability of scarce space in minimum-security prisons and limited supervision resources for work release assignments, because commissioners view these milestones as prerequisites for release. On information and belief, the DOC often denies juvenile lifers access to programming or work experiences because they are filled with inmates who are approaching mandatory release dates or fixed release dates under TIS. Because juvenile lifers have indefinite release dates, they are not given priority to receive programming even though they need programming to be considered by the Parole Commission for release.

87.     As a result of the role of classification, programming, and employment determinations in Parole Commission release decisions, the BOCM director and PRCs can, and do, effectively prevent matured and rehabilitated juvenile lifers from being released on parole.

> **2.     The Parole Commission's rules and practices prohibit juvenile lifers from presenting evidence of maturity and rehabilitation.**

88.     Defendants' regulations, rules, practices, and policies individually and collectively prevent juvenile lifers from presenting evidence of maturity and rehabilitation.

89.     The Commission severely restricts juvenile lifer parole applicants' ability to meaningfully present their case that they have been rehabilitated and reformed. Wis. Admin. Code § PAC 1.06(7). Applicants receive a multiple-page, preprinted "Release Plan Information" form to complete. The form provides only a paragraph in which the applicant can explain how he or she has matured or rehabilitated over a period that often spans decades. The form comes with the strict instruction: "**DO NOT ATTACH ANY DOCUMENTS TO THIS FORM**." Upon information and belief, the Commission will accept letters in support of—or in opposition to— the applicant from persons outside the prison system, such as attorneys, but will often reject attachments to such statements or letters.

90.     Defendants have access to and cite to previous involvement in the juvenile justice system and disciplinary tickets issued to juvenile lifers when they were still juveniles as factors in denying parole. For example, Mr. King was denied release to parole supervision on November 15, 2018. Former Parole Commission Chair Landreman cited his "significant juvenile criminal history" and the fact that he had, "served time as a juvenile prior to confinement," as reasons for finding that he had "NOT served sufficient time for punishment" and that "release would involve an unreasonable risk to the public," even though all other evidence before Landreman pointed to Mr. King's unmistakable rehabilitation and reform. Landreman also cited an almost 20-year-old

disciplinary violation on Mr. King's record that occurred when he was just 18 years old (and for which he spent 3 years in solitary confinement) as a "circumstance" for which now "additional time for punishment is warranted."

91.     On information and belief, the interviewing commissioner's decision is often determined before the interview at which the applicant is supposedly given an opportunity to be heard. The outcomes of parole hearings reported in the Parole Commission Action sheets often contain similar, if not identical, language in successive decisions to defer (*i.e.*, deny) parole. The section on the sheet entitled "General Reasons For Action Taken," almost always includes the reason "You have NOT served sufficient time for punishment"—*even if* other findings in the record indicate satisfactory or even exemplary institutional conduct, participation in programs, reflections of remorse, and all other conduct within the control of the parole applicant was positive.

92.     To the extent a particular decision is not predetermined, any "deliberation" by the commissioner conducting the interview must take place *during* the interview, because the commissioner's decision is read into the audio record at the conclusion of the interview. As a matter of practice, Commissioners will never recommend parole at the first interview, regardless of the facts of the case. Assuming the applicant does not have major conduct tickets (which are often issued for quite minor infractions) between interviews, subsequent parole consideration interviews, outside of the context of this lawsuit, result in predictable deferral periods. The commissioners also make predictable recommendations for additional programming and work experiences that are *de facto* prerequisites to release. This indicates that the reason for the deferrals has nothing to do with an assessment that the prisoner needs more time to mature or rehabilitate—particularly because the Parole Commission rarely, if ever, makes such a factual

28

finding about a juvenile lifer, and has no established process for considering demonstrated maturity or rehabilitation during its evaluation.

93.    A single parole commissioner conducts a release consideration interview but lacks the power to grant release. Wis. Admin. Code § PAC 1.06(5); Wis. Admin. Code § PAC 1.07(4). The single commissioner who interviews the parole candidates hears petitioners' evidence of transformation and reform, and is in the best position to evaluate their maturation and rehabilitation, but is not the final decision-maker when it comes to granting release. (The opposite is not true of a denial of parole, however, which a commissioner can make without the approval of the chairperson.) The chairperson is the "final parole-granting authority," Wis. Stat. § 304.01, and often extends the deferral period beyond the term requested by the interviewing commissioner.

94.    The Parole Commission's rules prohibit legal counsel from participating in parole interviews. Wis. Admin. Code § PAC 1.06(13). Although statutes expressly require that victims, the sentencing court, and the prosecuting district attorney be given notice and an opportunity to be heard, the applicant may not be supported by an advocate of any sort. Wis. Stat. § 304.06(1)(c)–(f). The Parole Commission's regulations even allow the commissioners to exclude the applicants *themselves* from the consideration interview under certain conditions. Wis. Admin. Code § PAC 1.06(11).

95.    Wisconsin statute requires the Parole Commission to consider "victim's statements," Wis. Stat. § 304.06(1)(em); and Wis. Admin. Code § PAC 1.06(6), (17), (18), but the Commission does not allow persons seeking parole to see and confront this potentially adverse testimony or even verify that it does not contain erroneous statements of fact. A life-sentenced juvenile has a protected liberty interest in parole release, and it is a due process

violation to rely on secret evidence. "Without knowing what information is being presented in opposition to their petitions for parole, *Miller*-affected inmates cannot know of, let alone challenge, 'allegations of fact that they perceive to be false.'" *Brown v. Precythe*, No. 2:17-CV-04082-NKL, 2018 WL 4956519, at *8 (W.D. Mo. Oct. 12, 2018). "[A] meaningful opportunity for *Miller* affected inmates to demonstrate maturity and rehabilitation requires notice of all adverse information presented to the parole board." *Id.* at 21.

96.     Commissioners consider other "confidential" information and submissions from unknown entities that applicants do not have access to and therefore cannot rebut any erroneous information or characterizations of their crimes or institutional behavior contained in the "confidential" information and submissions. "Inaccurate information in the file that remains unverified or unrebutted inflates the risk of erroneous decisions and could thus flaw the decisionmaking process." *Williams v. Missouri Bd. of Prob. & Parole*, 661 F.2d 697, 700 (8th Cir. 1981); see also *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 15 (1979).

97.     The Parole Commission does not make available funds for inmates to retain their own experts—such as psychiatrists, psychologists, or social workers. The prevalence of mental impairments among juvenile offenders is substantially higher than among adolescents who are not involved with the justice system. *See generally*, Lee Underwood & Aryssa Washington, *Mental Illness and Juvenile Offenders*, 13 Int. J. Environ. Res. & Pub. Health 228 (2016). Lack of access to psychological experts significantly raises the risk that a person serving a life sentence for crimes committed as a juvenile is denied parole based on undiagnosed psychiatric or cognitive impairments, which are often untreated in prison. *See id.*

98.     Commissioners rely on a risk-assessment instrument that Plaintiffs are not permitted to inspect for accuracy: the Correctional Offender Management Profiling for Alternative Sanctions, or "COMPAS" program. COMPAS is a commercial risk-assessment product that employs secret, allegedly proprietary algorithms. As a result, neither Defendants nor Plaintiffs know whether or how COMPAS treats juveniles and the hallmark features of youth, and the vendor's refusal to disclose its algorithms makes it impossible for Plaintiffs to effectively contest potential "errors of material fact in the record." Wis. Adm. Code § PAC 1.06(7).

99.     Plaintiffs and Class Members lack knowledge and are denied information about how their COMPAS scores are calculated, what variables enter into the scores, how variables are weighted in the algorithmic prediction, whether and how the scores can be improved through rehabilitative efforts and whether there is any way to challenge the inclusion of erroneous information.

100.    In fact, on information and belief, COMPAS sometimes treats youth as an aggravating factor.[8] For example, it counts as negative not having a job prior to incarceration, not being married and the age of first offense, includes juvenile justice encounters at very young ages in the criminal involvement score and uses Plaintiffs' current age to predict risk of felony violence. Defendants' use of COMPAS thereby disadvantages Plaintiffs and Class Members who were sentenced as juveniles to serve longer sentences than their adult counterparts.

101.    The Commission's parole consideration process does not provide sufficient opportunity for Class Members to be meaningfully heard and to receive decisions rendered based on demonstrated maturity and rehabilitation.

---

[8] *See* Megan Stevenson and Christopher Slobogin, Algorithmic Risk Assessments and the Double-Edged Sword of Youth, VAND. U. L. SCH., Res. Paper No. 18-36 at 1 (Aug. 2, 2018), available at https://ssrn.com/abstract=3225350.

102.     Compounding these defects in the Parole Commission's process, there is no administrative appeal procedure and access to records to challenge the hearing is limited. *See* Wis. Stat. § 304.01(1) (chairperson of commission is "the final parole granting authority"). The prisoner may request a copy of the audio record at his or her own expense, but often cannot listen to it him or herself, and must have it sent to someone outside the prison. A transcript is made "only upon an order of the court which has jurisdiction over a petition for judicial review of the decision." Wis. Adm. Code § 1.06(10). The only available judicial review is through a common law writ of certiorari, in which the court reviews the agency action under an extremely deferential standard. *See, e.g., Doty v. Wisconsin Parole Comm'n*, 2017 WI App 71, ¶¶ 11, 14, 378 Wis. 2d 326, 904 N.W.2d 408.

103.     The availability of a common law writ of certiorari does not correct the defects in the Parole Commission's process because Wisconsin courts, applying a presumption of correctness and validity to flawed agency action, almost never overturn a Commission's denial of parole, *see Doty v. Wisconsin Parole Comm'n*, 2017 WI App 71, ¶ 14 (citing *Pire v. Wisconsin State Aeronautics Comm'n*., 25 Wis. 2d 265, 273, 130 N.W.2d 812 (1964)); *see also Swinson v. Douma*, 2017 WL 549041, at *1 (Wis. Ct. App. Feb. 9, 2017, *review dismissed*, 376 Wis. 2d 639 (2017)), rendering the writ of certiorari process effectively meaningless for juvenile lifers and Class Members.

104.     On information and belief, a Wisconsin court has never overturned on the basis of maturation or rehabilitation a decision of the Parole Commission to deny parole.

**D.     Defendants routinely deny parole based on facts that were not found by a jury or admitted by the parole applicant.**

105.     The Parole Commission proclaims its intention to consider facts not found at trial beyond a reasonable doubt as determinative of parole release. The notice provided to the parole

applicant that initiates the consideration process lists parole consideration criteria, which includes those set forth in Wis. Adm. Code § 1.06(16), but also includes illustrative facts under each criterion specified in the code. For example, under the criterion "Sufficient Time for Punishment," the notice identifies the following factors: "Mitigating (makes the crime less serious) and aggravating (makes the crime more serious) factors;" "Reason for committing the crime;" "Your part in the crime;" "Your feelings about the crime and the victim(s)." Some or all of these facts concern material elements of a different offense or the defendant's *mens rea* at the time of the offense and may not have been found by a jury or admitted by the offender at the time of sentencing. The notice provided by the BOCM to applicants in advance of their parole review explains that the Commissioners take into account the "attitude of the judge and district attorney" from the time of the crime, neither of which have any bearing on the maturation and rehabilitation of the applicant at present.

106.   In practice, the Parole Commission has routinely enhanced the penalty to be served by Plaintiffs based on facts not found by a jury at the time of trial. For example:

   a.   Former Parole Commissioner Daniel Gabler wrote in his 2017 parole denial that Plaintiff Pheil "played a key role" in the murder for which he is incarcerated and concluded that Plaintiff Pheil had "NOT served sufficient time for punishment." However, Mr. Pheil was convicted under the Wisconsin law of parties, and the Wisconsin Supreme Court noted that which defendant committed which act was "hotly disputed" at trial. *State v. Pheil*, 152 Wis.2d 523, 526 n.1 (1989). Gabler unilaterally determined that Mr. Pheil played a "key role," a fact not found by the jury, and unconstitutionally denied him parole in violation of the Sixth Amendment.

33

b.     Former Parole Commissioner Gabler also denied release to Plaintiff Pheil based on unadjudicated police contacts from his childhood. Gabler cited 15 separate arrests going back to 1981, when Plaintiff Pheil was an eleven-year-old boy, and concluded that "given your previous criminal history as a juvenile … release into society anytime in the near future is too great of a risk of harm to the public." None of these arrests were facts found at trial by a jury related to the sentence Plaintiff Pheil is currently serving, and yet Gabler enhanced the penalty imposed upon him based on these facts in violation of the Sixth Amendment.

107.    The Parole Commission may also—without Plaintiffs' knowledge—be enhancing the sentence on the basis of secret testimony, perhaps even erroneous facts, provided in victim impact statements because Defendants do not allow Plaintiffs to see or rebut any factual allegations made in these statements.

108.    On information and belief, the algorithms employed in COMPAS also incorporate information that was not found at trial beyond a reasonable doubt, the consideration of which violates the Plaintiffs' Sixth Amendment right to a trial by jury on any fact used to enhance their sentence.

**E.    Plaintiffs have repeatedly been denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation.**

109.    Defendants' failure to provide a meaningful opportunity for release based on maturation and rehabilitation is illustrated in their treatment of the Plaintiffs.

### *Plaintiff Victoriano Heredia*

110.    Plaintiff Victoriano Heredia is 38 years old and has been incarcerated for more than 21 years for crimes he committed as a juvenile.

111.    Mr. Heredia participated in a robbery that turned into a murder in 1997, when he was 17 years old.

112.    Mr. Heredia was sentenced to life in prison following a conviction for first-degree intentional homicide party to a crime, with eligibility for parole supervision after serving 13 years and four months in prison.

113.    Mr. Heredia was born and raise in a small, rural town in Mexico. His family was so poor, that he was born in his family's home because they could not afford to pay for a birth in a hospital. When Mr. Heredia was born, his father traveled to the U.S., became a citizen, and found a job in Wisconsin. In 1992, at the age of 12, Mr. Heredia legally immigrated to Wisconsin to live with his father. Mr. Heredia had to leave his mother and sisters behind and was heartbroken because he knew he would not be able to communicate with them.

114.    In his teenage years, Mr. Heredia possessed only a second-grade reading level, "had difficulty producing meaningful sentences," struggled with associative memory, and was on an "exceptional needs plan" in school. A psychological assessment conducted when Mr. Heredia was 15 concluded that his intellectual functioning was in the "low to extreme low range" and noted: "Victor's main peer group consists of Mexican-American youth, some of whom are no longer attending school. It is likely that many of Victor's associates are less than ideal role models for this 15-year-old student. Unfortunately, Victor appears cognitively and emotionally immature and quite susceptible to the negative influence of his peers."

115.    Mr. Heredia, longing for connection and familiarity, decided to join his older cousin's gang when he was 14 years old. Through that gang, Mr. Heredia met a 20 year old man, who asked him to participate in a robbery. Mr. Heredia made the foolish and life-changing

decision to go along with his new friend. While Mr. Heredia had no idea that his friend was planning on potentially committing murder, he accepts responsibility for his participation.

116.    Nothing in Mr. Heredia's record suggests, nor was any finding made, that he was among the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility." On the contrary, Mr. Heredia's sentencing judge stated, "I don't think we should give up on you just yet." Likewise, at the time of sentencing, Mr. Heredia's teacher wrote that "Victor tended to be a follower" and "his comprehension or reasoning as to what could be an outcome of a situation was usually very difficult for him." She added, "I feel that you are dealing with a very immature and young boy with very low reasoning skills who can be rehabilitated and become a benefit to our society."

117.    When Mr. Heredia was first sentenced to life in prison with the possibility of parole after 13 years and four months, he set out to do everything he could to learn how to be a better person and member of society, believing that if he worked hard at becoming a better person he would earn his freedom.

118.    During Mr. Heredia's time in prison, he has successfully completed every rehabilitative opportunity offered. For example, he earned his High School Equivalency Diploma and has held several jobs, including unit interpreter, server worker, unit janitor, maintenance mechanic, and carpenter for Badger State Industries at the sign and wood furniture shops. Additionally, he participated in all the programming available to him, including the Youth Offender Program and Stanley Correction Institute Relay for Life program; earning certification in the following areas: keyboarding, Microsoft Word, advanced computers, math computation, achievement reading, using maps, charts, and graphs, information skills, family and community

life, and success on the job. Mr. Heredia is currently participating in the Restorative Justice Program through the University of Wisconsin Law School.

119.   Mr. Heredia has tried his best to stay out of trouble and stay focused on positive development throughout his time in prison. Mr. Heredia has only received five major tickets while in prison, all for non-violent offenses, a very low number for someone imprisoned for 21 years starting as a teenager. His most recent major citation was issued in 2018, but before that his most recent major citation was issued in 2006. Mr. Heredia went 12 years without receiving a major citation in prison.

120.   Mr. Heredia has consistently received low scores on his COMPAS report and his inmate classification report from 2015 states that he has changed and has a positive attitude. The classification report states that Mr. Heredia separates himself from anything negative and that he is polite, respectful, and a role model for other men in his unit.

121.   Mr. Heredia has accepted full responsibility for his actions and does not blame anyone, but himself for participating in the crime that fateful day in 1997. Every single day, Mr. Heredia regrets his decision to join his friend in a robbery that turned into a murder. Mr. Heredia feels deep remorse for the pain he caused to the victim's family, his own family, and his community.

122.   Mr. Heredia has been rehabilitated and is no longer the follower he was as a teenager. He now understands the consequences of his actions and the importance of standing up for what is right. Mr. Heredia hopes to serve as a role model for his life partner's daughters, ages 14 and 16. He hopes to earn his freedom so that he can be a supportive and loving husband, father, son, brother, friend, and community member.

123.    Throughout his incarceration, Mr. Heredia has maintained strong ties with his family and has rehabilitated relationships in his life, including with his father. Mr. Heredia is in constant contact with his immediate and extended family.

124.    Mr. Heredia has secured employment upon his release and plans to attend Madison Area Technical College to build his vocational skills. Mr. Heredia also plans to marry his life partner upon release. His dream is to be able to watch his stepdaughters play in a basketball game.

125.    In 2010, after serving 13 years and four months for his crime, Mr. Heredia became eligible for parole. A parole interview was held on October 20, 2010, at which time the Parole Commission denied Mr. Heredia's release. The Commission did not indicate that Mr. Heredia was not sufficiently mature and rehabilitated, only that he must "serve additional time so as not to depreciate the seriousness of the crime" and that he had "an unmet" vocational education need. Former commissioner LaCost deferred parole for Mr. Heredia for 48 months—a full four years.

126.    On September 9, 2014, Mr. Heredia was again reviewed for parole. The Parole Commission noted that "there are no essential program needs identified," "you have continued to make progress" and "your conduct has remained positive," but Mr. Heredia was again denied parole on the sole basis that, "more time should be served to address the seriousness of the crime." And, again Mr. Heredia was deferred for 42 months so that he would not come up for parole review again until May, 2018, *eight years* after the date set by the legislature for his parole eligibility.

127.    Mr. Heredia's Classification Report from 2015, states that "[h]ousing staff report that Mr. Heredia is respectful, polite, and a role model to other men in the unit. The sergeant

wishes he had 83 men like him on the unit." In 2016, the BOCM noted that COMPAS indicated Mr. Heredia had a risk level of "low," but nonetheless recommended that he receive "medium" security classification, a classification under which he could not be released to parole supervision. In its "Inmate Classification Report," the BOCM explained that the security classification was due to his "sentence structure" alone.

128.     Defendants denied Mr. Heredia release on March 5, 2018, again on the unsubstantiated basis that due to the seriousness of the crime he should serve additional time. Mr. Heredia initially received a 24 month deferment of parole, but the deferment was increased to 36 months deferment due to a recent nonviolent major disciplinary ticket.

129.     Unlike the other Named Plaintiffs who were granted "file reviews" parole consideration in response to the COVID-19 Pandemic, Mr. Heredia was initially denied such consideration. Under pressure from Plaintiffs' counsel, he was finally granted such a review and again denied parole release on September 2, 2020. Defendant Tate again denied release without citing to *any* evidence in the record to show that he failed to meet the constitutional standard of demonstrated rehabilitation. The only grounds noted were the "victim impact statements [that] were received in opposition to early release," which the Commission has refused to make available for inspection. Defendant Tate reduced the three year deferral imposed in April 2018 by four months *but* maintained that "[t]his amendment does not mean that parole will or should be granted at your next review."

130.     Mr. Heredia was denied release to parole supervision for the fourth time on October 20, 2020.

131.     Mr. Heredia has been denied programming that would help him further demonstrate his rehabilitation and readiness for release. He has applied to enroll in vocational

training in welding, but has been denied because he is not close enough to his release date. Because Mr. Heredia does not have a guaranteed release date, and because he is continually denied parole, he is given low priority for placement in scarce programming necessary to show continued efforts towards rehabilitation and reform, even though he was specifically transferred to Fox Lake because of their welding training program. Mr. Heredia is trying to better himself and gain valuable skills while incarcerated, but he has been told it would be a waste of time to train him because he is not going to be released any time soon, even though he has been eligible for parole for the past eight years.

132.    Mr. Heredia has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Plaintiff Dontae Doyle*

133.    Plaintiff Dontae Doyle is 38 years old and has been incarcerated for nearly 20 years for his proximity to crimes committed in 1999 when he was 17 years old.

134.    On November 24, 1999, a friend picked up Mr. Doyle in a stolen car, and when an officer began to pull them over, Mr. Doyle attempted to elude the officers by car and on foot. He was arrested shortly thereafter and charged with a number of crimes related to a series of robberies committed in August through November of 1999.

135.    Despite his assertions of innocence, on October 20, 2000, Mr. Doyle was convicted of eight counts of armed robbery, second degree recklessly endangering safety, attempted armed robbery, and eluding an officer in a vehicle. Mr. Doyle was sentenced to 87 years.

136.     In 2018, Mr. Doyle successfully challenged his sentence, and received a sentence modification which reduced his sentence from 87 to 50 years. Consecutive to the 50 year sentence is a 20 year term of probation which has a 45 year imposed and stayed sentence. This sentence modification made him immediately parole eligible.

137.     This sentence modification was supported by a co-defendant, who confirmed Mr. Doyle's assertions of innocence by stating in an affidavit, "I am responsible for the crimes that Mr. Doyle is wrongfully convicted of. Furthermore, I am ashamed and feel [sic] guilty for perverting justice and taking part in activity that resulted in an innocent man going to prison." While Mr. Doyle has continued to fight for his freedom through the legal system, he also takes responsibility for his role in eluding an officer and for making the decision to socialize with a group that was involved in unlawful behavior.

138.     Mr. Doyle grew up in Milwaukee with his mother and father. His parents worked long hours and Mr. Doyle spent a lot of time on his own. When he was 14 years old, he started spending time with a group of adults who were "running the neighborhood." Due to his involvement with this group, he was exposed to criminal activity at a young age.

139.     Mr. Doyle's lack of experience meeting new people led him to believe that he should associate with groups familiar to him. Mr. Doyle explains that he "was a follower" and allowed himself "to be part of an environment that I wasn't supposed to [be] part of." While Mr. Doyle maintains his innocence, he regrets not making better decisions about his social surroundings.

140.     Mr. Doyle has spent much of his sentence focusing on personal growth and advocacy. Mr. Doyle has gained an understanding of what the victims went through and takes accountability for his actions. Mr. Doyle has also learned to communicate with and appreciate

people who are different from himself and is able to form positive relationships with people from different backgrounds.

141.    The fact that Mr. Doyle has consistently maintained his innocence, which has been corroborated, does not reflect a lack of remorse or maturity. To the contrary, Mr. Doyle has not only worked to educate himself, but has become a more thoughtful, empathetic person.

142.    Mr. Doyle has done everything in his power to transform himself and has successfully completed every rehabilitative and educational program made available to him. He earned his High School Equivalency Diploma in 2005 and completed all of his programming requirements. He also received a certificate in building and material maintenance from Moraine Park Technical College and is interested in pursuing a theology degree.

143.    Mr. Doyle has consistently held a job while in state custody. He has worked in the kitchen, as a custodial security runner, a tier tender as a custodian, a laundry worker, game keeper, and as a unit dietary worker ensuring that everyone is getting the proper meals based on their dietary restrictions.

144.    Mr. Doyle consistently receives low scores on his COMPAS risk level recommendation, in addition to low violence recidivism and low general recidivism evaluations. He is not a risk to public safety. As noted in his most recent PRC report, Mr. Doyle demonstrates "excellent institutional adjustment" and his social worker is not opposed to his relocation from Redgranite Correctional Institution, a medium custody institution, to minimum placement.

145.    Mr. Doyle has only received two major tickets in the past seven years. The first ticket was punishment for filing a grievance against a correctional officer for sexual harassment and threats after the officer gave Mr. Doyle soap with a picture of a penis carved on it for his cellmate. The second major was for marking and removing papers from his institutional file.

Before that, his most recent major was for disobeying orders in 2013. Prior to his 2013 major, he

had not received a major for over eight years.

146.    Despite the fact that Mr. Doyle has low COMPAS scores in all areas, was

determined to have "demonstrated excellent institutional adjustment" in the four years he has

been in medium custody, and has had positive evaluations in his institutional work assignments,

he was given a two year defer during his 2018 parole hearing. Commissioner Drankiewicz used

Mr. Doyle's juvenile supervision record from 19 years prior to make his determination and

decided that "based on the nature and severity of the case, the fact that you have an unconfirmed

release plan, a need to successfully transition through reduced security, and have a poor history

on community supervision it is clear that you continue to present as an unreasonable risk and that

more time is warranted so as not to depreciate the severity of your offending behaviors and

therefore the decision by the Commission will be to defer your case for 24 months."

147.    Chairperson Gabler reviewed Commissioner Drankiewicz's 2018

recommendation, and determined that due to four minor conduct reports, the refusal of Mr.

Doyle to discuss his crimes due to pending litigation and his assertions of innocence, that the

deferral recommendation was appropriate because "1. Even though you have participated in

required prison programming as noted above (This is positive!) you have NOT demonstrated a

sufficient benefit from said programming. If anything, your conduct has gotten progressively

worse. 2) in light of your record on supervision, your criminal history and the nature of your

crimes, the time you have served thus far is grossly insufficient. To release you to parole in the

near future would greatly depreciate the seriousness of your crimes and 3) given your previous

criminal history, your history on community supervision/probation as a Juvenile and your

attitude towards your crimes as expressed to PRC staff, your release into society anytime in the

near future is too great a risk of harm to the public." Chairperson Gabler then went on to require a 36-month deferral until the next parole hearing.

148.    In March 2020, the BOCM denied Plaintiff Doyle, who had served nearly four years successfully in medium custody, minimum security classification even though the BOCM found that Plaintiff Doyle had "demonstrated excellent institutional adjustment." That denial was based on "the severity of his offense dynamics, offense history, conduct history, time served, and the lengthy sentence structure." PRC also noted that "currently there is no endorsement or information from parole that would indicate any recommendation for changes in his custody." This determination illustrates that the PRC makes custody classification determinations not based on the date of parole eligibility or risk but based on maximum discharge date and endorsements from the parole commissioner.

149.    Failure to provide minimum custody classification prevents Mr. Doyle from meeting one of the criteria that the parole commission has set forth as necessary for release: successful placement at minimum custody level. The PRC ignored Mr. Doyle's "demonstrated excellent institutional adjustment," positive supervisor reports that say "he is respectful and does his job," the fact that his social worker was not opposed to minimum placement, and low risk of recidivism as evaluated by the state's risk assessment instrument, when making their determination.

150.    The BOCM further indicated on June 8, 2020, appeal of the March 2020 PRC decision that that it would not reduce Mr. Doyle's security classification to minimum because the BOCM was unable to substantiate the erroneous information considered as part of the reclassification review and after reviewing Mr. Doyle's parole documents and subsequent letter

from Chairperson Tate, found that neither of the documents "indicate[d] specific endorsements regarding custody, program, or placement."

151.    After Mr. Doyle's parole file review, Mr. Doyle requested an early re-classification due to the finding that he has served sufficient time for punishment. Mr. Doyle was denied because there were "no significant change in risk factors based on recent parole decision" and "no current endorsement or indication of imminent release."

152.    Mr. Doyle was issued minor disciplinary tickets for three non-violent incidents this year.  The first minor ticket was in May 2020 because he had taken a meal tray from the top of a pile, and placed it on the table for another inmate, without taking any food for himself.  This was apparently in violation of the rule that an inmate may not provide a tray to another without first eating from it himself. Mr. Doyle was unaware that there was a rule against providing another inmate with a tray without first eating from it; in fact, he had provided a tray to an inmate on previous occasions without eating from the tray, and had never been told this improper or disciplined for this conduct. In August 2020, Mr. Doyle was issued a minor ticket for not standing at "count," as he had overslept.  And, in September, 2020, Mr. Doyle received another minor ticket for the same violation of failing to be standing at "count" time.  None of these tickets reflect a lack of maturity or rehabilitation.

153.    Due to COVID-19, Mr. Doyle received a parole file review in September 2020. Despite finding that he had served "sufficient time for punishment", had satisfactorily completed all programming, and "developed an adequate release plan", Chairperson Tate denied release saying that release would "involve an unreasonable risk to the public" because of the "multiple minor reports of misconduct." Defendant Chairperson Tate thus denied Plaintiff Doyle his liberty because Plaintiff Doyle been disciplined for a rule violation that had not previously been

45

enforced (and of which he was unaware) and had overslept on two occasions. The release
standard evidently applied by the Board is not one of maturity and rehabilitation but human
perfection.

154.     Mr. Doyle has maintained strong family ties with his immediate and extended
family throughout his incarceration. His family members are positive and stable members of
their community and are deeply invested in his success. His family would help to support him if
released, including his mother, father, brother, aunt, and his son.  Mr. Doyle is the only member
of his family in prison. Mr. Doyle's mother worked as a Milwaukee Police Department
administrator in the public safety building for many years and has been supportive of him during
his incarceration. Mr. Doyle's son is currently enrolled in college and Mr. Doyle has dedicated
himself to developing a relationship with him and learning how to be father. Mr. Doyle was not
always aware of the impact his incarceration and absence had on his son. Mr. Doyle never
reached many important milestones himself and was not always aware of their significance and
importance for his son. However, now Mr. Doyle recognizes the impact that his incarceration
had on his son, and the significance of his absence during the important events in his son's life.
This awareness, self-reflection, and relationship investment demonstrates his maturity and
rehabilitation.

155.     Mr. Doyle has a secure release plan and plans to live with his mother upon
release. He has secured a job as a custodian at Holy Redeemer church. He hopes to eventually
participate in the Interstate Compact Offender Tracking System ("ICOTRS") and get approval to
move to Dallas, Texas with his mother to be with his brother and complete his paralegal
certificate. His brother owns a cleaning service in Texas and has offered him a position if he is
permitted to move there.

156.    Nothing in Mr. Doyle's record suggests, nor was any finding made, that he was the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility."

157.    Mr. Doyle has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Plaintiff Jumar Jones*

158.    Plaintiff Jumar Jones is 42 years old and has been incarcerated for nearly 24 years for a series of armed robberies and felony murder he committed at the age of 17 years old. In 1996, Mr. Jones was sentenced after pleading guilty, in adult court, to 105 years which statutorily set his parole eligibility after 26 years.

159.    Mr. Jones is currently incarcerated at the Redgranite Correctional Institution. His mandatory release date is February 28, 2066, when he will be 88 years old. His parole eligibility date is April 8, 2022.

160.    Mr. Jones' childhood was difficult. His parents divorced when he was six years old after which time Mr. Jones lived with his father who was an alcoholic and physically abusive.

161.    At the age of nine, Mr. Jones was reunited with his mother after he ran away from his father's home and informed his mother of the abuse, which she reported to protective services.

162.    Although Mr. Jones's mother's home was a loving and safe place, the wounds his father inflicted were significant. Mr. Jones was later determined by a Sentencing and Dispositional Specialist to have been living in "emotional poverty" in the lead up to his crimes.

163.    Although Mr. Jones participated in some special education courses, he struggled with "emotional disabilities" and did poorly in school, having a grade point average of .429.

164.    When Mr. Jones was 10 years old he was referred by school administrators for an evaluation and found to be "depressed" and "exhibiting a need for security and nurturing." A second evaluation at the age of 14 revealed that he had "low self-concept."

165.    When Mr. Jones was 12 years old he began spending time with older kids he looked up to who "ran the street" where he lived. Under this guidance, Mr. Jones also began drinking and using drugs. The older of the two, a 20 year old man, acted as a caretaker for Mr. Jones. Mr. Jones relied on him for emotional support and believed him to be his friend.

166.    When Mr. Jones was 15 years old, he was arrested for an armed robbery and was sent to Lincoln Hills.

167.    From August 1995 to October 1995, Mr. Jones was employed at the Old Country Buffet.

168.    From October 1995 to the time of his arrest, Mr. Jones worked at McDonalds in Northridge, Wisconsin. His supervisor described him as "friendly" and added that he "got along well with everyone."

169.    When asked, both of Mr. Jones' employers described his performance as good.

170.    Between October 1995 and January 1996, Mr. Jones, age 17, committed a series of armed robberies in Milwaukee, Wisconsin with three adult males. During one robbery, after Mr. Jones left the store, his co-defendants fired shots, and one person was killed. Mr. Jones was not armed during that robbery or any of the preceding robberies. The group committed one more robbery before Mr. Jones' arrest, at which time he was armed.

171.     The Sentencing and Dispositional Specialist in Milwaukee County Circuit Court, reported that Mr. Jones engaged in criminal activity in part because of the "influence of his peers" and that he was "genuinely remorseful about his actions." She further found that Mr. Jones was thoughtful and self-reflective, even as an 18-year-old and that he was "genuinely remorseful for his actions." She concluded "I do not think Jumar is without hope" and recommended a prison sentence in the "50 year range." She also wrote that she believed "how much of that time he will spend incarcerated" would depend on "Jumar's adjustment."

172.     The judge who sentenced Mr. Jones, Judge Patricia McMahon, noticed that at the time of the crimes Mr. Jones had an "extreme lack of maturity," but that he had accepted responsibility for the crimes, recognized the impact on others, on the community in general and on the victims in particular.

173.     Judge Patricia McMahon nonetheless sentenced Jumar not to the 50 years recommended by the Presentence Report, but to a consecutive sentence totaling 105 years with parole eligibility statutorily set at 26 years. Judge McMahon also believed that Mr. Jones had control over how much of that sentence he would serve, saying, at sentencing, "Whether you return to the community sooner or later is in your hands, totally your decision as to how you cooperate and take advantage of the programs."

174.     However, likely unbeknownst to Judge McMahon, two years earlier, then-Governor Tommy Thompson directed the DOC to detain currently incarcerated persons past their parole eligibility date and to pursue "any and all available legal avenues to block the release of violent offenders who have reached their mandatory release date."

175.     Shortly after Mr. Jones was sentenced, the federal Violent Offender Incarceration/TIS went into effect under which the State of Wisconsin received millions of

49

dollars from the Federal Government in exchange for not releasing incarcerated people at their statutorily authorized parole date, but instead delaying their release until they had served at least 80% of the maximum sentence.

176.    Even though the Milwaukee County Circuit Court acknowledged Mr. Jones' history of trauma, he has not been provided any rehabilitative services or mental health counseling since his incarceration.

177.    Early in his incarceration, while Mr. Jones was still under the age of 24, the Defendants extended his statutory presumptive mandatory release date four times all for non-violent disciplinary violations, such as "disrespect."

178.    Nonetheless, Mr. Jones' record has been exemplary. Mr. Jones has never received a single conduct report for violence. The only major ticket he has received in the past 20 years was because, in 2017, Mr. Jones, asked not to be transferred to the Badger State Industries dorm at the Green Bay Correctional Facility. He asked not to be transferred to that housing unit because it was widely known to be violent and dangerous.[9] Mr. Jones then wrote a letter to a social services director detailing his concerns. In response, the DOC issued him a ticket for "falsely accusing staff of abusing inmates" and writing a "disrespectful" letter rather than find alternative safe housing. Mr. Jones was put into isolation for three months. Green Bay

---

[9] *See e.g.*, Matt Jarchow, *Green Bay Correctional Institution: The most dangerous place in Wisconsin?*, NBC26 (Nov. 20, 2019), https://www.nbc26.com/news/local-news/green-bay-correctional-institution-the-most-dangerous-place-in-wisconsin (describing Green Bay Correction Institution as "one of the most dangerous places in Wisconsin.");Sarah Thomsen, *Target 2 Investigates: 20 percent of state's prison assaults in Green Bay*, 2 FIRST ALERT (July 5, 2017), https://www.wbay.com/content/news/Target-2-Investigates-20-percent-of-states-prison-assaults-in-Green-Bay-432745773.html (describing the dangerous conditions and stating that "Inmates at Green Bay's maximum security prison accounted for approximately 20 percent of the completed assaults at all adult facilities in Wisconsin."); Sarah Thomsen, *Target 2 Investigates: Employee harassment at Green Bay prison*, 2 FIRST ALERT (Jan. 3, 2019), https://www.wbay.com/content/news/TARGET-2-INVESTIGATES-Employee-harassment-at-Green-Bay-prison-503875631.html.

Correctional Facility Warden Scott Eckstein stepped down in 2018 and incidents of violence have declined dramatically.

179.     Mr. Jones received his High School Equivalency Diploma in July 1997 and his Literacy Volunteer of America Tutor Certificate in 2001. Mr. Jones tutored other incarcerated people in basic math as well as custodial, building, and printing services for five years while at Columbia Correctional Institution.

180.     In preparation for a future in the construction field, in 2012, Mr. Jones obtained certifications in CPR and AED and obtained a Personal Protective Equipment certification from the Occupational Health and Safety Administration ("OHSA") which does not expire. The following year, Mr. Jones completed his electricity vocational certificate. Mr. Jones has been actively employed for the majority of his incarceration. He initially worked in the laundry center at Columbia Correctional Institution for approximately two and half years, then he worked as a tutor, later he worked as an inspector at Badger State Industries for four years at Green Bay Correctional Institution before working as a clerk, now he works in the kitchen at Redgrante Correctional. Mr. Jones has worked hard to be a valued employee, for example he was at Badger State Industries for "about 5 years and did very well according to documented history."

181.     Mr. Jones is an active member of the community and regularly participates in advocacy for prisoner's rights and criminal justice reform. In 2012, Mr. Jones completed an intensive and transformative 12 week restorative justice program "Challenges and Possibilities 2012." This volunteer program allows male inmates to confront their crimes by listening to presenters who come in and discuss the community impact of crime and, at the end, the inmates give speeches about how the program impacted them.

182.    Mr. Jones has tried to enroll in programming to further develop his skills and demonstrate his suitability for parole. He is often denied access to such programming because his release date is far into the future and others with earlier release dates have priority. For example, in 2013, Mr. Jones' request for anger management programming was denied because "inmates closer to their release dates are given priority over those with longer time to their release dates."

183.    In August 2015, a memorandum from the BOCM to all staff and inmates stated that to participate in the transportation and housing pre-release module, ". . . you must . . . have a 10 year projected release date."

184.    Although Mr. Jones becomes parole eligible in just two years, his latest PRC report, dated February 12, 2020, noted that he would not be evaluated for program needs, or reduced to minimum security classification— the security classification the Parole Commission requires for an inmate to be released to parole supervision— "given the time left to serve." The "time left to serve" is, according to the PRC report, not the two years until his parole eligibility date, April 8, 2022, but the *46 years* remaining until his mandatory release date, February 28, 2066, when Mr. Jones would be 88 years old.

185.    The PRC report also noted that Mr. Jones was determined, in 2015, by the state's COMPAS risk assessment tool, to be a low risk for recidivism.

186.    Mr. Jones has been rehabilitated and is no longer the emotionally dependent person looking for acceptance that he was as an adolescent. His COMPAS Risk Assessment, taken in 2015, shows that he is a very low risk to the community. The PRC, in February 2020, determined that Mr. Jones does not need "anger management" because his "current offense does not appear to be motivated by anger, rather than him trying to fit in as he was 17 years old at the

time of the offense" and because "he has not received any conduct reports which would indicate a need for Anger Management" (no assaultive conduct reports).

187.    The PRC at Redgranite Correctional Institution also determined that Mr. Jones' institutional adjustment is positive with no conduct reports overall since intake arrival, he has demonstrated program motivation through his vocational and programming completion.

188.    Mr. Jones has a large and supportive family available and willing to support him upon release. He has offers to live with his mother or his aunt in Milwaukee. He also has six siblings, including his older brother with whom he is very close with and speaks with on a daily basis. Further, Mr. Jones has a close circle of friends, including his childhood friend, Casey Anderson, who visits and calls regularly.

189.    Through Mr. Anderson, Mr. Jones has a job available upon release at General Plastics, in Milwaukee Wisconsin.

190.    Nothing in Mr. Jones's record suggests, nor was any finding made, that he was the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility."

191.    Mr. Jones has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Plaintiff Joseph Orosco*

192.    Plaintiff Joseph Orosco is 40 years old and has been incarcerated for over 23 years for crimes he committed when he was 16 years old.

193.    In 1997, Mr. Orosco was sentenced to life with the possibility of parole after 22 years for first-degree intentional homicide.

194.    Mr. Orosco grew up in Green Bay, Wisconsin as a member of the Oneida Nation.

195.    Mr. Orosco and his three sisters were raised by their single mother after his parents divorced when Mr. Orosco was just 10 years old.

196.    Mr. Orosco soon began acting out in school, getting in fights with other kids, often in response to racial slurs lodged at Mr. Orosco for his Native American identity.

197.    Due to his outbursts in middle school, Mr. Orosco was put into special classes for the emotionally disturbed and children with learning disabilities.

198.    Mr. Orosco had his first run in with law enforcement at the age of 13 for disorderly conduct, and continued to have minor run-ins prior to his crime of conviction at age 16.

199.    Mr. Orosco's criminal behavior was a result of his frustration and inability to express himself and peer pressure from his friends to act out to impress others and fit in.

200.    On November 20, 1996, Mr. Orosco and his friend Hugo were dining at a restaurant when a man on the phone walked in and exchanged "dirty looks" with them. The man told the person on the other end of the phone call that he was going to stab Mr. Orosco and Hugo. Hugo informed Mr. Orosco that he was going to go home and come back to the diner to fight the man. Mr. Orosco was dropped off at home, where he retrieved a shot-gun and proceeded to get in his own car and drive himself back to the restaurant to meet Hugo. When Mr. Orosco and Hugo arrived, there was another exchange between Hugo and the man. Although Mr. Orosco began to unload the gun, the man chortled at him in a belittling way and then turned his back while taking a sip of beer, almost challenging Mr. Orosco. That's when Mr. Orosco shot him.

201.    Now, after more than 23 years in prison, Mr. Orosco is a changed person. He has aged and matured, taken advantage of institutional programming to better himself, has accepted full responsibility for his crime, showing great remorse, and blames no one but himself.

202.    Mr. Orosco has worked hard to improve and educate himself in prison. He earned his High School Equivalency Diploma early on. He successfully completed anger management, cognitive intervention programming, Commitment to Change, Diversity Circle training, Framework for Recovery, Able Minds training, and Alcohol and Other Drug Abuse treatment programming. He also became a certified tutor to other inmates for the high school equivalency test.

203.    Mr. Orosco worked for Badger State Industries from 2014 through 2019 where he learned welding and machining. Mr. Orosco received good job reviews while working at BSI.

204.    Mr. Orosco has demonstrated good behavior and a very low risk of violence. His last major ticket was in 2013, more than 7 years ago, for possession of contraband when he requested his friend mail him CD's that were not approved by the institution. Mr. Orosco's last minor was in 2019 for letting someone else punch his time card. When asked by the Parole Commission why he would make such a careless decision, Mr. Orosco admitted that he only did it because everyone else was but that he knew it was wrong and regretted it.

205.    Mr. Orosco became eligible for parole in November 2018 and he has been denied parole twice. His next parole hearing date is set for June 2021.

206.    Despite having matured dramatically, successfully availing himself of all rehabilitative programming, and the state's own risk-assessment tool scored Mr. Orosco as a "low" risk, on October 18, 2018 at Mr. Orosco's first parole hearing, Mr. Orosco was denied parole. The Commissioner noted that his institutional conduct and program participation had

been satisfactory, he developed an adequate release plan, but denied release to parole because he had "NOT served sufficient time for punishment."

207.     Mr. Orosco was up for parole again on March 24, 2020 and was again denied parole and instead given a 15 month deferral. This deferral was largely based on the minor ticket detailed above related to letting someone else punch his time card. However, the Commission's reasoning stated, "due to the severity of your case, it does not appear that sufficient time has been served . . . ."

208.     Despite Mr. Orosco's accomplishments, he was also denied a transfer to a minimum security prison that he requested in 2019. Mr. Orosco appealed this denial and explained he was told by BOCM that he "was not allowed to be placed at a minimum site in absence of an 11 month defer and parole endorsement" even though "according to Wis. Adm. Code DOC 302.12, '[a]n inmate serving life sentence shall have reached parole eligibility under s.973.014 stats, prior to consideration for a minimum or community custody classification.'" Mr. Orosco's appeal was rejected noting that "no factual error noted." He was recently denied a transfer to a minimum security prison again on October 1, 2020 on the same grounds.

209.     Further, Mr. Orosco has been denied access to programming on multiple occasions. For example, in 2013 and 2014, Mr. Orosco expressed his interest in machining, requesting a transfer to Fox Lake to learn it, but was denied because he was not parole eligible.

210.     Nothing in Mr. Orosco's record suggested, nor was any such finding made, that he was among the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility."

211.     Mr. Orosco has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the

right to have facts that enhance the penalty to which a criminal defendant may lawfully be sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Plaintiff Dujuan Nash*

212.     Plaintiff Dujuan Nash is 38 years old and has been incarcerated for over 21 years for reckless homicide and mutilation of a corpse; a crime he committed at the age of 17 years old. In 1999, Mr. Nash pled guilty and was sentenced to 50 years in prison.

213.     His presumptive mandatory release date is December 9, 2032, by which time, Mr. Nash will be over 50 years old.

214.     Mr. Nash was born in Merrillville, Indiana and raised in Gary, Indiana from age two to eight. When he was five years old his parents divorced. As a result, Mr. Nash spent the school year with his mother in Milwaukee, Wisconsin and the summers with his father in East Chicago, Indiana.

215.     At the age of eight, Dujuan decided to live with his father year around and moved to East Chicago, Indiana. Two short years later, Mr. Nash's father died suddenly from lung cancer and Mr. Nash returned to his mother's home in Milwaukee.

216.     Losing his father was incredibly difficult for Dujuan and led him to act out. He fought with his mother's boyfriends and argued with his classmates. As a result, he was often suspended, placed in a school disciplinary program which sent him to 3rd grade classrooms as punishment, and started counseling. Still, Mr. Nash lacked any drive to excel in school and was eventually expelled.

217.     He started high school on the east side of Milwaukee and felt that he had a fresh start, however, these feelings quickly dissipated. Although Dujuan's mother was a loving and

supportive parent, her work required her to be absent from the home. Unsupervised, Dujuan fell in with a troublesome group of friends and started skipping school to abuse drugs and alcohol.

218.    Due to his truancy, Dujuan was again expelled and sent to night school which required him to tutor younger students during the day. This program frustrated Dujuan immensely because he was initially sent to a 5th grade classroom to tutor, but was unable to complete the work himself. Dujuan failed to complete the program and stopped attending school all together after the 11th grade. During this time, Mr. Nash began selling crack cocaine.

219.    One night, while using drugs and drinking alcohol, Mr. Nash became angry at a friend who had been at his mother's home socializing. The anger stemmed from a previous altercation. Blindsided by this anger, Mr. Nash stabbed his friend to death. Fearing his mother's response, Mr. Nash then decided, in order to remove the body from his home, he cut up the body and placed the parts into suitcases. He then deposited the suitcases in garbage dumpsters around town.

220.    Now, after more than 21 years in prison, Mr. Nash is a changed person. He has spent his time in prison committed to bettering himself. He has completed all assigned program needs and has two vocational certificates (barber/cosmetology and CNC).

221.    Mr. Nash has only received three major tickets while in prison the last of which was issued in 2008, over a decade ago.

222.    In 2001, he received his only major ticket related to a violent offense relating to an incident in which Mr. Nash tried to defend himself from a fellow inmate.

223.    In 2012, after serving 13 years for his crime, Mr. Nash became eligible for parole. A parole interview was held in January, 2012, at which time the Parole Commission denied Mr. Nash's release even after Mr. Landreman labeled his conduct as "satisfactory." The

Commission did not indicate that Mr. Nash was not sufficiently mature and rehabilitated and instead deferred parole for him for 42 months—nearly four years after he was eligible for release.

224.    In 2015, Mr. Nash was again interviewed for parole. During this interview, Mr. Nash inquired about a classification reduction. In response, then-chairperson Landreman stated, "I think you would do just fine in a reduced security setting," but "the Commission does not make decisions about your classification or placement in the system." "Typically for an inmate with your sentence structure, you're going to serve anywhere from 12 to…36 months at a secure minimum and probably a similar timeframe at an unfenced minimum… And, then when you receive minimum community custody and you become eligible for work release in the community you are probably looking at a similar timeframe on minimum community custody before we're going to get serious about sending you home because it's important for you after having served so much time in prison (clapping his hands) to make that transition down and to prove yourself at each step along the way."

225.    Mr. Nash has been rehabilitated and is no longer a reckless teenager. He now understands the consequences of his actions, on March 5, 2015, he informed the BOCM: "I have matured into a man that takes responsibilities for his actions. I discovered a moral code that requires me to treat everyone as I want to be treated, regardless of their actions towards me. I learned how to express compassion, kindness, and gentleness. I tried to learn from others to make me a better person. I understand the weight that my crime has against me. Reading my actions on paper disturbs even me. I am trying to be better." Mr. Nash has also committed his life serving the Lord and is currently enrolled in the Trinity College baccalaureate program at Waupun Correctional Institution.

226.    Throughout his incarceration, Mr. Nash has maintained strong ties with his family and is in constant contact with his immediate and extended family. In fact, during his 2015 parole interview, Mr. Landreman stated: "You have more community support than most…In your case, your family obviously continues to stand behind you."

227.    Defendants last denied Mr. Nash release on June 14, 2018, again on the grounds that the "disturbing nature" of his crime required him to serve additional time for punishment. During the interview, Mr. Landreman stated: "I'll be honest with you in saying that I have seen men in prison serving life sentence for, yes, taking a nothing life, but for less egregious circumstances… because it's what aggravates this case and that is what you did with that body after you took the life from him and it's difficult for me and I have to be most anybody to comprehend and understand how another individual is capable of caring out those actions these fine people, I think have some understanding of what happened to their son… but they were never able to bury him. I have trouble getting past the fact that he is in some landfill somewhere. You got a 50 year prison sentence, Mr. Nash, and it was pretty evident that the Judge intended you to serve a significant amount of time…but I can't help, but do the math and technically you are 15 years to your release date…if you serve the next 14 and half years in prison, you are basically coming to be 50 or 51 when you release on your MR date…even if you were released on your mandatory release date you will still have a pretty significant amount of life ahead of you. Your victim only had 18 years on this earth…because you took that… selfishly." Mr. Landreman then "commended" Mr. Nash for taking the positive opportunities available to him while in prison. Mr. Nash received another 36 month deferment of parole. He is scheduled to be reviewed by the Parole Commission in August of 2021.

228.    Each time Mr. Nash has been interviewed by BOCM, he is denied a lower classification because he did not have a recommendation from the Parole Commission. In September 2017, the BOCM stated: "a custody reduction at this time would be too risky for the community perception."

229.    Nothing in Mr. Nash's record suggests, nor was any finding made, that he was the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility."

230.    Mr. Nash has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Plaintiff Brian Pheil*

231.    Plaintiff Brian Pheil is 50 years old and has been incarcerated for 33 years for crimes he committed as a juvenile.

232.    Mr. Pheil endured abuse and neglect from before he was even born. His mother's drug and alcohol addictions stunted Mr. Pheil's pre- and post-natal development. As a result of his mother's drug-addiction, a 1987 court-ordered psychological report noted that Mr. Pheil suffered from "severe learning disabilities that made achieving in school or even sitting still in class nearly impossible."

233.    Mr. Pheil was also frequently targeted by school bullies who taunted him because of his shabby clothes and because he lived in a mixed-race household, uncommon in Superior, Wisconsin where 94% of people were white. Mr. Pheil often had to defend his younger Black siblings from physical assault. The trifecta of bullying, discrimination, and learning difficulties made school "a chronic failing experience" for Mr. Pheil—a place where he felt ostracized and excluded.

234.     Home life was worse. His mother's struggles with addiction— and the carousel of violent men she brought home—created a toxic, unstable childhood. Mr. Pheil often had to physically defend himself and his mother from her violent boyfriends.

235.     In one incident, when Mr. Pheil was around 11 years old, the boyfriend burst into Mr. Pheil's room in a fit of rage. His yelling escalated to violence, ultimately grabbing Mr. Pheil's throat, slamming him into the floor, and repeatedly stomping and kicking him.

236.     Alarmed by Mr. Pheil's wounds, his school referred him to a social worker. The social worker investigated the abuse but ultimately made it worse by betraying Mr. Pheil's trust and sharing his allegations with his abuser. Those allegations provoked further abuse.

237.     From ages 12 to 15, Mr. Pheil found relief from the violence at home during two separate stints at the Northwest Passage boys' home. When Mr. Pheil was notified that his second stay at the boys' home was set to expire, he desperately sought any way to avoid returning to the mounting abuse he faced at home. His first and only positive role model, the facilitator of a group for children whose parents were addicted to drugs, tried to adopt him, but her requests were denied.

238.     Forced back home again, Mr. Pheil saved his mother from an abusive boyfriend for the last time. He awoke to her familiar screams and found her then-boyfriend beating her with a 2x4 downstairs. After ordering the boyfriend out of the house, Mr. Pheil consoled his mother and urged him to not bring the violent man back. A few days later, she brought him home again, forcing Mr. Pheil out.

239.     At just 15 years old, Mr. Pheil escaped to Denver, Colorado to live with his two older siblings who had run away before him. Both young teenagers themselves, neither sibling could take care of Mr. Pheil.

240.     When Mr. Pheil was 16 years old, his older brother left Denver and abandoned Mr. Pheil in the home of a man Mr. Pheil hardly knew. His brother's friend sexually abused Mr. Pheil while he lived there.

241.     Mr. Pheil escaped at 16 years old and was taken in by two sex workers and their pimp. The pimp gave Mr. Pheil a car to drive which, unbeknownst to him, was stolen. Mr. Pheil was charged with theft of a motor vehicle and sent back to Wisconsin to live with his mother while on probation.

242.     In June 1987, when Mr. Pheil was 17 years old, he followed his two co-defendants into the home of his neighbor, John Ennis, to commit a burglary. During the burglary at which Mr. Pheil was present, his co-defendants violently and brutally murdered  Mr. Ennis and Mr. Pheil did not take action to prevent the murder.

243.     Which of the three committed which act was hotly disputed at trial and Mr. Pheil was convicted in 1988 of being a party to first-degree murder, party to armed robbery, party to burglary, and party to theft. He was sentenced to life in prison, plus 35 years to be served concurrently.

244.     Although Mr. Pheil was just 17 when he committed the crimes, the court-ordered psychology report estimated that his "brain age" was even younger. He had the mental capacity of an average 14-year old.

245.     After 33 years in prison, Mr. Pheil, now a 50-year-old man, has been rehabilitated and is no longer the person he was as a teenager. He has risen above the abusive circumstances of his youth, seeking out educational, professional, and personal opportunities, defying the odds that further schooling would produce "inevitable failure" by earning a high school diploma.

246.     Over the past 33 years, Mr. Pheil has worked hard to build a foundation for vocational success, studying cabinetmaking, carpentry, and cosmetology. He is a respected barber and plans to continue his barber career when released.

247.     Mr. Pheil has also sought out prosocial relationships and developed stronger family ties outside of the prison than he ever had as a child. His aunt and fiancée both call and visit regularly and have provided Mr. Pheil with stability and emotional support while he has been incarcerated. Mr. Pheil has also built relationships with other family members, but many of those have died since he entered prison, including his mother, grandmother, sister, two aunts, an uncle, and his daughter. Mr. Pheil's dream is to marry his fiancée and continue building a life and being a grandpa to her grandchildren when he is released.

248.     Mr. Pheil attributes his turn-around to individuals in his life who believed in him and were willing to help him and to a restorative justice program. The restorative justice program helped him to "think about the victim, and reflect on how it affected his life, my life, and how I can't atone for it…I was able to see the pain that relatives of my victim must have had."

249.     A role model in the prison community, Mr. Pheil has used his maturity and insight to help others. He participated in a voluntary self-help group for over five years, has mentored troubled teens through two institution programs, and has become an ordained minister.

250.     Despite Mr. Pheil's demonstrated remorse and rehabilitation, he has been denied parole eight times and has served 16 years beyond the retributive portion of his sentence. Mr. Pheil first became eligible for parole in October 2005 after serving 17 years in prison. He was given a thirty-six-month deferral. Mr. Pheil was subsequently denied parole in August 2008 (twelve month deferral), August 2009 (twelve month deferral), August 2010 (twelve month

deferral), August 2011 (twelve month deferral), July 2015 (twenty-four month deferral), July

2017 (thirty month deferral), and January 2020 (eleven month deferral).

251.    The Parole Commission has unconstitutionally denied Mr. Pheil parole based on

factors unrelated to his demonstrated remorse and rehabilitation.

      a.    Commissioner LaCost cited Mr. Pheil's juvenile record, including unadjudicated accusations and an incident from when he was just eleven years old, as a reason to deny him parole as a forty-seven-year-old man in 2017.

      b.    Mr. Pheil's 2017 parole denial was based on the commission's finding that he had "NOT served sufficient time for punishment" despite the fact that he had served 13 years beyond the retributive portion of his sentence as of 2017.

      c.    The commission denied Mr. Pheil release in 2017 because his "program participation has NOT been satisfactory" based on the fact that he had not completed CGIP programming, but DOC's own policy of not making the programming available to those deemed low risk prevented him from completing the programming.

252.    Mr. Pheil accepts responsibility for the tickets he has received while incarcerated,

the last of which was in 2017. However, the Parole Commission has misconstrued Mr. Pheil's

disciplinary record to support its finding that his "institutional conduct has NOT been

satisfactory." For example:

      a.    In March 2010, Mr. Pheil was discovered in his cell with severe injuries that required him to be hospitalized. He had been jumped by a group of inmates in the prison bathroom. After returning from the hospital, Mr. Pheil was himself given a ticket for fighting.

      b.    Commissioner LaCost also denied Mr. Pheil release to parole supervision in 2017 because he had received a disciplinary ticket for wearing a gold wedding ring during a visit from his fiancée in 2012.

      c.    Mr. Pheil's most recent ticket, in April 2017, was again for himself being assaulted, this time on the basketball court. After a hearing and review of a videotape of the incident, in which it was plain that Mr. Pheil had himself been assaulted, Mr. Pheil was exonerated of the charge of assault but was given a major conduct ticket for "disruptive conduct" for talking back to the person who assaulted him. Yet Commissioner LaCost denied him

release to parole supervision saying that his "own behavior provokes these assaultive encounters."  The parole board's own report stated that Mr. Pheil complied with a correctional officer's instructions to cease the altercation, even as the other inmate continued to hit Mr. Pheil until the correctional officer used pepper spray.

253.    Nothing in Mr. Pheil's record suggested, nor was any such finding made, that he was among the "rarest of juvenile[s]…whose crime reflects permanent incorrigibility."

254.    Both of Mr. Pheil's co-defendants, one of whom was younger and one of whom was older than he was at the time of the crime, have received parole. His COMPAS risk assessment is low.

255.    Mr. Pheil has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Plaintiff Deng Yang*

256.    Plaintiff Deng was born in Laos and moved to the United States when he was approximately seven years old after spending his early childhood in a refugee camp. His family originally lived in California and then moved to Madison, Wisconsin when he was nine or ten years old.

257.    After moving to the United States, Deng found school difficult because he did not speak English and had to enroll in ESL classes to learn. He was also placed in additional programming due to potential learning disabilities.

258.    Deng's mother died of leukemia when he was only twelve or thirteen years old. He was thereafter cared for by his grandmother and father. A few years later, Deng's family moved again, this time to Milwaukee, Wisconsin, where he started at a new high school at age fifteen. He befriended a neighbor of his, Michael Bruss, who was also his age.

259.     In 1997, a neighbor of Deng's, Harrison Fields, approached Deng's father, Chong Yang, and offered him $25,000 "to find minorities to kill his wife." Chong Yang refused, and further warned Deng, who was fifteen at the time, to stay away from Mr. Fields, whom he recognized as a "bad person," and from Michael.

260.     Mr. Fields had also approached Deng's friend, Michael Bruss, another teenager, asking him to kill his wife in exchange for money and a truck. Michael said he would ask Deng to do it and Mr. Fields began to pressure Deng. Deng initially refused, but Mr. Fields would not take no for an answer, and repeatedly and insistently found ways to be alone with Deng and began grooming him for the job. Mr. Fields hired Mr. Yang to cut his grass and paint his window. At other times, Mr. Fields would come to Deng's house and take him driving. During these drives, he would tell Deng that his wife had killed or aborted some of her children and was a bad person. Even in his own yard, Deng could not escape Mr. Fields, who would approach him when he was doing household chores, such as taking out the trash. Michael also pressured Deng to do the "job".

261.     Worn down by the bombardment, Deng, a teenager with no prior criminal record, finally relented and agreed to do as Mr. Fields, an adult, had asked.

262.     The morning of the crime, Michael and Deng met Mr. Fields in his basement. Michael was in the house when Mr. Fields gave Deng a gun and told him where in the house to find his wife. Mr. Fields then asked Deng to call him at work later in the morning to help Mr. Fields establish an alibi. Deng did as he was told: he went into Mr. Fields's house with the gun and shot Mr. Field's wife, Mrs. Tracy Fields. Michael, not Deng, was later paid $80 by Mr. Fields.

263.    In the time between the crime and his arrest, Deng was plagued by guilt. He recalled that he "couldn't sleep at all" during this period. He told his lawyer, after being arrested, that he felt "bad" and that he would "take the blame for everything."

264.    Deng, at age fifteen, pleaded guilty to being party to a crime of first-degree intentional homicide and was charged as an adult and sentenced to life in prison with parole eligibility after serving 13 years and 4 months. The sentencing judge felt Deng was manipulated by Mr. Fields, who had "orchestrated" the crime, as Deng was young and impressionable at the time. According to the sentencing minutes, Mr. Fields evidently had "previously served time for 2nd Degree murder after he stabbed his girlfriend multiple times resulting in her death."

265.    An expert who evaluated Deng after his arrest concluded, per Deng's attorney, that Deng "lacked substantial capacity for judgment due to his young age" and the possible cognitive side effects of a childhood illness that had delayed his development. Nonetheless, fifteen year old Deng Yang was sent to maximum-security Columbia Correctional Institution.

266.    While incarcerated, Mr. Yang has been a model of "excellent" "institution[al] adjustment." His disciplinary record is exemplary and he has excelled in his programming and in his employment. He has not had a major disciplinary ticket in over 20 years and has progressed from a fifteen-year old kid who was coerced into committing a terrible act, to a man who has shown time and time again that he is remorseful for his actions and that he is prepared to reenter the civilian world.

267.    Mr. Yang has excelled at his job at Badger State Industries (BSI). He has worked at the BSI Sign Shop for approximately eight years. During his 2019 performance review, he received a near-perfect 49 points out of a possible 50. He received the following commendation for his excellent work: "He is a very skilled and kno[w]ledgeable person"; "always willing to

help out in other areas"; "always willing to share his knowledge with others"; and "he is a very valuable asset to the shop."

268.    Mr. Yang also garnered praise for his work as an indoor rec worker in 2013, receiving the highest possible score on his review. His evaluation further stated: "Mr. Yang goes above and beyond instruction for the Recreation Department."

269.    Mr. Yang has served more than *twenty* years without a major conduct report and has *never* had a conduct violation for violence. His only major conduct report was in August 1999 for making a three-way phone call.

270.    Furthermore, Mr. Yang's last *minor* report was twelve years ago. He was reported for being in an "unassigned area" when he helped another individual who was struggling with a food cart. Even one of the prison authorities was shocked at the report and said he would not have reported Mr. Yang for helping someone navigate a food cart.

271.    Mr. Yang earned his High School Equivalency Diploma in 2005 and has completed his vocational training in custodial services. He has also completed all of his programming requirements to the satisfaction of the Parole Commission.

272.    Mr. Yang comes from a large family and has kept in close contact with them while incarcerated. He emails weekly with his family and they visit him annually. Mr. Yang has discussed his plans, should he be released, with the Parole Commission. As of his August 2020 parole interview, Mr. Yang intended to live with his father and step-mother. Multiple family members, including his sisters Blia and Pa Dao, also offered their support and a place to live. Moreover, both Mr. Yang's mother and sister own their own clothing alternation companies and have offered him employment after release.

273.     Mr. Yang was first eligible for parole consideration in 2011. He has been denied parole seven times. His first four deferrals were each for 24 months. The fifth was for 12 months, the sixth was for 10 months, and his most recent deferral was for 8 months. He has now served nearly ten years more than the plea deal retributive term, despite the fact that he has not received a major report in twenty years and has completed his programming requirements.

274.     During Mr. Yang's 2012 review, Defendant Commissioner LaCost noted that Mr. Yang had been "very young and vulnerable when [he] committed this crime." However, the Parole Commission also stated that "more time should be served towards punishment" and listed two of the reasons for the denial as, "[y]ou have NOT served sufficient time for punishment" and, without explanation and in contradiction to the state's own risk assessment tool, that "[r]elease at this time would involve an unreasonable risk to the public." Commissioner LaCost also said that Mr. Yang would not be considered for release until he had "transitioned successfully through reduced custody" and met a programming need—even though the BOCM refused to reduce his custody level or allow him to take the program LaCost said was needed.

275.     In October 2015, a risk assessment determined that Mr. Yang was a "low" risk for "violence" and "recidivism," and his "COMPAS Recommended Supervision" was also "low." When his score was broken down at a more granular level, he scored in the "low" or "unlikely" range for every factor except for four: "Current Violence" "Early Onset," "Gang Indicators," and "Vocation/Education." The first two indicators, Mr. Yang's crime and the age at which he committed it, are immutable characteristics. Mr. Yang was at no time a member of a gang. Finally, Mr. Yang has asked the Parole Board for opportunities to further his job prospects. He stated in one of his letters to the Parole Board that he hoped to transfer to a minimum-security facility "so that I can further my job experience."

70

276.     During his 2016 review, the Parole Commission noted that Mr. Yang "had no prior record, [he had] served [his] time in a productive manner and [he had] made the most of the available opportunities." The Parole Commission noted that Mr. Yang "remain[s] apologetic to everyone [he] harmed." The Parole Commission further recognized that Mr. Yang has found it "difficult to live with" the choice he made, but that he has "chosen to make the most of [his] situation." The Parole Commission further encouraged him to "[k]eep up the good work" but denied parole and again listed two of the reasons as: "[y]ou have NOT served sufficient time for punishment" and "[r]elease at this time would involve an unreasonable risk to the public." Instead, the Parole Commission stated he needed to qualify for "reduced custody with work release."

277.     Despite Mr. Yang's evident maturation and his success at the opportunities afforded to him, the Parole Commission has imposed additional steps before he can be granted parole. At Mr. Yang's November 2018 parole interview, Mr. Landreman informed Mr. Yang that before Mr. Yang would be released he would need to be transferred to a secure-minimum and, after that, a minimum community facility and and "[b]e on work release for a period of time, earn some money, [and] get [his] driver's license."

278.     In January 2019, the BOCM again denied Mr. Yang minimum security classification even though he had not had any conduct violations *at all* for more than ten years, had completed his programming requirements, was assessed at a COMPAS Risk Level Recommendation of "low," and "[had] maintained positive adjustment and employment for a significant amount of time." The only reason BOCM refused to reduce his security classification was the "potential time remaining to serve" and "dynamics of [the] offense" Mr. Yang committed when he was fifteen years old.

279.    Despite Mr. Yang's "low" COMPAS risk score, the BOCM *overrode* his COMPAS recommendation and rated him as "Moderate Risk" on its own unvalidated internal risk assessment rubric because of his lengthy sentence and his original crime: two things that will never change.

280.    In November 2019, then-Commissioner LaCost acknowledged that Mr. Yang had "developed an adequate plan," "served sufficient time for punishment," and that both his "institutional conduct" and "program participation" had been "satisfactory." Yet he was *still* not released because Commissioner LaCost, for unsubstantiated reasons determined that "[r]elease at this time would involve an unreasonable risk to the public" and expected him to "transition[] through reduced custody with successful adjustment at work release, obtain[] a driver's license, save[] additional money and secure[] an approved release plan" to "aid further risk reduction." At this interview, now eight years after Mr. Yang became eligible for parole—LaCost finally endorsed custody reduction to minimum.

281.    Then, in January 2020, the BOCM *overrode* the Parole Commission's recommendation, writing that "Mr. Yang's current offense occurred when he was just still a teenager and was extremely assaultive . . . He has been incarcerated in a maximum or medium security facility for just under 22 years. These factors create a heightened level of risk." The BOCM stated that Mr. Yang instead needed "a slower transition to a WCCS center." Thus, the BOCM recommended Mr. Yang to John Burke Correctional Center because it has "more restrictions than… other WCCS centers." Mr. Yang was denied minimum community custody again because of the nature of his original crime and his age at the time he committed it, which are not features he can change or on which he can demonstrate growth to the PRC.

282.     In August, 2020 Mr. Yang was denied release to parole supervision for the seventh time. During her interview of Plaintiff Yang Defendant Kramer again stated that she would like to evaluate Mr. Yang's progress after he had served time at a minimum-custody facility. At this point, Mr. Yang has served almost a decade longer than the retributive portion of his plea deal, yet the Parole Commission continues to erect additional hurdles for him to clear before granting him parole.

283.     Now, Mr. Yang is *still* incarcerated at the medium-security facility Stanley Correctional Institute, where he has been for the past eighteen years, as he awaits a transfer to a lower-security facility. Mr. Yang has been incarcerated for more than twenty-two years at this point, and nine years longer than the retributive portion of his plea deal.

284.     Mr. Yang has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Plaintiff Barney Guarnero*

285.     Plaintiff Barney Guarnero is forty-one years old and has been incarcerated for twenty-three years for crimes he committed at the age of seventeen. He became eligible for parole in 2011, has been denied release three times, and has now been incarcerated for almost a decade longer than the retributive portion of his sentence.

286.     Mr. Guarnero's parents, teenagers struggling with drug and alcohol addiction, were unable to care for him and his younger brother. At the age of five, Mr. Guarnero was placed in the care of his grandmother along with his three year old brother and his teenaged uncle, Robert.

287.    At his grandmother's home, Mr. Guarnero was often physically beaten by his aunt and locked in a room alone for extended periods of time. Robert, only 15 years older than Mr. Guarnero and already involved in petty crimes, served as father figure and was the primary and permanent adult influence on Mr. Guarnero throughout his childhood.

288.    In elementary school, Mr. Guarnero was regularly attacked by other kids because he was perceived as a "ragged dirty little kid" and wore shabby, torn clothes. This bullying sometimes escalated into physical fighting. While still in elementary school, Mr. Guarnero began skipping school to escape the bullying.

289.    In the fourth grade, Mr. Guarnero was placed into an emotional disturbance program at his elementary school as a result of his frequent absences and involvement in altercations. As part of this program, Mr. Guarnero was separated from the students subjecting him to harassment. The teachers in this program gave Mr. Guarnero individual attention and guidance for one of the first times in his life.

290.    Although the special program improved Mr. Guarnero's performance in school, by fourth grade it became too dangerous to attend school. Gangs on the South Side of Milwaukee during that time period, where Mr. Guarnero lived, were in constant and violent territorial disputes. Mr. Guarnero, not a member of a gang himself at the time, had to cross territory of four different rival gangs each day just to get to school, the MPs, the Spanish Cobras, Latin Kings, and the Insane Unknowns. Mr. Guarnero was chased and beaten while walking to or from school by members of the different gangs on eight separate occasions and was sent to the hospital three times—once for stab wounds, broken bones, and once for stitches after he was pounded over the head with a metal bar. The violent gang competition in the area made it impossible for Mr. Guarnero to leave his own several block area without risking assault.

291.    When Mr. Guarnero was about 13 years old his older cousin introduced him to a local gang, the Nasty Boys for protection from the violence in his neighborhood. In order to maintain their membership in the gang, he and his cousin began engaging in criminal activity. At fourteen years old, Mr. Guarnero was put on probation after being charged for being in proximity to a gun found on the street and after helping his uncle, a person who served as father figure and mentor to Mr. Guarnero, steal a car.

292.    Mr. Guarnero was placed in the United Community Center, an alternative high school in Milwaukee, as part of his probation. The classes in the school were smaller and there was more individualized attention. Mr. Guarnero felt cared for by his teachers and began to make strides in his learning and self-perception.

293.    During his time at the United Community Center Mr. Guarnero realized his involvement in the Nasty Boys was creating more harm than good and chose to disassociate from the gang by getting "jumped" or "violated" out, that is, allowing himself to be physically beaten by the gang for several minutes in order to leave its membership. Mr. Guarnero's cousin gave him a gun for protection and security.

294.    Once Mr. Guarnero separated from the Nasty Boys, he sought out his father in an attempt to build a positive connection and seek out an alternative father figure to his crime-involved uncle. His father had his own new family and not much time for Mr. Guarnero, but by the time he was sixteen, he and his father had rekindled their relationship; they would see each other frequently and Mr. Guarnero would stay at his father's house on occasion. Only a year into the newfound relationship Mr. Guarnero's father died suddenly in a hospital bed after routine back surgery.

295.    Mr. Guarnero again began struggling academically and returned to the influential ambit of his gang-involved uncle and cousins, who were, as LaCost herself described, "the male influences in [his] life.

296.    In 1997, at age 17, Mr. Guarnero was living with his older cousin, David Rivera. In December of this year, David planned on walking to a party to pick up some of his friends. The party took place at a home on the corner of 6th and Mitchell, a notoriously dangerous part of Milwaukee and a neighborhood where Mr. Guarnero had been robbed twice in the preceding year. Mr. Guarnero offered to drive them, concerned that, had they decided to walk, they would expose themselves to the frequent violence that took place in that area. His girlfriend, who was pregnant at the time, decided to come with Mr. Guarnero and keep him company on the drive.

297.    As Mr. Guarnero drove to the house to pick them up at the end of the party, he saw a group of men outside yelling and throwing gang signs. Mr. Guarnero left the party without incident but had to turn back at the request of one of his friends who forgot her purse at the party. When Mr. Guarnero arrived at the party the same group of men advanced on his vehicle, yelling at him. Mr. Guarnero opened the door to hear what they were saying and saw one of the men reach down as if drawing a weapon. Mr. Guarnero drew first and shot five times out of the window of the vehicle and drove away. He was not aware that he had killed anyone until he was arrested the next night.

298.    Mr. Guarnero was charged with first-degree reckless homicide for killing the man who he thought had been drawing a weapon and first-degree reckless injury with a deadly weapon for an injury to another member of the group who had advanced on Mr. Guarnero's car. Mr. Guarnero's attorney convinced him to take a plea deal of forty-five years, and told him that with that sentence he would be paroled in 12 years.

76

299.    At his plea hearing, however, Mr. Guarnero's judge deviated from the agreed-upon sentence. He was sentenced instead to forty-five years and fifteen years, to be served consecutively for a total of sixty years, with eligibility for parole after serving 14 years. He was never told why he was given the maximum sentence and why the judge rejected the agreed upon terms of the plea.

300.    Without a grant of release, Mr. Guarnero will be seventy-seven years old before he is released from prison.

301.    Soon after his conviction, Mr. Guarnero turned eighteen and anticipated spending the rest of his adult life in prison. At the beginning of his incarceration, Mr. Guarnero felt angry and hopeless. He was given several tickets for fighting and being disruptive. He felt as though his opportunity to live a meaningful life was no longer in reach.

302.    As he grew older, Mr. Guarnero received fewer and fewer disciplinary tickets. His most significant major ticket was in 2009. This ticket was the result of Mr. Guarnero's attempt to prevent violence within the prison. He knew that a former acquaintance of his was going to enter the prison, and that others within the prison intended to start a fight with the new individual. His mitigation strategy began with simply discussing the potential conflict between the groups. Yet, before any altercation took place, correctional officers caught wind of his conversations through two confidential informants.

303.    For his attempt to prevent violence in the prison, Mr. Guarnero was given three years in the segregation unit. He was not allowed to hear the evidence against him or to confront his accusers; he appealed the ticket but was dismissed for failing to meet a filing deadline.

304.    For three years, Mr. Guarnero was deprived of any interpersonal interactions. He was allowed phone calls once per month but was otherwise allowed no contact with anyone but

often hostile correctional officers in the facility. To keep himself sane, he made drawings, read, wrote, and exercised. For the first year of segregation, he was on "program status," meaning his year in segregation extended his total amount of time in prison. For the second and third year, he was in "administrative confinement;" his time was not extended, but he remained in the same cell, enduring the same isolation, day after day, for two years. After three years, he was released back to the general population.

305.    Today, having spent twenty-three years in prison, Mr. Guarnero is a changed person. While much of his growth can be attributed to his physiological maturation, he has worked hard with what little resources were available to him to educate himself, help others, and to grow as a person. To date, he has completed all the programming that he was asked to in anticipation of his future parole hearings. He completed an anger management class, a communications class, CGIP, a restorative justice program, and other programs made available to him. He donates artwork he makes to charity auction fundraisers to raise money for a shelter for battered women and children. Mr. Guarnero also grows his hair to donate to Locks of Love, a charity which provides wigs to children undergoing chemotherapy. The recipients of his hair sent him a card of gratitude and it made him "feel good, so [he] did more and more" acts of giving.

306.    Mr. Guarnero has several supportive family members and friends who will support him when he is released on parole. His mother has re-entered his life, and they speak once a week. His cousin, a Milwaukee schoolteacher, has asked him to stay with her once he is released. Even his former teachers ask about him and anticipate his return to the community. Mr. Guarnero's plans for his release include working in construction, and volunteering to build and fix houses for low-income families in the community.

307.   Mr. Guarnero, understanding the importance of rehabilitation, voluntarily waived his first opportunity for a parole hearing in 2011. He wanted to have more time to show the Parole Board that he has grown from the person he was as a teenager in 1991.

308.   Since he first became eligible for parole, and after the initial waiver, Mr. Guarnero has been denied parole on three separate occasions: in 2014, 2017, and 2019.

309.   In 2017, he was denied parole because the parole board determined that he had not "served sufficient time for punishment." In his report following the denial of parole, the Commissioner said that "more time should be served noting the seriousness" of the crime, and that "release at this time would pose an unreasonable risk." The defendants gave no details or elaboration to explain why Mr. Guarnero's release would be unreasonably risky, or how the seriousness of the crime bore on their decision.

310.   In November 2019, Commissioner LaCost again denied Mr. Guarnero release to parole supervision even though she acknowledged that Mr. Guarnero had not had a conduct report in five years and that he was remorseful for his juvenile actions. Commissioner LaCost denied release on the stated basis that "[r]elease at this time would involve an unreasonable risk to the public" in direct contradiction of the state's own risk assessment tool finding Mr. Guarnero to be low risk. Commissioner LaCost also denied release stating that Mr. Guarnero had "NOT served sufficient time for punishment" (sic) even though he had long passed the date on which he became eligible for parole supervision under the statutory scheme for the crimes for which he was convicted. Commissioner LaCost also denied release for the reason that an "unmet TX need of SUD" – a program he did not have access to because he was repeatedly denied medium security custody, where the program was available. Instead, he was told he was "expected to save money and demonstrate good budgeting skills which is required in the community."

Commissioner LaCost told him that he could not expect release until he had "transitioned through reduced custody levels, completed programming, earned work release, saved money, and obtained a drivers license."

311.    In advance of his February 2020 PRC hearing, a social worker who met with Mr. Guarnero recommended that he be released to minimum-security custody upon his parole hearing. His COMPAS assessment showed he is a low risk for recidivism of any sort and his last major conduct report was six years ago. This recommendation and supporting risk assessments were ignored by the BOCM committee who instead determined that he should stay in medium custody "based on the heightened risk associated with his violent offense dynamics, sentence structure with PMR status, latest Parole action, recent custody reduction from Maximum custody after 22 years, and conduct history."

312.    Mr. Guarnero has completed multiple rehabilitative programs in prison. He has a plan to be employed and housed with his community after his release. In support of his parole application, he has written, "I just want to live the second half of my life in peace, doing good to others, and helping my loved ones – making something good from all the bad." Mr. Guarnero's primary interest upon release lies in contributing positively to his community by using the empathy and kindness he has learned in prison to give back and which now gives him purpose.

313.    Nothing in Mr. Guarnero's record suggests, nor was any such finding made, that he was among the "rarest of juvenile[s]…whose crime reflects permanent incorrigibility." On the contrary, he has matured and grown from the person he was when he committed the crime and looks forward to having a positive role as a member of his community once released.

314.    Mr. Guarnero has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due

process, and the right to have facts that enhance the penalty to which a criminal defendant may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Carlos King*

315.    Carlos King is 39 years old and was incarcerated for over 22 years for crimes he committed as a juvenile.

316.    In June 1997, Mr. King shot and killed one man and shot and injured another in the course of an attempted robbery. He was 16 years old.

317.    Mr. King was convicted later that year by a plea in adult court and sentenced to life in prison plus 45 years, running concurrently, for first-degree intentional homicide, and attempted first-degree intentional homicide. The judge set a parole eligibility date of January 1, 2013.

318.    Mr. King's father was in the military, so he moved frequently as a child. When he was in first grade his family moved back to Racine, Wisconsin, from California and his parents divorced. He lived with his mother and three siblings in what was widely considered a "bad" and dangerous neighborhood. His mother worked second and third shifts to support three children on one income. At the age of 10, he turned to the streets for a sense of belonging, and at the age of 14 began selling drugs for money, clothes, and food.

319.    On June 6, 1997, at the age of 16, Mr. King was shooting dice in the backyard of a house. Realizing there was money inside, he left and went with a friend to get a gun and returned to the house. During the course of the robbery, he shot and severely injured one man and then shot and killed another. He left Wisconsin and went to Mississippi, where he was apprehended.

320.     When Mr. King entered prison in 1997, with a life sentence at the age of 17, he thought his life was already over, and frequently acted out with despair and anger. During his first year at Green Bay Correctional Institution, he threw a chair that struck a prison guard. He received a misconduct ticket for battery and spent approximately three years in solitary confinement at Green Bay and Columbia Correctional Institutions. He also pled to a charge of second degree recklessly endangering safety for throwing the chair and was sentenced to two additional years of prison time to run consecutive to his life sentence. This extended the date of his earliest possible parole release from January 2013 to July 2013.

321.     In 2001, after finally getting out of solitary confinement Mr. King dedicated himself to the task of transformation. He signed up for and successfully completed all rehabilitative programming available to him. He earned 14 college credits, including in business administration and accounting from universities in the University of Wisconsin System, successfully completed programming in childhood trauma and anger management, succeeded in several vocational programs, and succeeded in cognitive behavioral programing that helped him recognize the consequences of his actions and taught him to take time to think before acting. He used this rehabilitative programming in service of a prison-conditions committee at Stanley Correctional Institution, facilitating dialogue between the inmate population and prison administration.

322.     In 2017, Mr. King, classified by the BOCM as "medium" security, asked to be transferred to Waupun Correctional Institution, a maximum-security prison where he was subjected to many more restrictions and longer in-cell hours, for the purpose of enrolling in a Bachelor of Arts program, Operation Transformation, only available at the facility. Operation

Transformation is a collaboration of the Wisconsin Inmate Education Association and Trinity International University.

323.    Mr. King maintained a nearly 4.0 grade point average into his sophomore year in the Trinity program and was selected by prison administration officials to live in a housing unit in the maximum-security prison for the purpose of serving as a role model for other prisoners.

324.    Mr. King's last "major" ticket for misconduct was 15 years ago in 2003, and his last minor misconduct ticket was nearly six years ago.

325.    Mr. King has accepted full responsibility for his crimes. He recognizes that he alone pulled the trigger that took a life and nearly took another. He sincerely regrets his impulsive, thoughtless and opportunistic teenage actions. He feels incredible sadness for the loss of life and suffering that he caused his victims and their families and would do anything to bring back the life he took.

326.    Mr. King is no longer the person he was at 16 years old. At 16, he had no empathy and no concept of the consequences of his actions. Today, he thinks carefully about the consequences of his actions and the impact of his behavior on others. He has been rehabilitated and is no longer the violent person he was as a teenager.

327.    Mr. King also credits his Islamic faith for his rehabilitation and devotion to an ethically principled life. He makes every effort to empathize with others and resolve disputes without argument. Mr. King takes it upon himself to help others, to the best of his ability, by speaking up for those who are being mistreated. As a clerk in the chapel at Stanley, Mr. King would sometimes use his own limited and hard-earned funds to purchase educational and interfaith materials to aid other inmates in their own rehabilitation.

328.    Mr. King maintained strong family ties while in prison. His mother and siblings regularly visited, along with many nieces and nephews. His father occasionally visited as well. Several of his family members have law enforcement and corrections backgrounds and strongly believe in his ability to succeed. His mother and sister offered him places to live upon release.

329.    Mr. King was first eligible for parole consideration in July 2013. He was denied parole five times. The first deferral was for 30 months. The second was for 24 months, the third and fourth were for 12 months each, and the final deferral on November 25, 2019 was for three months.

330.    Mr. King was granted parole on February 21, 2020, effective on or after March 31, 2020. His release was expedited due to concerns about COVID-19, and he returned to his family and community for the first time in his adult life on March 25, 2020.

331.    Before his release, Mr. King was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation. After his parole consideration interview in December 2017, Mr. King was denied release to parole for the third time. The commissioner noted that Mr. King had not had a major ticket in 14 years, that his institutional conduct was satisfactory, and that he had completed all recommended needs "and more," but denied release to parole supervision because he had "NOT served sufficient time for punishment" for the crimes he committed as a teenager.

332.    At his Parole Commission interview in November 2018, the commissioner said that, despite his good conduct and exemplary efforts at education, he was going to continue with a 12 month defer because Mr. King would not complete his degree until 2021. He observed that the 21 and a half years he had already served was on the "low end" of what the Parole Commission expects lifers to serve, regardless of their parole eligibility date or risk assessment.

333.    The BOCM continued to classify Mr. King as "medium" security, despite his lack of a major disciplinary ticket in 15 years and positive institutional contributions. The BOCM has acknowledged his "positive institutional adjustment," but refused to classify him as "minimum," a prerequisite for parole, because of the "assaultive offense dynamics" of his juvenile crime 21 years ago and his "lengthy sentence structure," including that the parole commission had given no indication that release was imminent.

334.    Denial of minimum security and the length of Mr. King's defers kept him from taking programs that would have helped him further demonstrate his rehabilitation and readiness for release for seven years past his parole eligibility date.

335.    Nothing in Mr. King's record suggested, nor was any finding made, that he was among the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility." In fact, the sentencing judge, despite noting the aggravated nature of Mr. King's crimes, expressed hope that he would change and mature and be able to lead a productive life.

336.    Mr. King was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Thaddeus Karow*

337.    Thaddeus Karow is 46 years old and was incarcerated for more than 31 years for crimes he committed as a 14 year old child. At the time of his conviction, Mr. Karow was the youngest person in Wisconsin history to be tried as an adult.

338.    Mr. Karow grew up in an unstable environment. His mother, who had previously spent time in reform school herself, gave birth to Mr. Karow when she was only 16 years old. By

the time she was 18, his mother had already divorced Mr. Karow's biological father and she soon remarried. Mr. Karow's mother and stepfather were both addicted to drugs and alcohol. They sometimes left Mr. Karow and his older brother home for weeks at a time, unsupervised, while they were off drinking and using drugs. During this time, Mr. Karow was physically abused by his stepfather to the point of partial paralysis.

339.    In the seventh and eighth grades, Mr. Karow began to have significant behavioral problems. He skipped school, got in fights, and began to get in trouble with the law. He spent time in a series of group homes beginning in 1985.

340.    In September 1987, Mr. Karow and another juvenile decided to run away from the group home in Oshkosh where they were living. Without any resources or a plan, the boys came across a nearby senior living complex and decided to steal a car and money to aid their escape to a better living situation. The door they knocked on was opened by an 80-year-old woman, and the boys pushed their way into the unit. The other boy retrieved a knife from the kitchen and instructed Mr. Karow to stab the woman. Mr. Karow complied. The boys then stole the victim's car and roughly $20 from her purse. Rather than running away, they returned to the group home where they were arrested the next day.

341.    Now, after more than 31 years in prison, Mr. Karow is a changed person. He has aged and matured. He has taken advantage of educational programs, work, and other opportunities to better himself. He has accepted full responsibility for his crimes. He blames no one, but himself. He has developed substantial insight into his childhood and youthful behavior, for which he feels deep remorse. At Mr. Karow's January 9, 2018 parole interview, former chairperson Landreman remarked, "I'm really proud of you, Mr. Karow. You are on the right track."

342.     Mr. Karow has worked hard to improve and educate himself in prison. He earned

his High School Equivalency Diploma early on. He successfully completed anger management

training, studied math, and successfully completed a vocational education program in graphic

arts and printing.

343.     Mr. Karow has held dozens of prison jobs and received positive evaluations for

his work. He has worked for Badger State Industries, making prison mattresses and bedding,

glove and mitten manufacturing, and in kitchen, laundry and custodial positions. Mr. Karow has

also served as Chapel clerk. Most recently, he worked in the hobby department at Oakhill where

he received very positive evaluations. During Mr. Karow's January 9, 2018 parole interview,

former chairperson Landreman remarked to Mr. Karow that he could "see that you are valued in

your work positions, by the evaluations that are on file. I can see that you are sincere in … in

what you're doing in your life, based upon your presentation, and your emotion in your

presentation."

344.     Mr. Karow has demonstrated good behavior and a very low risk of violence. His

last major ticket was in 2003, more than 15 years ago, for possession of tattoo paraphernalia.

345.     Mr. Karow became eligible for parole in January 2011. He was denied parole six

times, most recently in December 2018, but was finally released in late May 2020 due to

concerns about the spread of COVID-19.

346.     Despite having matured dramatically, successfully availing himself of all

rehabilitate programming, and the fact that the state's own risk-assessment tool scored Mr.

Karow as a "low" risk across the board, former Commissioner Landreman has repeatedly told

Mr. Karow that he needs to serve more time as punishment for the crimes he committed at age

14. During Mr. Karow's January 9, 2018 parole interview, former Commissioner Landreman

informed Mr. Karow that the BOCM will not assign him a minimum-security classification—a prerequisite to release—because "when you're dealing with a lifer—just in and of itself—a life sentence elevates the flight risk, because you face serving the rest of your life in prison." Accordingly, Mr. Karow could not expect to be released at his parole eligibility date or anywhere close to it, even though the former Commissioner "c[ould] see that [Mr. Karow has] steered clear of trouble—any significant trouble—for the better part of the past 15 years."

347.    Former Commissioner Landreman explained to Mr. Karow that the Parole Commission has established a set of requirements and "tests" for an inmate to be released to parole supervision, including "transitioning" through a community release program, and that this process would not start until long after he had reached his parole eligibility date and been assigned a "minimum" custody classification.

348.    During Mr. Karow's December 19, 2018 parole interview, former Commissioner Danielle LaCost told Mr. Karow he needed significant savings, as much as $20,000, for "risk reduction" before she would recommend parole. Even with full-time work at prison pay rates, saving this amount would take him years.

349.    Mr. Karow was also informed that he must hold a job continuously for six months in prison, then work for an outside employer in prison (with DOC supervision), and then a job on work release outside of prison (without DOC supervision) before being meaningfully considered for parole. Even when the Parole Commission recommends these step-ups, however, he can only progress if the Warden and the PRC approve, and they often delay these opportunities.

350.    While incarcerated, Mr. Karow tried to enroll in programming to further develop his skills and demonstrate his suitability for parole. He was often denied access to such programming, however, because his release date was too far into the future and others with

earlier mandatory release dates were given priority. At Oakhill, for example, and while in minimum security, he was denied a basic computer course three times and a building maintenance program twice for this reason. He was also put on a waiting list when he tried to enroll in a cognitive intervention program because he is considered "low risk."

351.    Nothing in Mr. Karow's record suggested, nor was any such finding made, that he was among the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility."

352.    Mr. Karow was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may lawfully be sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *James Price*

353.    James Price is 40 years old and was incarcerated for more than 26 years for a gang-related shooting crime he committed in 1992 when he was 14 years old.

354.    Mr. Price was convicted on a plea in adult court and sentenced to 25 years to life for first-degree intentional homicide with use of a dangerous weapon.

355.    When Mr. Price was five years old, his mother relocated her three children to Wisconsin in search of economic opportunities, while his father stayed behind to raise a separate family in Illinois. At the time, Mr. Price felt abandoned by his father and envious of the children that his father had chosen to care for. Mr. Price's relationship with his father dwindled and eventually became nonexistent.

356.    Back in Wisconsin, Mr. Price's mother worked long hours trying to provide financially for her now four children. In 1988, Mr. Price's infant brother died unexpectedly. His mother developed a drug habit soon thereafter. Eventually, when Mr. Price started to lose focus

on school, his mother, busy with her three other children and trying to hold down a job and struggling with her own drug habit, was unavailable. Mr. Price turned to the streets for a sense of belonging, financial support, and self-worth. The "Latin Kings," a gang in the Milwaukee area, accepted him with open arms.

357.     On November 11, 1992, at the age of 14, Mr. Price was at his girlfriend's house when two of his fellow gang members, ages 14 and 16 at the time of the incident, showed up and asked for his help. Some members of a rival gang had been threatening members of the Latin Kings, and Mr. Price's fellow gang members sought retribution. At the time, Mr. Price believed it was his duty to help his friends and did not fully comprehend the potential consequences of his actions.

358.     During the incident, Mr. Price's fellow gang member handed him a gun as they drove to where a rival gang member had been seen. The plan was to drive by and fire a few warning shots. As Mr. Price shot, however, the rival gang member turned, ducked, and was struck by a bullet in the back of the head. Another bullet struck his girlfriend in the leg.

359.     In 1993, Mr. Price began his sentence at the Ethan Allen School for Boys. He was transferred to an adult maximum-security prison, Waupun Correctional Institution, at the age of 16. Mr. Price's life as a gang member initially followed him into prison. He relied on other members of his former gang for support and friendship, and he continued to get in trouble inside.

360.     In 1999, when he was 21, Mr. Price was transferred to Boscobel Correctional Institution, where he escaped the reach of the Latin Kings and, with the help of new mentorship, committed to changing his life. From that point forward, he dedicated himself to becoming the type of person who could never be involved in an act that would cause others the type of suffering his victims and their families had to endure.

361.     After resolving to turn his life around, Mr. Price earned his High School Equivalency Diploma and proudly served as graduation speaker. He successfully completed 24 college credits in a Building Service Course and finished at the top of his class. He received his Human Relations and Communications Skills certificate and participated in and successfully completed the Turning Point I Program, the Cognitive Thinking Program, and a Modumath Arithmetic Course. Driven by a desire to succeed upon his release, Mr. Price has completed every rehabilitative programming opportunity that was afforded to him.

362.     Mr. Price has also learned the importance and joy of helping others. At Columbia Correctional Institution, he assisted in framing homes for Habitat for Humanity thereby using his talents for maintenance and construction to help people in need. As he completed new programming, Mr. Price also opted to serve as a tutor so that he could help others achieve success. This included aiding predominately Spanish speaking inmates through his work for Literacy Volunteers of America as an English as a Second Language tutor. Serving others has given Mr. Price a new and profound sense of purpose.

363.     Mr. Price has accepted full responsibility for his crimes and does not blame anyone, but himself. He recognizes that he alone pulled the trigger that took a life and nearly took another. He sincerely regrets his teenage actions and fully accepts the accountability for the inconceivable loss of life and suffering that he caused his victims and their families.

364.     Prison records reflect that Mr. Price has been rehabilitated and is no longer violent. The last major ticket that Mr. Price received was in 2016, for giving a fellow inmate an aspirin to treat a headache. When Mr. Price was younger, he would have been angry that he was being punished for attempting to help and he would have been unwilling to listen to reason. However, because he has grown and matured, he was able to realize the potential danger in his

actions in that he did not know the inmate's health history, or if his body would react adversely to the medication. As a result, he learned from his action and accepted his punishment. Prior to that, his last major ticket was in 2009.

365.   Mr. Price is no longer the person he was at 14 years old. He has matured and reformed behind prison walls. The recent losses of his mother (in 2014) and older brother (in 2017) deepened his understanding of the impact of the loss that he caused to his victims and their families. Mr. Price wishes to live a meaningful life, to make amends for his past actions, and to help others from falling into the same traps that he did. At 14, he had no empathy and no concept of the consequences of his actions. Today, he thinks carefully about the consequences of his actions and the impact of his behavior on others.

366.   Mr. Price maintained strong family ties while in prison. His sister and stepbrother visit regularly. Several of his family members have law enforcement and corrections backgrounds and strongly believe in his ability to succeed. His sister offered him a place to live upon release.

367.   Despite Mr. Price's dedication to reforming his life and his positive institutional accomplishments, he was denied parole on July 17, 2018. The Parole Commission's deferment decision applauded Mr. Price's positive attitude, educational endeavors, willingness to help others through tutoring, and work ethic in the various jobs that he sustained in prison. Nevertheless, the Parole Commission found that "due to the senseless loss of life, serving additional time for punishment is warranted." The Parole Commission explained that Mr. Price would need to spend at least 24 months at a secure minimum-security facility, prove himself there, and then spend another 24 months at a work-release site before being realistically considered for parole.

368.     The Parole Commission ignored the overwhelming evidence of Mr. Price's reform and rehabilitation and instead made its own sentencing determination. Nothing in Mr. Price's record suggests, nor was any finding made, that he was among the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility." In fact, the sentencing judge, despite noting the aggravated nature of Mr. Price's crimes, expressed hope that he would change and mature and be able to lead a productive life.

369.     The Parole Commission further ignored Mr. Price's maturation and rehabilitation when it again denied Mr. Price parole on February 18, 2020 asserting, "…while you've made considerable strides, additional work is needed to mitigate your risk to a reasonable level. Serving time in a productive manner, earning further custody reduction with work release privileges, obtaining a driver's license and securing an approved release plan will aid further risk reduction." At this meeting, the Commission deferred Mr. Price's parole for seven months.

370.     In July 2020, Defendant Tate granted Mr. Price parole in light of the COVID-19 Pandemic stating, "while the Commission would, in normal circumstances, seek a more sustained period at your current classification level, the reasons for doing so: participating in work release, obtaining a driver's license, development of financial resources; are all currently suspended due to complications with COVID-19… delaying your release for the purpose of engaging in activities which may be suspended for an indefinite period of time is an unreasonable expectation."

371.     Although at home currently, Mr. Price was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant may lawfully be sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

### *Craig Alan Sussek*

372.     Craig Alan Sussek is 40 years old and was incarcerated for more than 24 years for non-homicide crimes he committed as a juvenile.

373.     Mr. Sussek shot a woman while stealing her car in November 1995, when he was 16 years old. His victim survived.

374.     Mr. Sussek spent his adolescence being shuffled back and forth between his parents, both of whom were more focused on partying than raising a son. Throughout his childhood, he was abused physically, verbally, sexually, and emotionally by family members. His family treated him as an inconvenience rather than a person. As a result, Mr. Sussek felt utterly lost and alone, and gave up on life.

375.     In November 1995, at 16 years old, Mr. Sussek decided to run away with an acquaintance, who was 15 at the time. Without much of a plan, the boys took two guns from Mr. Sussek's stepfather and attempted to steal a car. As the boys were getting into a car in an open garage, the owner of the vehicle unexpectedly came outside and confronted them. The boys took her back inside the home and instructed her to lay down. Holding a pillow over her head, Mr. Sussek shot her. Mr. Sussek and his accomplice drove to another town, but returned home later that day. He was arrested within a matter of hours.

376.     Mr. Sussek was tried as an adult and convicted in 1996, at age 17, for attempted first degree intentional homicide with use of a dangerous weapon party to a crime and armed burglary party to a crime, and he was sentenced to 45 years and 35 years to be served consecutively. His combined sentences exceed his life expectancy.

377.     In 1997, Mr. Sussek's victim visited him in prison and forgave him. When they met, Mr. Sussek promised he would do everything in his power to better his life and help others.

378.   Since 1997, Mr. Sussek has visited with his victim in-person at least once per year through the Restorative Justice Project of the University of Wisconsin Law School. Mr. Sussek and his victim also frequently write each other.

379.   Every few years, Mr. Sussek writes letters for presentations that his victim gives in the community. She speaks to a wide variety of audiences, including incarcerated juveniles, children, incarcerated adults, and adults living in the community. As part of her presentation, she asks a member of the audience to read one of those letters. Mr. Sussek's letters urge those who may want to give up on life like he did to make better choices. Mr. Sussek has also joined his victim in interviews for newspapers as well as news programs on television, including The Oprah Winfrey Show, Dateline Australia, NBC 15 Madison and, most recently, 60 Minutes.

380.   Mr. Sussek has successfully completed all rehabilitative programing available to him and more. When he was sentenced, he was required to earn his High School Equivalency Diploma, complete a vocational training program, and get a job. In addition to completing those requirements, Mr. Sussek has also completed almost all of the available self-paced re-entry modules when they were offered, successfully completed rehabilitative programming, invested 215 hours of community service, tutored other inmates, and learned skills that will help him upon release such as Microsoft Office.

381.   Mr. Sussek would have completed even more programs during his incarceration, but the PRC often denied him access to programming because of his long sentence. A month or two after arriving at Fox Lake Correctional Institution in 2014, Mr. Sussek saw the PRC and requested another vocational program. A PRC member responded: "Unless parole says they want you to get a vocational program, you will never get into a vocational program, ever." This experience was consistent with his interactions with the PRC at other Wisconsin prisons. At

Stanley Correctional Institution, he was told he had too much time remaining on his sentence for a vocational program. Mr. Sussek was also told that he will be put into programming once he's closer to his release date. By withholding programs from Mr. Sussek, the PRC impeded Mr. Sussek's ability to demonstrate his rehabilitation and readiness for life outside prison.

382.    Between 2015 and 2020, Mr. Sussek rose through the ranks of Badger State Industries. He began as a custom table and chair builder, then was an assistant computer numerically controlled (C.N.C.) machinist, then a C.N.C. machinist lead operator, and most recently served as a C.N.C. programmer.

383.    Mr. Sussek has been rehabilitated and is no longer the violent person he was as a teenager. His last "major" ticket for misconduct was seven years ago, in 2012, for participating in a one-meal food protest. Before that, he had not received a major ticket since 2002. His last minor misconduct ticket was five years ago and was for sharing food with another inmate.

384.    Mr. Sussek maintained strong family ties throughout his incarceration remaining in close communication with his immediate and extended family. His aunt offered him a place to live upon release, and family friends offered him employment.

385.    Despite Mr. Sussek's dedication to reforming his life and his demonstrated low risk of violence, the Parole Commission denied his release twice—once in 2015 and again in 2018. On October 9, 2015, the Parole Commission met with Mr. Sussek and acknowledged his remorse, his relationship with his victim, his good conduct in prison, and his successful completion of programming. Regardless, former Commissioner Landreman gave Mr. Sussek a 24 month deferral period. On his Parole Commission Action report, Landreman wrote that "additional time, continued good conduct, continued positive involvement in available program and institution job opportunities, continued restorative justice efforts, eventual transition through

reduced security with a positive adjustment along the way, and eventually an approved parole

plan will all be necessary in reducing your risk to a more reasonable level."

386.    On October 20, 2015, former Parole Commission Chairman Stensberg changed

Landreman's decision. Although he noted Mr. Sussek's age at the time of the offense and

"positive elements to the incarceration," including Mr. Sussek's relationship with his victim, the

number of programs he's completed, and his positive adjustment, former chairman Stensberg—

unilaterally and without a personal interview—increased Mr. Sussek's deferral period to 36

months "largely given current sentence structure."

387.    On September 13, 2018, Mr. Sussek met with Mr. Landreman again who told Mr.

Sussek that he was giving him a 12 month deferral period. Mr. Sussek asked Mr. Landreman if

he could provide him with any kind of timeline for his release. Landreman replied that Parole has

a process. He said that if he saw Mr. Sussek the next year, they could talk about a potential

endorsement to a secure minimum facility. The former chairperson futher explained that once

Mr. Sussek would likely spend at least 18 to 24 months at a minimum security facility. Then, Mr.

Sussek could go to community custody and work release where he would probably need to spend

another 18 to 24 months before he would realistically be considered for parole. Mr. Landreman

also told Mr. Sussek that he should save tens of thousands of dollars and have a driver's license

before he would be considered for release.

388.    In Mr. Sussek's 2018 Parole Commission Action report, the Commission repeated

the language from the 2015 report: "You have matured and made positive progress throughout

your incarceration, but considering the serious nature of your offense and your lengthy sentence

structure, serving additional time for punishment is warranted. . . . In conclusion, additional time,

continued good conduct, continued positive involvement in available program and institution job

opportunities, continued restorative justice efforts, eventual transition through reduced security with a positive adjustment along the way, and eventually an approved parole plan will all be necessary in reducing your risk to a more reasonable level."

389.    In response to COVID-19, and at strong urging of the American Civil Liberties Union, the Parole Commission reviewed Mr. Sussek's file on May 1, 2020, at which time Defendant Tate stated, "While the Commission typically desires observation in work release for a prolonged period and encourages obtaining a driver's license, both options currently suspended due to complications with COVID-19.Further, delaying your release for the purpose of engaging in activities which maybe suspended for an indefinite period of time is an unreasonable expectation." Mr. Sussek was subsequently released on June 1, 2020.

390.    Mr. Sussek has accepted full responsibility for his crimes and does not blame anyone, but himself. He recognizes that he alone pulled the trigger that could have taken a life. He sincerely regrets his teenage actions. He deeply comprehends the indescribable pain his actions have had on his victim, her family, and others.

391.    Mr. Sussek is no longer the person he was when he was 16 years old. Mr. Sussek has matured and reformed throughout his incarceration. Mr. Sussek has honored the promise he made to his victim over 20 years ago—a promise to reform his life and lift up those around him. Mr. Sussek has taken advantage of every opportunity he has had to learn and to better himself.

392.    Nothing in Mr. Sussek's record suggests, nor was any finding made, that he was among the "rarest of juvenile[s] . . . whose crime reflects permanent incorrigibility."

393.    Mr. Sussek, although home for the first time as an adult now, was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, the right to due process, and the right to have facts that enhance the penalty to which a criminal defendant

may be lawfully sentenced found by a jury beyond a reasonable doubt or admitted by the criminal defendant.

## CLASS ACTION ALLEGATIONS

394.    Named Plaintiffs bring this action individually and on behalf of a class consisting of all persons currently incarcerated or otherwise in the legal custody of the Department of Corrections who were convicted of crimes committed when they were children under the age of 18 and sentenced to life, or sentences for terms of years longer than 470 months, with the possibility of parole.

395.    This action meets the requirements of Fed. R. Civ. P. 23(a) as follows:

i.      The proposed class is so numerous that joinder of all of its members is impracticable. In Wisconsin, there are more than 120 persons currently serving life sentences for offenses they committed before age 18, and who are now, or will be in the future, eligible for release to parole supervision.

ii.     The questions of law and fact presented by the Named Plaintiffs are common to other members of the class. Such questions include, generally, whether, under federal law, Defendants provide a meaningful opportunity for release upon demonstrated rehabilitation and maturity. More specifically the common questions may include but are not limited to:

a.      Whether Plaintiffs and Class Members have been subject to disproportionate punishment in violation of the Eighth Amendment by being denied a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation under the current substantive parole criteria and considerations applied by the Defendants;

b.  Whether Defendants' policies and practices in conducting parole release interviews and making parole release decisions, described in detail above, violate the Fourteenth Amendment rights of Class Members to procedural due process protections of their right to release upon a showing of maturity and rehabilitation;

c.  Whether Defendants' reliance on the underlying juvenile crime, prior juvenile record, juvenile disciplinary history, and "community" or victim opposition, to deny release subjects Class Members to extended sentences based upon facts not found by a jury beyond a reasonable doubt or admitted by Plaintiffs, in violation of the Sixth Amendment.

iii.  The violations alleged by Named Plaintiffs are typical of those suffered by the class. The entire class will benefit from the relief sought.

iv.  Named Plaintiffs will fairly and adequately protect the interests of the class. Named Plaintiffs have no interests adverse to or in conflict with those of the other Class Members. Plaintiffs' counsel have experience in constitutional litigation and class action litigation.

v.  The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class. Fed. R. Civ. P. 23(b)(l)(A).

vi.    Defendants have acted or refused to act on grounds generally applicable to

the class, making appropriate declaratory or injunctive relief with respect

to the class as a whole. Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Violation of the Prohibition Against Cruel and Unusual Punishment in the Eighth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983)**

396.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

397.    Defendants, in their official capacities, have acted and are acting under color of state law.

398.    The Eighth Amendment to the U.S. Constitution forbids a statutory scheme that mandates life imprisonment for juvenile offenders or permits the imposition of life sentences on juveniles who have not been adjudicated irreparably corrupt without providing them with a realistic and meaningful opportunity for release upon demonstrated maturity and rehabilitation.

399.    Defendants have denied and continue to deny Plaintiffs, and Class Members, a meaningful opportunity for release, despite their showing of maturity and rehabilitation, in violation of the Eighth Amendment's proportionality requirements.

400.    Plaintiffs Victoriano Heredia, Dontae Doyle, Jumar Jones, Barney Guarnero, Dujuan Nash, Joseph Orosco, Brian Pheil, and Deng Yang and other Class Members, have been injured and will likely suffer future injury by Defendants' policies and practices by being denied their rights to a meaningful opportunity for release from imprisonment based on a demonstration of maturity and rehabilitation, in violation of the prohibition against cruel and unusual

punishments in the Eighth Amendment to the U.S. Constitution, giving rise to Plaintiffs' and Class Members' claims for relief under 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

### (Violation of the Due Process Clause in the Fourteenth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983)

401. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

402. Defendants, in their official capacities, have acted and are acting under color of state law.

403. Under established U.S. Supreme Court case law, the Eighth Amendment to the U.S. Constitution confers upon juvenile lifers a legitimate expectation of parole upon a showing of maturation and rehabilitation. This is a liberty interest protected by the Due Process Clause.

404. Defendants' conduct and actions in conducting the parole consideration process deny Plaintiffs, and other Class Members, due process of law to secure their liberty interest in parole release, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

405. Plaintiffs Victoriano Heredia, Dontae Doyle, Jumar Jones, Barney Guarnero, Dujuan Nash, Joseph Orosco, Brian Pheil, and Deng Yang and other Class Members, have been injured and will likely suffer future injury, as a result of Defendants' official policies and regular practices, which fail to adequately distinguish between persons serving life sentences for crimes committed as children and those committed as adults, and Defendants' failure to provide sufficient procedural protections necessary to secure the substantive right to release upon a showing of maturity and reform in violation of the Due Process Clause of the Fourteenth

Amendment, giving rise to Plaintiffs' and Class Members' claims for relief under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

**(Violation of Right to a Jury Trial under the Sixth Amendment and to Due Process under the Fourteenth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983)**

406.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

407.     Defendants, in their official capacities, have acted and are acting under color of state law.

408.     Each Plaintiff was, and Class Members were, convicted of, or pleaded guilty to, a crime committed while he or she was a juvenile.

409.     Any fact, other than the fact of a prior conviction, that enhances the penalty to which a criminal defendant may lawfully be sentenced must be found beyond a reasonable doubt or admitted by the criminal defendant. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Ring v. Arizona*, 536 U.S. 584, 604–05 (2002); *Blakely v. Washington*, 542 U.S. 296, 303–05 (2004); *Alleyne v. United States*, 570 U.S. 99, 114–15 (2013).

410.     A state may impose a life sentence upon a juvenile offender only upon a finding that the defendant is among the "very rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S. Ct. at 734.

411.     Each Plaintiff was, and Class Members were, either convicted without a finding that, or pleaded guilty without admitting that, Plaintiffs' and Class Members' crimes reflected that they were among the rarest juveniles whose crimes reflect permanent incorrigibility.

412.     Defendants may not deny parole release to juvenile lifers who have demonstrated unmistakable rehabilitation and have completed the term of imprisonment required under the

sentencing scheme existing at the time the sentence was imposed by the judge on the basis of a fact about the crime committed or the defendant at the time of sentencing that was not found beyond a reasonable doubt or admitted by the criminal defendant.

413.    Defendants' conduct and actions—including, *inter alia*, increasing the amount of time that must be served based on facts not found by a jury beyond a reasonable doubt or guilty plea—deny Plaintiffs, and Class Members, their right to have only facts found beyond a reasonable doubt or admitted by the criminal defendants expose them to punishment, in violation of the jury trial right of the Sixth Amendment and their right to due process of the Fourteenth Amendment to the U.S. Constitution.

414.    Plaintiffs Victoriano Heredia, Dontae Doyle, Jumar Jones, Barney Guarnero, Dujuan Nash, Joseph Orosco, Brian Pheil, and Deng Yang and other Class Members, have been injured and will likely suffer future injury, as a result of Defendants' denial of parole release based on alleged aggravating factors relating to the crime of conviction or the defendant that was not an element proved beyond a reasonable doubt or admitted by the criminal defendants at their original criminal trial, in violation of their right to a jury trial under the Sixth Amendment and their right to due process under the Fourteenth Amendment to the U.S. Constitution, giving rise to Plaintiffs' and Class Members' claims for relief under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Certify a plaintiff class pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (b)(2);

B.    Declare, pursuant to 28 U.S.C. §§ 2201–2202, that Defendants are operating a parole scheme that violates the prohibition against cruel and unusual punishment in the Eighth Amendment, violates the Due Process Clause in the Fourteenth Amendment, and violates the

right to a jury trial in the Sixth Amendment to the U.S. Constitution by denying Plaintiffs, and other Class Members, a meaningful and realistic opportunity for release upon a showing of rehabilitation and maturation, including by:

      i.    Failing to release on parole juvenile lifers who have demonstrated rehabilitation and maturity;

      ii.    Failing to provide an opportunity to demonstrate maturity and rehabilitation in advance of the parole eligibility date and in support of parole;

      iii.    Failing to provide an opportunity to see and confront any evidence used against them;

      iv.    Failing to provide funds to obtain counsel in preparation for parole interviews, including the first parole interview for which juvenile lifers are eligible;

      v.    Failing to permit counsel to be present and make statements at parole interviews;

      vi.    Failing to allow the submission of evidence and arguments in support of a request for parole;

      vii.    Failing to provide funds for inmates to present testimony from relevant experts, such as psychologists, psychiatrists, criminologists and/or social workers;

      viii.    Failing to establish and apply objective and non-arbitrary standards and procedures, including standards and procedures for evaluating maturity and rehabilitation of persons who committed crimes while juveniles, for use in parole decisions;

      ix.    Failing to provide explanations as to what additional steps within Class Members' control that they must take to obtain parole;

      x.    Failing to rely solely on facts related to the Class Members' crimes that were found by a jury or admitted by the Class Members at the time to enhance the penalty imposed; and/or

      xi.    Being given a caseload that does not permit Defendants sufficient time to read and evaluate the materials presented by Class Members.

    C.    Enjoin Defendants immediately from continuing practices that violate the U.S. Constitution and to take remedial steps to address their past illegal conduct by granting Plaintiffs,

and Class Members, a meaningful and realistic opportunity to demonstrate their rehabilitation, maturity, and readiness for release, including by requiring that that Defendants alter the Parole Commission's operating procedures and the DOC administrative regulations to enable Defendants to meaningfully analyze the question of whether maturity and rehabilitation have been demonstrated, including by requiring that Defendants:

       i.     Provide Class Members an opportunity to demonstrate maturity and rehabilitation in advance of the parole eligibility date and in support of parole;

       ii.     Provide Class Members an opportunity to see and confront any evidence used against them;

       iii.     Provide funds for Class Members to obtain counsel in preparation for parole interviews, including the first parole interview for which juvenile lifers are eligible;

       iv.     Permit counsel to be present and make statements at parole interviews;

       v.     Allow the submission of evidence and arguments in support of a request for parole;

       vi.     Provide funds for inmates to present testimony from relevant experts, such as psychologists, psychiatrists, criminologists and/or social workers;

       vii.     Establish and apply objective and non-arbitrary standards and procedures, including standards and procedures for evaluating maturity and rehabilitation of persons who committed crimes while juveniles, for use in parole decisions;

       viii.     Provide explanations as to what additional steps within Class Members' control that they must take to obtain parole;

       ix.     Rely solely on facts related to the Class Members' crimes that were found by a jury or admitted by the Class Members at the time to enhance the penalty imposed; and/or

       x.     Be given a caseload that permits them sufficient time to read and evaluate the materials presented by Class Members.

     D.     Order Defendants to provide new release consideration interviews to all class members using a lawful standard and lawful procedures;

E.      Award Plaintiffs their attorneys' fees and costs incurred in pursuing this action, as provided in 42 U.S.C. § 1988; and

F.      Grant such other and further relief as the Court may deem just and proper.

Dated this 25th day of November 2020.

                                        *s/Gregory T. Everts*
                                        _____

QUARLES & BRADY LLP                     ACLU OF WISCONSIN FOUNDATION, INC.
Gregory T. Everts (SBN 1001636)         Laurence J. Dupuis (SBN 2029261)
Martha J. Snyder (SBN 1070865)          R. Timothy Muth (SBN 1010710)
33 East Main Street, Suite 900          Emma S. Shakeshaft (SBN 1092046)
Madison, WI 53703                       207 East Buffalo Street, Suite 325
Telephone: (608) 251-5000               Milwaukee, WI 53202
gregory.everts@quarles.com              Telephone: (414) 272-4032
martha.snyder@quarles.com               ldupuis@aclu-wi.org
                                        tmuth@aclu-wi.org
Patrick J. Proctor-Brown (SBN 1091326)  akadri@aclu-wi.org
400 East Wisconsin Avenue, Suite 2350   eshakeshaft@aclu-wi.org
Milwaukee, WI 53202
Telephone: (414) 277-5000               FOLEY & LARDNER LLP
patrick.proctor-brown@quarles.com       Daniel A. Kaplan (SBN 1018122)
                                        Jasmine Reed (SBN 1098484)
Amy L. Lenz (IL BN 6332968)             150 E. Gilman Street
Stephanie M. Moon (IL BN 6333095)       Madison, WI  53703
300 North LaSalle Street, Suite 4000    Telephone: (608) 258-4231 (DAK)
Chicago, IL 60654                       Telephone: (608) 258-4240 (JR)
Telephone: (312) 715-5000               dkaplan@foley.com
amy.lenz@quarles.com                    jreed@foley.com
stephanie.moon@quarles.com


Issa Kohler-Hausmann (NY BN 4694576)    Avery P. Gilbert (NY BN 4524237)
Yale Law School*                        15 Shatzell Avenue, Suite 232
127 Wall Street                         Rhinecliff, NY 12574
New Haven, CT 06511                     Telephone: (845) 380-6265
Telephone: (203) 432-4956               avery@agilbertlaw.com
issa.kohler-hausmann@yale.edu


**Attorneys for Plaintiffs**

* This document has been partially prepared by an individual affiliated with Yale Law School, but does not purport to present the school's institutional views, if any.