IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VICTORIANO HEREDIA, DUJUAN NASH, JOSEPH
OROSCO, BARNEY GUARNERO, BRIAN PHEIL,
DONTAE DOYLE, JUMAR JONES, DENG YANG, on
behalf of themselves and all others similarly situated,

                Plaintiffs,

   v.

JOHN TATE II, Chairperson and Commissioner of the       OPINION and ORDER
Wisconsin Parole Commission; JENNIFER KRAMER,
Commissioner of the Wisconsin Parole Commission;          19-cv-338-jdp
DOUGLAS DRANKIEWICZ, Commissioner of the
Wisconsin Parole Commission; KEVIN CARR,
Secretary-Designee of the Wisconsin Department of
Corrections; and ANGELA HANSEN, Director of the
Bureau of Classification and Movement, in their official
capacities,

                Defendants.[1]

---

This is a class action that challenges how Wisconsin's parole system applies to prisoners with very long sentences for crimes committed as juveniles. Plaintiffs' claims are rooted in a line of Supreme Court decisions holding that the Eighth Amendment bars life sentences for most juvenile offenders. *See Montgomery v. Louisiana*, 136 S. Ct. 718 (2016); *Miller v. Alabama*, 567 U.S. 460 (2012); *Graham v. Florida*, 560 U.S. 48 (2010). Plaintiffs contend that implicit in these decisions is a constitutional right to meaningful parole consideration specifically on the basis of the prisoner's maturity and rehabilitation, which Wisconsin's parole system does not provide.

---

[1] In their amended complaint, plaintiffs substituted John Tate II, Jennifer Kramer, and Angela Hansen for Steven Landreman, Danielle Lacost, and Mark Heise pursuant to Federal Rule of Civil Procedure 25.

The Supreme Court has recently decided a new case that addresses life sentences for juvenile offenders: *Jones v. Mississippi*, 141 S. Ct. 1307 (2021). This court stayed discovery and asked the parties to explain whether *Jones* would foreclose any of plaintiffs' claims. Dkt. 96; Dkt. 110.

For reasons explained below, *Jones* does not foreclose plaintiffs' claims, but it does nothing to buttress plaintiffs' arguments that the Constitution requires some specific mode of discretionary parole consideration for juvenile offenders. The court will not dismiss plaintiffs' claims, but it will create subclasses for those convicted of homicide and those convicted of nonhomicide crimes to reflect the distinction that *Jones* recognizes between the two groups. The court will also lift the stay and decide plaintiffs' two discovery motions, Dkt. 69 and Dkt. 92, which are fully briefed.

ANALYSIS

A. **Effect of *Jones***

In the order granting plaintiffs' motion for class certification, the court summarized plaintiffs' claims as follows:

1) Defendants are violating the Eighth Amendment by failing to give plaintiffs a meaningful opportunity for release based solely on plaintiffs' demonstrated maturation and rehabilitation.

2) Defendants are violating the Due Process Clause by failing to adopt procedures that allow plaintiffs to demonstrate that they are entitled to release based solely on their maturity and rehabilitation.

3) Defendants are increasing plaintiffs' mandatory minimum sentence in violation of the Sixth Amendment by denying parole on the ground that plaintiffs haven't served enough time, even after plaintiffs reach their parole eligibility date.

4) Defendants are increasing plaintiffs' maximum sentence in violation of the Sixth Amendment by implicitly finding that plaintiffs are "incorrigible" when

> defendants deny parole based on the amount of time served rather plaintiffs' demonstrated maturity and rehabilitation.

Dkt. 53, at 3–4. Neither side challenges this summary. But plaintiffs now withdraw claim 4) because the evidence gathered in discovery doesn't support it. Dkt. 97, at 4 and Dkt. 101, at 24. The court will dismiss that claim with prejudice.

Plaintiffs' Eighth Amendment and due process claims rest in large part on *Montgomery*, *Miller*, and *Graham*. In *Graham*, the Court held that the Eighth Amendment prohibits a juvenile offender convicted of a nonhomicide crime from being sentenced to life in prison without the possibility of parole. The Court stated that juvenile offenders must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75. In *Miller*, the Court issued a narrower holding for juvenile offenders convicted of homicide. The Court didn't impose an outright ban on life sentences in that situation but held instead that a sentencing scheme that *requires* life without parole for juvenile offenders violates the Eighth Amendment. *Miller*, 567 U.S. at 465, 479. The sentencing court must be able to "consider[] an offender's youth and attendant characteristics." *Id.* at 483. In *Montgomery*, the Court held that *Miller* announced a substantive rule that has retroactive effect in cases on collateral state review.

In the orders screening the complaint, the court concluded that plaintiffs stated a claim under the Eighth Amendment by alleging that they were eligible for parole, but defendants were failing to provide a meaningful opportunity for release; plaintiffs stated a claim under the Due Process Clause by alleging that defendants were not providing the procedures necessary to allow plaintiffs to show that they were entitled to release; and plaintiffs stated a claim under the Sixth Amendment by alleging that defendants were increasing their mandatory minimum sentence based on facts not determined by a jury. Dkt. 3 and Dkt. 6.

The question now before the court isn't whether plaintiffs have proven any of their claims or are likely to succeed on them. Rather, the question is a narrow one: whether *Jones* forecloses any of the claims on which plaintiffs are proceeding.

Plaintiffs' remaining Sixth Amendment claim rests on cases such as *Alleyne v. United States*, 570 U.S. 99 (2013), and is about the parole commission's authority to find certain facts. It's not based on *Montgomery*, *Miller*, or *Graham*, and the argument plaintiffs are making isn't specific to juvenile offenders. So *Jones* has no implications for that claim. And *Jones* didn't limit or even consider the scope of *Graham*, so it would have no effect on the claims of nonhomicide juvenile offenders.[2]

To determine the potential effect of *Jones* on the Eighth Amendment and due process claims of the class members convicted of homicide, the court starts with a closer look at *Jones's* holding and reasoning. The Court began by summarizing the holding of *Miller*: "an individual who commits a homicide when he or she is under 18 may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment." *Jones*, 141 S. Ct. at 1311. The question immediately before the Court was whether *Miller* and *Montgomery* prohibited a sentencing court from imposing a sentence of life in prison without parole on a juvenile offender convicted of homicide without first making an express or implicit finding that the offender was "permanently incorrigible." *Id.* The Court concluded that no such express finding was required, holding that "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient" to comply

---

[2] The class definition is based on the length of a juvenile's sentence rather than his conviction, so the class includes prisoners who were convicted of homicide and nonhomicide crimes.

with *Miller* and *Montgomery* before sentencing a juvenile offender convicted of homicide to life without parole. *Id.* at 1313.

*Jones* certainly does nothing to advance plaintiffs' claims. And it provides support for a view that the standards governing juveniles convicted of homicide are not the same as the standards governing juveniles convicted of homicide crimes. *Graham* holds unequivocally that juveniles convicted of nonhomicide crimes must have a meaningful opportunity to obtain release. *Miller* didn't go that far for juveniles convicted of homicide, but the Court left the door open for doing so in a later case. *See Miller,* 567 U.S. at 479 (concluding that it wasn't necessary to consider whether the Eighth Amendment requires a categorical bar on life-without-parole sentences for juveniles because narrower holding resolved the case). And *Montgomery* seemed to be headed in that direction, stating that "a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption." 577 U.S. at 195.

*Jones* closed the door on any claim that the Eighth Amendment categorically bars life-without-parole sentences for juvenile offenders convicted of homicide. So long as the legislative sentencing scheme does not mandate life-without-parole, the sentencing judge has the discretion to impose it. After *Jones*, "a sentencer never need determine, even implicitly, whether a juvenile convicted of homicide is one of those rare children whose crimes reflect irreparable corruption." 141 S. Ct. at 1328 (Sotomayor, J., dissenting) (internal quotation marks omitted). The sentencing court may sentence a juvenile offender convicted of homicide to life in prison without parole "[e]ven if the juvenile's crime reflects unfortunate yet transient immaturity." *Id.* (internal quotation marks omitted).

Defendants argue that the necessary implication of *Jones* is fatal to plaintiffs' claims on behalf of juveniles convicted of homicide. If a juvenile who isn't irreparably corrupt can be sentenced to life without parole consistent with the Eighth Amendment, then it ought to follow that the Eighth Amendment would have no application to the same juvenile in the parole context. Dkt. 99, at 26.

But the court isn't persuaded that *Jones* forecloses all relief under the Eighth Amendment and the Due Process Clause to juveniles convicted of homicide. *Jones* didn't overrule *Miller* or *Montgomery*, and the Court didn't reject the premise in *Graham*, *Miller*, and *Montgomery* that "[y]outh matters in sentencing" and the requirement in *Miller* and *Montgomery* that a "hearing where youth and its attendant characteristics are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Jones*, 141 S. Ct. at 1316–18. Rather, the Court held that "a discretionary sentencing procedure suffices to ensure individualized consideration of a defendant's youth" because "the sentencer [in a discretionary sentencing scheme] necessarily will consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth." *Id.* at 1319, 1321.[3]

Defendants are correct that *Jones* didn't impose any express requirements on parole officials, but neither did *Graham*, *Miller*, or *Montgomery*. As this court has noted previously, plaintiffs' claims represent an extension of sentencing principles to the parole context. *Jones*

---

[3] The Court qualified its holding by stating that a defendant might have a constitutional claim if his lawyer didn't raise the issue of youth or the sentencing court expressly refused to consider it. *Jones*, 141 S. Ct. at 1319 n.6, 1320 n.7.

simply doesn't address whether plaintiffs' view is correct in that regard. Plaintiffs rely not just on *Graham*, *Miller*, and *Montgomery*, but a much longer line of cases that stand for the general proposition that "children are constitutionally different from adults," *Miller*, 567 U.S. at 479, especially in the criminal justice context, because of their "lack of maturity and an underdeveloped sense of responsibility." *Roper v. Simmons*, 543 U.S. 551, 569 (2005). *Jones* doesn't undermine that basic principle.

*Jones* may have implications for determining *how* defendants must consider a prisoner's youth when making parole decisions, particularly for prisoners convicted of homicide. But *Jones* leaves room for plaintiffs to argue that defendants must take youth into consideration when considering class members for parole. Sentencing and parole are not so similar that the court can say that a discretionary parole scheme "necessarily" takes a prisoner's youth into account. *Jones*, 141 S. Ct. at 1319. The facts regarding whether and how defendants consider a prisoner's youth aren't fully before the court, so arguments on that issue will have to wait for a motion for summary judgment.

The court will make one procedural adjustment to the case. Because *Jones* suggests that the constitutional standards for juvenile offenders convicted of homicide may be different from the standards for juvenile offenders convicted of nonhomicide crimes, the court concludes that there should be subclasses for those two groups. *See* Fed. R. Civ. P. 23(c)(5) (allowing court to create separate subclasses); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011) (subclasses are appropriate when some class members may be subject to different defenses). So plaintiffs Victoriano Heredia, Jumar Jones, Joseph Orosco, Dujuan Nash, Brian Pheil, Barney Guarnero, and Deng Yang will represent a subclass of prisoners convicted of homicide; plaintiff Dontae Doyle will represent a subclass of prisoners convicted

of nonhomicide crimes. At summary judgment, the parties should include separate arguments for each subclass.

## B. Discovery motions

Two discovery motions are before the court. First, plaintiffs move to compel defendants to conduct searches of electronically stored information (ESI). Dkt. 69. Second, plaintiffs ask for a second round of depositions of the Wisconsin Department of Corrections under Federal Rule of Civil Procedure 30(b)(6). Dkt. 92.

### 1. Electronically stored information

Plaintiffs' motion doesn't precisely identify the information that plaintiffs are seeking. But plaintiffs filed a separate summary that includes a list of 17 search queries, along with a description of the parameters for the searches, including which officials' electronic documents should be searched, which computer systems, and what time frame. Dkt. 70-1.

In response to defendants' objections in their opposition brief about the relevance of the requests and the burdens they would impose, plaintiffs eliminated one of the 17 search queries. They also narrowed most of the queries, and they narrowed both the time frame and the officials implicated by the requests. Specifically, plaintiffs now seek emails created between 2014 and the present for parole chairpersons, parole commissioners, directors of the Bureau of Classification and Movement, or parole commission offender records associates who served any time after January 1, 2016. Initially, plaintiffs also included a request for searches of G drives, H drives, and text messages for each of the requested custodians. Now plaintiffs ask the court to direct defendants to provide more information about the contents of those drives. Dkt. 78, at 11–17.

Federal Rule of Civil Procedure 26(b)(1) sets for the standard for obtaining discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

The court will first consider defendants' objections to the search queries themselves and then to the parameters of those queries.

a. Search queries

In their opposition and reply briefs, the parties appear to have reached agreement on Queries 2–7, in addition to Query 15, which plaintiffs have withdrawn. *See* Dkt. 78, at 12–14. So the court won't discuss those further.

**Named plaintiffs' last names and DOC numbers.** Plaintiffs' first proposed search query is for any electronic document that includes either a named plaintiff's last name or DOC number. Defendants ran a test search of this query, using one plaintiff's last name and looking through the emails from the last four years for the commission chairperson and the bureau director. Dkt. 75, at 24. That one search generated nearly 10,000 documents, so defendants contend that the requested query is "extraordinarily overinclusive." *Id.* However, defendants state that they "would be open to running a narrower test search (e.g. inmate numbers)." *Id.* In their reply brief, plaintiffs state that nearly 10,000 documents for one named plaintiff "is not overly many," and they believe that "minor refinements can solve most of the problem" of overinclusiveness. Dkt. 78, at 11.

The court agrees with defendants that the requested search is overinclusive and not proportional to the needs of the case. Plaintiffs don't identify any specific "refinements" to the

9

search that would make it more manageable, so the court will limit the search as defendants propose—to the named plaintiffs' DOC numbers.

"**JLWOP**." Neither side identifies what this acronym stands for, but presumably it is "juvenile life without parole." Defendants don't object to this query on grounds of relevance or undue burden, but they believe that the relevant officials don't use that term because only nine documents turned up in their test search, and all of those documents referred to this case. But it isn't for defendants to decide whether a particular document might ultimately be useful to the plaintiffs, so the court will direct defendants to conduct this search.

"**BOCM Procedure**." Defendants object to this query on the ground that they have already provided plaintiffs with all of the bureau's policies and procedures. But plaintiffs cite testimony that officials sometimes use email to explain changes to policies and procedures. Dkt. 67 (Hansen Dep. 26:1–9). The court will overrule defendants' objection.

"**Punishment ~5 sufficient**" and "**depreciate ~5 offense OR severity OR seriousness**." Plaintiffs allege that a common consideration of defendants in granting or denying parole is whether a prisoner has received "sufficient punishment." Defendants don't deny this, but they say that the query isn't narrowly tailored because it doesn't "target[] guidance documents about implementing parole standards." Dkt. 78, at 14. A key contention in this case is that defendants are relying on the seriousness of a prisoner's offense rather than his rehabilitation and maturation, so defendant's objection is overruled.

"**Doyle ~10 (policy OR guidance OR releas\* OR 'violent offender')**." "Doyle" refers to Jim Doyle, who was the governor of Wisconsin from 2003 to 2011. Plaintiffs request the same search query for "Walker" (Scott Walker, governor from 2011 to 2019) and "Evers" (Tony Evers, the current governor). Plaintiffs' only basis for these queries is that the parole

10

chairperson is appointed by the governor, so the governor "may issue directives for how to apply parole statutes and regulations." Dkt. 78, at 14.

These queries have multiple flaws. First, the court cannot discern any relevance of informal guidance provided by a governor who has been out of office for 10 years. Second, the queries don't include the word "parole," so they would be likely to generate many irrelevant results. Third, plaintiffs provide no basis for inferring that a policy issued by the governor would be lurking in an email or a network drive, but not in any of the discovery that plaintiffs have already received, which includes all regulations, policies, and interpretive memos on parole issued since 2010. The court will sustain defendants' objection to these queries.

**"Truth ~4 'sentencing extension'" and "'TIS' ~3 (before OR prior)."** Defendants object to these queries on the ground that the truth-in-sentencing law doesn't apply to any of the class members. But plaintiffs say that defendants misunderstand the purpose of the queries. Plaintiff cites testimony of the bureau that prisoners subject to the truth-in-sentencing law are given priority for parole consideration over other prisoners because they have a fixed release date. Dkt. 67 (Hansen Dep. 120:11–17) (stating that commissioners are "trying to address [truth-in-sentencing] individuals first"). Plaintiffs are seeking ESI because there is no official policy on this practice. One of plaintiffs' primary contentions in this case is that defendants are denying parole to class members for reasons other than their failure to demonstrate maturity and rehabilitation. So the requested information is relevant, and the court will overrule defendants' objection.

b. **Time period**

Plaintiffs seek ESI created anytime between 2014 and the present. Defendants offer to provide information going back to 2016.

11

The court isn't persuaded that the additional burden of providing information from 2014 and 2015 is justified by the limited relevance of that information. Plaintiffs are not seeking damages in this case for past unconstitutional conduct. They are seeking a declaration "that Defendants are operating a parole scheme that violates the" Constitution and an injunction that stops defendants "from continuing" their illegal conduct. Dkt. 61, at 104–05. So the focus of discovery should be on defendants' current parole practices, not practices from years ago. Information from 2016 to the present should be more than enough to allow plaintiffs to evaluate whether defendants' current practices are unconstitutional.

Plaintiffs say that they need to know about defendants' past practices so that the court can enjoin defendants from "reverting" to past practices that are unconstitutional. Dkt. 69, at 17. But they cite no authority for the view that there is a justiciable controversy about practices that the defendants abandoned years before the plaintiffs filed their lawsuit. If a defendant voluntarily ceases unconstitutional conduct *after* a lawsuit is filed, a claim for declaratory or injunctive relief isn't necessarily moot. *See Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006). But a plaintiff doesn't have standing to seek declaratory or injunctive relief on conduct that ended before the lawsuit without showing both that he was subjected to that conduct in the past and that there is a "real or immediate" threat that he will be subjected to the conduct again. *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 395 (7th Cir. 2019). The plaintiff cannot rely on speculation or conjecture. *Id.*

It would be mere speculation to attempt at this point to predict what practices defendants might adopt if this court were to conclude that their current practices are unconstitutional. If plaintiffs prevail in this case and show that they are entitled to injunctive relief, defendants will not be able to revive abandoned policies that are inconsistent with the

12

injunction. And if defendants were to violate the injunction, plaintiffs could move to enforce it. But plaintiffs haven't shown that they are entitled to separately litigate the validity of policies and practices that haven't been in effect since this lawsuit was filed.

The court will limit the time frame of plaintiffs' search queries to 2016 and later.

### c. Custodians

Plaintiffs seek information held by any parole chairperson, parole commissioner, bureau director, or parole commission offender records associate who served any time after January 1, 2016. Defendants object to this list as overbroad because only the parole chairperson and the parole commissioner have the authority to issue directives to commissioners about classification and parole standards. This objection makes sense because plaintiffs aren't challenging individual parole decisions; they are challenging the standards that defendants apply.

Plaintiffs say that all of the requested custodians are "responsible for setting or applying parole and classification policy and procedure." Dkt. 69, at 18. But plaintiffs don't cite any evidence for that proposition or even explain how it would be possible for an individual commissioner or records associate to set policy for the bureau or the commission. So the court will limit the search queries to information held by any parole chairperson or bureau director since 2016.

### d. Location of information

Initially, plaintiffs asked defendants to run the search queries in each custodian's emails as well as in "Parole Commission [and] BOCM Group Drives ('G Drives'), their individual Home Drives ('H Drives'), [and] in text messages." Dkt. 70-1, at 2. Defendants objected that it would take approximately 1,500 hours to search all of the requested custodians' H drives

13

and approximately 216 hours to search the G drives of the bureau and the commission. Dkt. 75, at 17–18. In their reply brief, plaintiffs ask the court to direct defendants to provide the following information: (1) what files or directories exist on the G and H drives relating to the parole commission and the bureau; (2) what files exist for the custodians identified, including the types of files; and (3) potential options for exporting this data into a more searchable database. Dkt. 78, at 9–16.

Missing from either of plaintiffs' briefs is any explanation of why they believe they are likely to find helpful information in network drives or text messages that isn't redundant of other information they already have. Among other things, defendants have provided plaintiffs with the following materials: regulations, policies and interpretive documents related to classification and parole; parole decisions and audio recordings from the hearings of all the current and former named plaintiffs; and institution files for the current and former named plaintiffs. Plaintiffs have also taken depositions of several witnesses under Federal Rule of Civil Procedure 30(b)(6). After this order, plaintiffs will have emails covering numerous issues. In other words, plaintiffs should have virtually any relevant parole or classification document that has been disseminated to commissioners and applied by them. And if information wasn't disseminated to commissioners or used by them, its relevance is questionable.

Plaintiffs say that defendants' assertions about the difficulties of searching the drives is "speculative," Dkt. 78, at 10, but it isn't necessary to determine whether defendants' time estimates are inflated. Plaintiffs haven't made a threshold showing that the drives or text messages are reasonably likely to include relevant information, so the court will limit the requested searches to emails.

### e. Conclusion

To sum up, the court will direct defendants to run the following search queries: (1) each former or current named plaintiff's DOC number; (2) "JLWOP"; (3) "BOCM Procedure"; (4) "Punishment ~5 sufficient"; (5) "depreciate ~5 offense OR severity OR seriousness"; (6) "Truth ~4 'sentencing extension'"; and (7) "'TIS' ~3 (before OR prior)." The court also expects defendants to run searches for Queries 2–7, as agreed by the parties. The time frame of the searches will be from 2016 to the present. Defendants will run the search queries in the emails of any chairperson of the Parole Commission or director of the Bureau of Classification and Movement since 2016.

### 2. Rule 30(b)(6) depositions

Plaintiffs previously served deposition notices under Rule 30(b)(6) to the Wisconsin Department of Corrections and the Wisconsin Parole Commission, resulting in depositions of one representative of the commission and three representatives of the DOC. Plaintiffs have also deposed three other officials from the commission. Now plaintiffs move for leave to take another deposition under Rule 30(b)(6) of a representative or representatives of the DOC.

Under Rule 30(a)(2)(A)(ii), a party must seek leave of court if "the deponent has already been deposed in the case." Plaintiffs question whether that rule applies to depositions taken under Rule 30(b)(6), contending that the purpose of the rule is to "limit how many times a *person* may be required to sit for a deposition." Dkt. 92, at 3 (emphasis added). But that's incorrect. Rule 30(a) used to require court approval if "the person to be examined already has been deposed in the case." *See Infernal Tech., LLC v. Epic Games, Inc.*, No. 5:19-CV-00516-BR, 2021 WL 3493495, at *4 n.4 (E.D.N.C. Aug. 9, 2021). But the rule now refers to "the deponent" rather than the "the person to examined." In a Rule 30(b)(6) deposition, "the

15

deponent" is the entity, not the person testifying. *See* Fed. R. Civ. P. 30(b)(6) ("[A] party may name as the deponent . . . a governmental entity.").

The text of Rule 30(a)(2)(A)(ii) doesn't distinguish between individual and organizational deponents. *City of Las Cruces v. United States*, No. CV 17-809 JCH/GBW, 2021 WL 330062, at *6 (D.N.M. Feb. 1, 2021) ("The majority rule is that Rule 30(a)(2)(A)(ii) applies to Rule 30(b)(6) depositions since there is nothing in the text of Rule 30 that supports the conclusion that Rule 30(b)(6) depositions should be treated differently from depositions of individuals."). Furthermore, "[t]he policy against permitting a second deposition of an already-deposed deponent is equally applicable to depositions of individuals and organizations. Taking serial depositions of a single corporation may be as costly and burdensome, if not more so, as serial depositions of an individual." *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 254 F.R.D. 227, 235 (E.D. Pa. 2008).

The court will deny plaintiffs leave to depose the DOC for two reasons. First, the information plaintiffs are seeking has limited relevance. Plaintiffs identify the following topics for the proposed Rule 30(b)(6) deposition:

> a. Authority and criteria for determining which documents are placed in prisoners' institutional files and available for consideration by the parole commission and which are deemed confidential and unavailable to prisoners to review.
>
> b. The empirical basis for WI DOC's internal risk classification system.
>
> c. Current programs available at each correctional institution in Wisconsin.
>
> d. The relationship between programing and security reductions.
>
> e. The purpose, operations, and decision-making of the Classification Second Step Committee.

These topics are steps away from the core issues in this case, and plaintiffs make no attempt to show why they need the information to support their claims.

Second, plaintiffs are seeking the same information through written discovery. *See* Dkt. 95-1. Defendants do not object to those requests. *See* Dkt. 94, at 8 ("Plaintiffs can obtain the same information through the interrogatories and document requests they served with the deposition notice."). Under Rule 26(b)(2)(C), "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that . . . the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Because plaintiffs don't even attempt to explain why written discovery is inadequate, the court declines to grant leave to depose the DOC a second time.

ORDER

IT IS ORDERED that:

1. Plaintiffs' claim that defendants are increasing plaintiffs' maximum sentence in violation of the Sixth Amendment is DISMISSED with prejudice.

2. The stay is LIFTED. The clerk of court is directed to set this case for a scheduling conference before Magistrate Judge Stephen Crocker.

3. The court certifies the following two subclasses: (a) class members who were convicted of homicide; and (b) class members who were convicted of nonhomicide crimes.

4. Plaintiffs' motion to compel discovery, Dkt. 69, is GRANTED in part, as discussed in this opinion. The motion is otherwise DENIED.

5. Plaintiffs' motion for leave to depose the Wisconsin Department of Corrections, Dkt. 92, is DENIED.

Entered November 22, 2021.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge