IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VICTORIANO HEREDIA, et al.,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

    v.                         Case No. 19-CV-0338

JOHN TATE II, Chairperson and
Commissioner of the Wisconsin Parole
Commission, et al.,

        Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

JOSHUA L. KAUL
Attorney General of Wisconsin

KARLA Z. KECKHAVER
Assistant Attorney General
State Bar #1028242

COLIN A. HECTOR
Assistant Attorney General
State Bar #1120064

BEAUREGARD W. PATTERSON
Assistant Attorney General
State Bar #1102842

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6365 (KZK)
(608) 266-8407 (CAH)
(608) 266-9488 (BWP)

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................5

BACKGROUND .................................................................................................8

    I.    The parties. ............................................................................................8

    II.   Applicable Wisconsin sentencing and parole laws..........................9

        A.    Sentencing laws. .......................................................................9

        B.    Parole laws. ............................................................................ 11

            1.    The parole eligibility standard................................. 11

            2.    The parole process. ................................................... 13

    III.   Procedural history. ....................................................................... 16

LEGAL STANDARD......................................................................................... 19

ARGUMENT ................................................................................................... 20

    I.    Plaintiffs' constitutional claims fail as a matter of law............... 20

        A.    Wisconsin's parole system does not violate the Eighth Amendment because no class member was sentenced to life without parole. ......................................... 20

            1.    The Supreme Court's juvenile sentencing cases do not apply to juveniles who received sentences of life with parole eligibility. ................... 22

            2.    Under the Supreme Court's juvenile sentencing cases, discretionary parole systems like Wisconsin's are a *remedy* for unconstitutional life without parole sentences. ....... 27

            3.    The Supreme Court's juvenile sentencing cases do not apply to the two subclasses—homicide and nonhomicide offenders—for additional reasons....................................................................... 31

4.     Named plaintiffs who have been released have no live controversy and are not adequate representatives of the class or subclasses. ............... 33

5.     Lower courts that have addressed this issue generally affirm Defendants' positions and those that do not are unpersuasive ........................... 34

B.     Wisconsin's parole system does not violate the Due Process Clause because Plaintiffs do not have a cognizable liberty interest in release on parole. ............... 39

1.     Class members have no liberty interest in release on parole. ....................................... 40

2.     Even if the Supreme Court's Eighth Amendment cases could apply to parole, they would be limited to ensuring that parole systems do not result in the imposition of life without parole sentences on juvenile offenders. ................................................... 43

C.     Wisconsin's parole system does not violate the Sixth Amendment because prisoners are not entitled to Sixth Amendment protections during parole reviews. ................................................................ 45

1.     The Sixth Amendment and the *Apprendi* line of cases do not apply to parole.................................... 46

2.     An offender's parole eligibility date is not his minimum sentence.................................... 48

3.     Applying the Sixth Amendment and the *Apprendi* line of cases to parole would lead to absurd results. .......................................... 50

II.     Even if the Supreme Court's juvenile sentencing cases apply in this context, parole-eligible class members are receiving regular and meaningful parole reviews. ..................... 52

A.    *Graham* and its progeny require only the possibility of release, consistent with the traditional understanding of discretionary parole................................. 52

B.    Wisconsin's parole system provides a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. ................................................. 55

    1.    The parole procedures allow the inmate to demonstrate maturity and rehabilitation. ............... 55

    2.    The Commission considers maturity and rehabilitation as part of the parole factors.............. 59

        a.    Sufficient time................................................... 59

        b.    Institution adjustment. .................................. 60

        c.    Program participation. ................................... 61

        d.    Release plan. .................................................... 62

        e.    Risk to the public. ........................................... 62

C.    Parole-eligible class members in fact have some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. ...................... 63

    1.    Victoriano Heredia...................................................... 64

    2.    Barney Guarnero. ...................................................... 65

    3.    Brian Pheil. ............................................................... 67

CONCLUSION................................................................. 70

## INTRODUCTION

This class action centers around the Supreme Court's cases addressing juvenile life sentences. *Graham* held that sentencing a juvenile offender to life without parole for a non-homicide offense violates the Eighth Amendment, *Miller* extended that holding to sentences of mandatory life without parole for juvenile homicide offenders, and *Montgomery* made *Miller* retroactive. Just last term, *Jones* confirmed that *Miller* requires only a discretionary sentencing system, not particular findings or outcomes, before a court sentences a juvenile homicide offender to life without parole.[1]

Plaintiffs want to expand these cases well beyond their reasoning and holdings, asserting that the decisions provide juvenile offenders with an ongoing, constitutional entitlement to be considered for parole based exclusively on rehabilitation and maturity, without consideration of any other factor. Under this expansive view, Plaintiffs contend that Wisconsin's parole system violates their Eighth Amendment right to be free from cruel and unusual punishment, their right to due process under the Fourteenth Amendment, and their right to have a jury determine facts that will increase their mandatory minimum sentences under the Sixth Amendment.

---

[1] *Graham v. Florida*, 560 U.S. 48, 82 (2010); *Miller v. Alabama*, 567 U.S. 460, 479 (2012); *Montgomery v. Louisiana*, 577 U.S. 190, 208–09 (2016); *Jones v. Mississippi*, 141 S. Ct. 1307, 1313 (2021).

These claims fail for two reasons.

First, they are legally defective because *Graham* and its lineage apply only to juvenile offenders sentenced to life without parole. Those cases prohibit the imposition of life without parole sentences on juvenile offenders, except in rare circumstances where a homicide offender is permanently incorrigible. And in those rare cases, there is no need for the sentencer to make a factual finding of permanent incorrigibility; rather the sentencing system need only permit consideration of the mitigating qualities of youth. *Jones v. Mississippi*, 141 S. Ct. 1307, 1313 (2021). These cases cannot reasonably be extended beyond sentencing to parole. Far from constitutionalizing a particular parole standard, these cases expressly pointed to discretionary parole—as that process has long been understood—as a *remedy* for unconstitutional life without parole sentences. So, not only were the class members here not subject to the practice prohibited under the Supreme Court's cases (life without parole sentences), but also they have been receiving the precise process that the Court reasoned would cure an unconstitutional sentencing regime (discretionary parole). For that reason, Plaintiffs' claim that Wisconsin's parole standard violates the Eighth Amendment fails as a matter of law.

Plaintiffs' Fourteenth and Sixth Amendment claims fare no better. Plaintiffs do not state a viable procedural due process claim because they have no liberty interest in release on parole, and even if they had such an interest,

Wisconsin's existing parole procedures would provide more than adequate protection. Plaintiffs' Sixth Amendment claim is even further afield. That amendment simply does not apply because parole is not part of the criminal prosecution and does not change the sentence the offender received for his crimes. For these reasons, Defendants are entitled to summary judgment on all claims, and this case should be dismissed.

Second, even if the Supreme Court's cases applied to parole, Wisconsin's parole system offers "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 75 (2010). In *Graham*, *Miller*, *Montgomery*, and *Jones*, the Court repeatedly pointed to discretionary parole systems—like Wisconsin's—as a way to provide this opportunity. The upshot is that states need not radically transform their parole standard. Instead, a state may simply "extend[ ] parole eligibility to juvenile offenders," *Montgomery v. Louisiana*, 577 U.S. 212, 736 (2016), and apply a complex of factors in determining whether release on parole is warranted. That is exactly what Wisconsin has always done. And there can be no doubt about whether this process results in release for many juvenile offenders: the Wisconsin Parole Commission has released 88 juvenile lifers (out of 176) over the last ten years, including eight of twelve named plaintiffs. (Defendants' Proposed Findings of Fact (DPFOF) ¶ 49.)

## BACKGROUND

### I.     The parties.

The certified class consists of "[a]ll persons serving life sentences, or a term of at least 470 months, for crimes committed when they were children under the age of 18 in the custody of Wisconsin [Department of Corrections] and who are now, or will be, eligible for release under parole supervision." (Dkt. 53:11–12.) There are also two subclasses: prisoners convicted of homicide crimes and prisoners convicted of nonhomicide crimes. (Dkt. 113:7–8.)

In creating the subclasses, this Court categorized as homicide offenders class members convicted of any homicide offense, including first-degree intentional homicide, felony murder, and reckless homicide. (Dkt. 113:7; DPFOF ¶¶ 1–8.) The Court determined that named "plaintiffs Victoriano Heredia, Jumar Jones, Joseph Orosco, Dujuan Nash, Brian Pheil, Barney Guarnero, and Deng Yang will represent a subclass of prisoners convicted of homicide; plaintiff Dontae Doyle will represent a subclass of prisoners convicted of nonhomicide crimes." (Dkt. 113:7–8.) Since this Court issued the order creating the subclasses, Heredia, Doyle, Pheil, and Yang have been granted parole and released. (DPFOF ¶¶ 1, 2, 6, 8.)

Defendants are five officials of the Wisconsin Parole Commission (the "Commission") and Department of Corrections (DOC), sued in their official capacities. Defendant John Tate II is the Commission's Chairperson-designee;

Defendants Douglas Drankiewicz and Jennifer Kramer are Parole Commissioners; Defendant Kevin Carr is the DOC Secretary; and Defendant Angela Hansen is the Director of the DOC Bureau of Offender Classification and Movement (BOCM). (DPFOF ¶¶ 13–16.)

## II.    Applicable Wisconsin sentencing and parole laws.

### A.    Sentencing laws.

Plaintiffs challenge the Wisconsin parole process as applied to their sentences imposed for crimes committed before December 31, 1999.[2] (Dkt. 61 ¶ 56.) At that time, Wisconsin had an indeterminate sentencing system, whereby offenders, depending on the crime for which they were convicted, were sentenced to either life, or to a term of years, with eligibility for parole after serving a certain number of years.

In Wisconsin, no single crime has ever carried a mandatory sentence of life imprisonment without release.[3] Before 1988, all offenders sentenced to life

---

[2] Wisconsin's Truth-In-Sentencing (TIS) law went into effect on December 31, 1999. That law created a determinate sentencing system, whereby offenders are sentenced to a fixed term of initial confinement in prison followed by a fixed term of extended supervision in the community. *See* Wis. Stat. § 973.01 (2015–16). Plaintiffs allege that their "class does not include persons sentenced under TIS." (Dkt. 61 ¶ 56.)

[3] Before 1995, life without parole was not a valid sentence in Wisconsin. *State v. Setagord*, 187 Wis. 2d 340, 523 N.W.2d 124, 126 (Ct. App. 1994). That year, the Legislature amended Wis. Stat. § 973.014 and added, for the first time, the option for the court to choose life without the possibility of parole for Class A felonies committed after August 31, 1995. 1995 Wis. Act 48, § 5; Wis. Stat. §§ 939.50(3)(a), 940.01 (1985–86).

terms were eligible for parole after they had served "20 years, as modified by the formula under s. 53.11(1)." Wis. Stat. § 57.06(1) (1985–86).[4] If an inmate earned a full deduction for good behavior, this amounted to parole eligibility after serving 13 years and four months of confinement. Wis. Stat. §§ 53.11(1m), 57.06(1) (1985–86).[5]

In 1988, the Legislature created Wis. Stat. § 973.014, which required a court sentencing a person to life in prison to "make a parole eligibility determination regarding the person and choose one of the following options:" "(1) The person is eligible for parole under s. 57.06(1)" or "(2) The person is eligible for parole on a date set by the court." 1987 Wis. Act 412, § 5. If the court decided to set a parole eligibility date, that date had to be later than "the earliest possible parole eligibility date as calculated under s. 57.06(1)." *Id.*

---

[4] Wisconsin Stat. ch. 57 was amended and renumbered as chapter 304 in 1989. 1989 Wis. Act 31, § 1699.

[5] Wisconsin Stat. § 57.06(1) provided that "[t]he department may parole an inmate serving a life term when he or she has served 20 years, as modified by the formula under s. 53.11(1)." Wisconsin Stat. § 53.11(1) provided for "mandatory release" for offenders not serving life sentences once they had served two-thirds of the sentence. Inmates serving life sentences were not entitled to mandatory release, Wis. Stat. § 53.11(1m), but under the formula in Wis. Stat. § 53.11(1) they became eligible for parole after serving two-thirds of 20 years, which amounted to 13 years and four months.

10

Individuals who committed a non-Class A felony before December 31, 1999, were sentenced to an indeterminate term of "not more than" a specific number of years. Wis. Stat. § 973.013(1)(a) (1995–96). These individuals became eligible for parole after serving 25% of their confinement term, or six months, whichever was greater. Wis. Stat. § 304.06(1)(b) (1995–96). For most felonies, a defendant would be entitled to mandatory release to parole after serving two thirds of his sentence. Wis. Stat. § 302.11(1) (1995–96).

### B.   Parole laws.

#### 1.   The parole eligibility standard.

When an inmate reaches his parole eligibility date, under either of the foregoing sentence types, the Commission may consider him for release to parole. Wis. Stat. § 304.06(1)(b). Wisconsin Stat. § 304.06 has detailed provisions requiring the Commission to notify the sentencing court, the district attorney's office, and victims about parole hearings and allow them to attend. It requires the Commission to consider a statement by any of those offices or persons. Wis. Stat. § 304.06(1)(e). The statute also mandates that no prisoner may be paroled until the Commission is satisfied that the prisoner has adequate plans for suitable employment or other means to sustain himself. Wis. Stat. § 304.06(2).

The Commission has discretion to determine whether an inmate should be released on parole. In reaching its decision, the Commission considers the

factors enumerated in Wis. Admin. Code PAC § 1.06(16). That provision reads as follows:

> A recommendation for a parole grant . . . may be made after consideration of all the following criteria:
>
> (a)   The inmate has become parole . . . eligible under s. 304.06, Stats., and s. PAC 1.05.
>
> (b)   The inmate has served sufficient time so that release would not depreciate the seriousness of the offense.
>
> (c)   The inmate has demonstrated satisfactory adjustment to the institution.
>
> (d)   The inmate has not refused or neglected to perform required or assigned duties.
>
> (e)   The inmate has participated in and has demonstrated sufficient efforts in required or recommended programs which have been made available by demonstrating one of the following:
>
>> 1.   The inmate has gained maximum benefit from programs.
>>
>> 2.   The inmate can complete programming in the community without presenting an undue risk.
>>
>> 3.   The inmate has not been able to gain entry into programming and release would not present an undue risk.
>
> (f)   The inmate has developed an adequate release plan.
>
> (g)   The inmate is subject to a sentence of confinement in another state or is in the United States illegally and may be deported.
>
> (h)   The inmate has reached a point at which the commission concludes that release would not pose an unreasonable risk to the public and would be in the interests of justice.

Wis. Admin. Code PAC § 1.06(16).

## 2.    The parole process.

The Commission conducts about 90 parole interviews each month. (DPFOF ¶ 25.) An inmate's initial parole interview is scheduled during the month prior to the date of first statutory eligibility for parole. *See* Wis. Admin. Code PAC § 1.06(1). (DPFOF ¶ 27.) The inmate is notified of this initial parole eligibility date during the intake process and is notified of subsequent deferred eligibility dates via the parole decision itself. (DPFOF ¶¶ 28, 38.)

The Commission and the institution where the inmate is confined work together to schedule a parole interview. (DPFOF ¶ 29.) At least 15 days before the interview, the institution sends written notice, providing the date of the interview, a detailed description of the information the Commission considers in assessing the parole factors, and what to expect at the interview. *See* Wis. Admin. Code PAC § 1.06(4). (DPFOF ¶ 30, Ex. 500.)

In preparation for the interview, the assigned commissioner reviews documents in the inmate's institution file, which includes information about the inmate's underlying offense and offense history, institution conduct records, and classification and parole decisions. (DPFOF ¶¶ 31–32.) The

inmate has access to this file at the institution.[6] *See* Wis. Admin. Code PAC § 1.06(6). (DPFOF ¶ 33.) Prior to the parole interview, the inmate—on his own or with the help of his social worker—can submit unlimited information to the Commission to explain his perspective, goals, and plan. *See* Wis. Admin. Code PAC § 1.06(7). (DPFOF ¶ 35.)

At the start of the interview, the commissioner verifies that the inmate received notice of the interview; the inmate's offense and sentence status; whether the inmate reviewed his institution file, and if not, whether he would like to adjourn the interview so he can do so; and whether the inmate understands the parole consideration factors. (DPFOF ¶ 36.) The commissioner and inmate then discuss information relevant to the factors set forth in Wis. Admin. Code PAC § 1.06(16). The discussion may cover a variety of topics including the individual's crime and sentencing; feelings about the crime and understanding of impact of the crime on the victim, the inmate, and others; institution conduct; personal and social history; prior criminal record; release plans; program participation; and goals for the future. (DPFOF ¶ 37.)

Following release consideration, the commissioner may recommend release or may recommend denying release for a specified period of time. If

---

[6] The only documents considered by the Commission that may not be disclosed to the inmate are confidential victim statements. *See* Wis. Const. art. I, § 9m(2)(a), (b), (i); Wis. Stat. §§ 950.04(1v)(ag), (n), 304.06(1)(em); and Wis. Admin. Code PAC § 1.06(6), (17), (18). (DPFOF ¶ 34.)

release is denied, the commissioner must establish a date for reconsideration, known as the deferral date. *See* Wis. Admin. Code PAC §§ 1.06(3), 1.07(1). (DPFOF ¶ 38.)

The inmate is advised in writing of the decision to defer or recommend parole, the reasons for the decision, and the date for the next opportunity for parole consideration or the release date. *See* Wis. Admin. Code PAC § 1.07(2). (DPFOF ¶ 39.) The written decision provides a detailed explanation of the reasons for the recommendation, citing to information in the institution file, statements made during the interview, and the relevant parole factors. The decision also indicates what the inmate should work on for subsequent reviews, if release is not recommended. (DPFOF ¶ 40.)

The length of the deferral is based on the individual's progress relative to the length of his sentence and the estimated time required to accomplish identified expectations. (DPFOF ¶ 41.) For example, a deferral of less than 12 months indicates the Commission believes release may be appropriate in the near future and that the individual is engaged in release planning and addressing factors that will support and sustain a successful release. (DPFOF ¶ 42.) A deferral of 12 to 18 months indicates the Commission believes that significant progress is being made toward release and that the individual is engaging in completing steps to facilitate risk reduction. (DPFOF ¶ 43.) A deferral of greater than 18 months means that the individual may be

considered for release in the future but indicates that the Commission does not believe that the inmate will be an appropriate release candidate under Wis. Admin. Code PAC § 1.06(16) in the near term. (DPFOF ¶ 44.)

The chairperson reviews and approves decisions deferring reconsideration for longer than 12 months and may review all other decisions. If the chairperson amends the decision, he provides the inmate with a written explanation of the reasons for the change. *See* Wis. Admin. Code PAC §§ 1.06(9), 1.07(4). (DPFOF ¶ 45.) Chairperson Tate reviews all parole decisions, regardless of the deferral length. (DPFOF ¶ 46.)

## III.   Procedural history.

On April 30, 2019, Plaintiffs filed this 42 U.S.C. § 1983 action, challenging the Wisconsin parole system as applied to prisoners who were sentenced to life in prison with the possibility of parole for offenses they committed as juveniles. (Dkt. 1.) Defendants moved to dismiss the complaint or, in the alternative, to stay proceedings pending a decision by the Supreme Court in *Mathena v. Malvo*, No. 18-217. (Dkt. 11–12.) On November 14, 2019, this Court granted Defendants' motion to stay. (Dkt. 20.) After the Supreme Court dismissed *Malvo* without issuing a decision, Defendants asked this Court to continue the stay pending the Supreme Court's decision in *Jones* or, in the alternative, to renew their motion to dismiss. (Dkt. 21.) On May 18, 2020, the Court denied Defendants' motion and lifted the stay. (Dkt. 37.) The Court

also declined Defendants' request to revisit the motion to dismiss but noted that "Defendants are free to raise any of their arguments in a motion for summary judgment when there is a more developed record." (Dkt. 37:2.)

On October 20, 2020, the Court granted Plaintiffs' motion for class certification. (Dkt. 53:4.) In certifying the class, the court observed that "[a]ll of plaintiffs' claims are based on the common contention that prisoners who committed crimes as juveniles are entitled under the Eighth Amendment, the Sixth Amendment, and the Due Process Clause to be considered for parole based on their maturity and rehabilitation and not on defendants' view the prisoner hasn't served enough time." (Dkt. 53:6.) The Court also ordered Plaintiffs to show cause why named plaintiffs who had been released since the filing of the case should not be dismissed on mootness grounds. (Dkt. 53:12.)

On November 3, 2020, Plaintiffs consented to the dismissal of the four named plaintiffs who had been released to parole, leaving one named plaintiff. (Dkt. 56.) Plaintiffs then filed an unopposed motion to file an amended complaint to replace the released plaintiffs with seven new plaintiffs, thus naming eight plaintiffs in total. (Dkt. 58; 59; 61.) Four of those plaintiffs have now been released as well. (DPFOF ¶¶ 1, 2, 7, 8.)

On April 22, 2021, shortly before the dispositive motion deadline, the Supreme Court decided *Jones v. Mississippi*. This Court stayed discovery and asked the parties to explain whether *Jones* would foreclose any of Plaintiffs'

claims. (Dkt. 110.) After briefing on the issue, this Court concluded that "*Jones* does not foreclose plaintiffs' claims, but it does nothing to buttress plaintiffs' arguments that the Constitution requires some specific mode of discretionary parole consideration for juvenile offenders." (Dkt. 113:2.) The Court did not dismiss Plaintiffs' claims but created "subclasses for those convicted of homicide and those convicted of nonhomicide crimes." (Dkt. 113:2.)

Plaintiffs claim that they are constitutionally entitled to be considered for parole based solely on maturity and rehabilitation, without the consideration of other factors such as whether release would depreciate the severity of the underlying offense. Specifically, they contend that: (1) Defendants are violating the Eighth Amendment by failing to give Plaintiffs a meaningful opportunity for release based solely on Plaintiffs' demonstrated maturation and rehabilitation; (2) Defendants are violating the Due Process Clause by failing to adopt procedures that allow Plaintiffs to demonstrate that they are entitled to release based solely on their maturation and rehabilitation; and (3) Defendants are increasing Plaintiffs' mandatory minimum sentence in violation of the Sixth Amendment by denying parole on the ground that Plaintiffs haven't served enough time, even after Plaintiffs

reach their parole eligibility date.[7] (Dkt. 53:4; 61 ¶¶ 396–400 (Eight Amendment), 401–05 (Due Process Clause), 406–14 (Sixth Amendment).)

Plaintiffs seek declaratory and injunctive relief. They request that the Court declare that Wisconsin's parole system violates the constitutional rights of the class members and fails to provide ten other procedural protections. (Dkt. 61:107–08.) They further seek to enjoin Defendants' allegedly unconstitutional practices and to make a host of changes to Wisconsin's parole system.[8] (Dkt. 61:107–09.) Finally, Plaintiffs ask for "new release consideration interviews to all class members using a lawful standard and lawful procedures." (Dkt. 61:109.)

## LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and when the moving party is

---

[7] Plaintiffs withdrew their claim that Defendants are increasing their maximum sentence (as opposed to their mandatory minimum sentence) in violation of the Sixth Amendment, and this Court dismissed the claim with prejudice. (Dkt. 97:4; 101:24; 113:3.)

[8] Plaintiffs claim they are entitled to an opportunity to demonstrate maturity and rehabilitation in support of parole; to see and confront any evidence used against them; to obtain counsel, at state expense, in preparation for parole interviews and to have counsel present and make statements at parole interviews; to submit evidence and arguments in support of a request for parole; to present testimony from expert witnesses, at state expense; to objective and non-arbitrary standards and procedures for use in parole decisions; to explanations as to what additional steps they must take to obtain parole; and to reduced caseload for commissioners so they have sufficient time to read and evaluate materials submitted by offenders. (Dkt. 61:108–09.)

entitled to a judgment as a matter of law. The moving party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted). "[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322.

## ARGUMENT

### I. Plaintiffs' constitutional claims fail as a matter of law.

#### A. Wisconsin's parole system does not violate the Eighth Amendment because no class member was sentenced to life without parole.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Supreme Court has interpreted this provision to include a "a 'narrow proportionality principle' that 'does not require strict proportionality between crime and sentence but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.'" *Graham*, 560 U.S. at 59–60 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring in part and concurring in judgment));

*see also Solem v. Helm*, 463 U.S. 277, 284–90 (1983). In a series of recent decisions—*Graham*, *Miller*, *Montgomery*, and *Jones*—the Court has addressed how this principle applies to sentencing juvenile offenders.

Those decisions hold that the Eighth Amendment forbids imposing life without parole sentences on juveniles, except for the rare circumstance when a homicide crime reflects permanent incorrigibility. Plaintiffs' contention that the Eighth Amendment requires states to radically overhaul their parole systems to be based solely on "maturity and rehabilitation," (*see* Dkt. 61 ¶¶ 398–99), runs headlong into the holdings and reasoning of these cases.

First, the Supreme Court has repeatedly limited its Eighth Amendment analysis to life *without* parole sentences, which have no bearing here because no class member received such a sentence. Second, the Supreme Court's juvenile sentencing cases are limited to sentencing and cannot be extended to parole under any reasonable reading. Rather than constitutionalizing a specific parole standard, the Court has held up discretionary parole systems as a *cure* for unconstitutional life-without-parole sentences, reinforcing the states' primary role in developing their parole systems. Third, there are additional problems for the two subclasses. For the juvenile homicide offenders, the cases restrict only *mandatory* life without parole sentencing schemes, which Wisconsin has never had, and for the juvenile nonhomicide offenders, who all received long aggregate sentences for multiple crimes, no

case calls into question such a sentence. Because Plaintiffs' theory is foreclosed by the very cases upon which they rely, their Eighth Amendment claim must be dismissed.

### 1. The Supreme Court's juvenile sentencing cases do not apply to juveniles who received sentences of life with parole eligibility.

The Supreme Court's juvenile sentencing cases prohibit states from imposing life without parole sentences on juveniles, except in the "rare" circumstances in which a homicide crime reflects "irreparable corruption." *Montgomery*, 577 U.S. Ct. at 209. *Graham* prohibited sentencing juvenile nonhomicide offenders to life without the possibility for parole. *Graham*, 560 U.S. at 82. *Miller* prohibited sentencing schemes that mandated life without parole sentences for juvenile homicide offenders. *Miller*, 567 U.S. at 479. *Montgomery* made *Miller* retroactive. *Montgomery*, 577 U.S. at 208–09. And *Jones* confirmed that juvenile homicide offenders can be sentenced to life without parole under discretionary sentencing schemes, without need for the sentencer to make a specific finding of permanent incorrigibility. *Jones*, 141 S. Ct. at 1313.

In each decision, the Court drew on capital punishment precedent and emphasized that its decisions were limited to life sentences without parole. *See Campbell v. Ohio*, 138 S. Ct. 1059 (2018) (Sotomayor, J., respecting the denial of certiorari) ("Because of the parallels between a sentence of death and

22

a sentence of life imprisonment without parole, the Court has drawn on certain Eighth Amendment requirements developed in the capital sentencing context to inform the life-without-parole sentencing context."). The *Graham* Court explained that "life without parole sentences share some characteristics with death sentences that are shared by no other sentences," in that it "alters the offender's life by a forfeiture that is irrevocable." *Graham*, 560 U.S. at 69. The Court held that the "sentencing practice" of imposing this punishment on juveniles for nonhomicide crimes "is cruel and unusual." *Id*. at 74. Accordingly, while "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," it "must . . . give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 75. The Court stated that in carrying out this mandate, "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." *Id*.

In *Miller*, the Court confirmed that one mechanism for compliance is parole eligibility. *See Miller*, 567 U.S. at 465. There, the Court explained that its holding applied only to sentences of "life imprisonment without the possibility of parole," and not to "a lesser sentence (for example, life *with* the possibility of parole)." *Id*. at 465. The Court drew on *Graham*, emphasizing that its prior case law "liken[ed] life-without-parole sentences imposed on juveniles to the death penalty itself," which "suggested a distinctive set of legal rules"

because the sentence was "akin to the death penalty." *Id.* at 474, 475. Indeed, both lines of precedent the *Miller* Court looked to—categorically banning certain punishments based on proportionality and requiring individualized sentencing in the death penalty context—relied on "*Graham's* '[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment.'" *Id.* at 475 (alterations in original) (citation omitted).

Consistent with the analogy to the death penalty, the *Miller* Court confirmed that the constitutional problem with life without parole sentences concerned their irrevocability. In discussing statutes permitting juvenile offenders to be transferred to adult court—at which point they would be subject to mandatory life sentences—the Court found that "the presence of discretion in some jurisdictions' transfer statutes" did not render these schemes constitutional. *Id.* at 487. Instead, the Court explained that "[d]iscretionary sentencing in adult court" would be required, which would mean "a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term *with* the possibility of parole or a length term of years." *Id.* at 489. For that reason, "the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court—and so cannot satisfy the Eighth Amendment." *Id.* The inescapable conclusion being that where the sentencer has discretion and is *not* required to impose a sentence of

life without parole on a juvenile offender—as in Wisconsin—there is no Eighth Amendment issue. *See id.*

*Montgomery* reinforced that *Miller* and *Graham* were limited to sentencing and contemplated discretionary parole as a constitutional alternative to prohibited life without parole sentences. The *Montgomery* Court observed that "*Miller* requires a *sentencer* to consider a juvenile offender's youth and attendant characteristics *before* determining that *life without parole* is a proportionate sentence." *Montgomery*, 577 U.S. at 209–10 (emphasis added). And in discussing the scope of *Miller*'s retroactive application, the Court held that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.* at 212. Noting the Court's prudence in "limit[ing] the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice system," *id.* at 211, the Court did not mandate any distinct parole procedure, *id* at 212. Instead, the Court reasoned that simply "[e]xtending parole eligibility to juvenile offenders" would provide an "opportunity for release" that satisfied *Miller*. *Id.*

Most recently, in *Jones*, the Court explained that *Miller* did not require a sentencer to make a factual finding of permanent incorrigibility before imposing a life without parole sentence on a juvenile

murderer. *Jones*, 141 S. Ct. at 1313. The Court confirmed that *Miller* "mandated 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." *Id.* at 1311 (quoting *Miller*, 567 U.S. at 483). Accordingly, the Court held that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.* at 1313.

The Court has repeatedly confirmed that its holdings are limited to irrevocable life sentences *without* the possibility of parole. At every turn, the Court has emphasized that these sentences are problematic given their similarity to the death penalty, contrasted unconstitutional life sentences with the lesser sentence of life with the possibility of parole, and affirmed the flexibility of states in determining how to comply with *Miller* and *Graham*. And the Court explicitly held that one way to comply with these holdings is to *extend parole eligibility* to individuals sentenced to life without parole for crimes they committed as juveniles. Class members here are already serving sentences *with* parole eligibility. That is all that is required to comply with the Eighth Amendment.

> **2.**  **Under the Supreme Court's juvenile sentencing cases, discretionary parole systems like Wisconsin's are a *remedy* for unconstitutional life without parole sentences.**

Even if the Supreme Court's juvenile sentencing cases applied to juvenile offenders who received sentences of life with parole eligibility, Plaintiffs' Eighth Amendment claim fails for another basic reason. *Graham* and its progeny are limited to sentencing and cannot be extended to parole without an absurd distortion of their holdings and reasoning.

*Graham*, *Miller*, *Montgomery*, and *Jones* stand for the proposition that "youth matters in *sentencing*." *Jones*, 141 S. Ct. 1313–14 (emphasis added). Those cases are limited to restricting states' sentencing procedures and do not dictate how states must administer their parole programs. That makes sense. Parole is not part of a criminal prosecution. *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). And a denial of parole does not constitute punishment. *See Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 507 (1995) (concluding that law allowing a state to decrease the frequency of parole hearings did not increase punishment because it "had no effect on the standards for fixing a prisoner's initial date of 'eligibility' for parole, or for determining his 'suitability' for parole and setting his release date") (citations omitted); *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be

conditionally released before the expiration of a valid sentence."). It follows that the Eighth Amendment—and its prohibition on "cruel and unusual punishments"—cannot logically be extended to parole. U.S. Const. amend. VIII.

Instead of constitutionalizing a particular parole standard for juvenile offenders, the Supreme Court pointed to discretionary parole systems like Wisconsin's as a *remedy* for unconstitutional life without parole sentences. Most strikingly, the sole parole standard the *Montgomery* Court pointed to as an example of providing a meaningful "opportunity for release" is substantively similar to Wisconsin's system. *Montgomery*, 577 U.S. at 212. The Court cited to Wyoming's parole system—which, like Wisconsin, provides the parole board with considerable discretion—as a way for a state to "remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.* (citing Wyo. Stat. Ann. § 6–10–301(c)). Under that system, juvenile homicide offenders are eligible for parole after serving 25 years of their sentence. Wyo. Stat. Ann. § 6–10–301(c). In determining whether to grant parole, the law "provides the Board with almost absolute discretion in paroling decisions," subject to narrow limitations. Daniel M. Fetsco, *Early Release from Prison in Wyoming: An Overview of Parole in Wyoming and Elsewhere and an Examination of Current and Future Trends*, 11 Wyo. L. Rev. 99, 106 (2019); *see* Wyo. Stat. Ann. § 7–13–402(a)–(d).

It is no surprise that the *Montgomery* Court would cite to a discretionary parole system like Wyoming's as an example of how states could comply with its Eighth Amendment precedents. It did precisely the same thing in *Graham* and *Miller*. In *Graham*, the Court pointed to six jurisdictions that forbade imposing life without parole decisions on juveniles for non-homicide crimes—Alaska, Colorado, Kansas, Kentucky, Montana, and Texas—in finding that there was a national consensus against the practice. *Graham*, 560 U.S. at 62, App. pt. III. Each of these states have—and had at the time *Graham* was decided—discretionary parole systems that permitted the consideration of a wide variety of factors, including the severity of the underlying crime.[9]

Likewise, *Miller* cited to 15 jurisdictions, including Wisconsin, in which life sentences without parole were not mandatory, in engaging in the same analysis with respect to sentences for homicide

---

[9] *See* Alaska Admin. Code tit. 22, § 20.150(d) (requiring applicant "be prepared to discuss any topic that could reasonably relate to the applicant's possible success or failure on parole," including "present offense"); 8 Colo. Code Regs. § 1551-1:6.04 (permitting board to grant parole based on "totality of the circumstances," including "[a]ggravating or mitigating factors from the criminal case"); Mont. Admin. R. 20.25.504(1)(e) (requiring hearing panel to consider several factors, including "facts and circumstances of the crime for which the offender was sentenced"); Kan. Stat. Ann. § 22-3717(h) (requiring board to consider "all pertinent information," including "the circumstances of the offense of the inmate"); Ky. Rev. Stat. Ann. § 439.340(1) (requiring board to consider "pertinent information," including "the circumstances of his or her offense"); 37 Tex. Admin. Code § 145.2(1), (2)(A)(iv) (setting forth several factors that "guide" parole decisions, including "[s]tatic factors" like "[t]he commitment offense").

offenses. *Miller*, 567 U.S. at 483 n.10. The *Miller* Court cited to authority from California, Indiana, New Mexico, and the 12 states listed in respondent Alabama's brief: Georgia, Maryland, Maine, Nevada, North Dakota, Oklahoma, Rhode Island, South Caroline, Tennessee, Utah, West Virginia, and Wisconsin. *Id.*; Brief of Respondent in *Miller v. Alabama*, No. 10-9646, 2012 WL 588454, at *25. As with the statutes cited in *Graham* and *Montgomery*, many of these states have parole systems that are discretionary, and explicitly require the consideration of the severity of the underlying crime.[10]

Plaintiffs' claim that Wisconsin's discretionary parole system is unconstitutional cannot be reconciled with the Court's repeated use of states with discretionary parole systems as examples of appropriate alternatives to life without parole sentencing schemes. And Plaintiffs' theory would require states to apply parole to juvenile offenders in a way that diverges from how that process has long been understood. The Supreme Court has repeatedly characterized parole as discretionary, with "[t]he parole release decision . . . depend[ing] on an amalgam of elements," *Greenholtz*, 442 U.S. at 9–10; *see also Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005) (noting "broad discretionary

---

[10] *See, e.g.*, Ga. Code Ann. § 42-9-42(c); Nev. Rev. Stat. Ann. § 213.10885; Okla. Stat. Ann. tit. 57, § 332.8; 13 R.I. Gen. Laws Ann. § 13-8-14.1; Tenn. Code Ann. § 40-28-117; W. Va. Code Ann. § 62-12-13(l); Wis. Admin Code. PAC § 1.06(16).

powers" of parole board); *Garner v. Jones*, 529 U.S. 244, 252 (2000) (finding that "[t]he States must have due flexibility in formulating parole procedures").

In short, what Plaintiffs describe—an entitlement of immediate release upon the fulfillment of a single "rehabilitation and maturity" criteria—bears no resemblance to how the Court has described parole systems over the past four decades. Every class member in this lawsuit received a sentence with parole eligibly, which is exactly what the Supreme Court pointed to as a *remedy* for an unconstitutional life without parole sentence. Plaintiffs cannot overcome this basic problem, and their Eighth Amendment claim fails as a matter of law.

> **3.    The Supreme Court's juvenile sentencing cases do not apply to the two subclasses—homicide and nonhomicide offenders—for additional reasons.**

In addition to the primary flaws in Plaintiffs' constitutional claims—that the Supreme Court's juvenile sentencing cases do not apply beyond sentencing or to life with parole sentences—there are other problems unique to each subclass.

This Court recently split the class into two subclasses: juvenile homicide offenders and juvenile nonhomicide offenders. The homicide subclass consists of juvenile offenders serving life or aggregate sentences of 470 months (about 40 years) or more (with eligibility for parole) with at least one homicide offense. (Dkt. 113:7.) The nonhomicide subclass consists of juvenile offenders serving

aggregate sentences of 470 months or more (with eligibility for parole) for multiple nonhomicide offenses. (Dkt. 113:7–8.)

For those class members serving sentences for homicide offenses, *Miller* restricts only *mandatory* life without parole sentencing schemes for juvenile homicide offenders, which Wisconsin has never had. *Miller*, 567 U.S. at 479. *Jones* confirms this holding: for juvenile homicide offenders, "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Jones*, 141 S. Ct. at 1313. In other words, that is all that is required under the Eighth Amendment. There is no additional requirement at sentencing, and, by extension, there can be no additional requirement for parole consideration. Plaintiffs' Eighth Amendment claim is simply inconsistent with the holding and reasoning of *Jones* and would lead to the absurd result that a juvenile homicide offender could be resentenced to life without parole under discretionary standards (as a remedy for a *Miller* violation), but deferring parole using a discretionary standard would be a constitutional violation. That makes no sense. *Jones* forecloses the Eighth Amendment claims brought by class members convicted of homicide.

The claims of class members serving sentences for nonhomicide offenses are foreclosed for another reason. All of the nonhomicide offenders are serving aggregate sentences of 470 months or more for *multiple* crimes. But *Graham* and *Miller* do not apply to consecutive term-of-years sentences imposed on

32

juveniles convicted of multiple crimes. "[E]very sentence[ ] must be treated separately, not cumulatively, for purposes of determining whether it is cruel and unusual." *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001); *but see McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016) (concluding that "the logic of *Miller* applies" to a *de facto* life 100-year sentence without parole eligibility for murder with a firearm). The Seventh Circuit recently explained that while it has "held that the Eighth Amendment prohibits not only *de jure* life sentences, but also *de facto* life sentences," an aggregate 140-year sentence for multiple crimes with the possibility of parole is not a *de facto* life without parole sentence. *Sanders v. Eckstein*, 981 F.3d 637, 641, 643 (7th Cir. 2020) (citing *McKinley*, 809 F.3d at 911). Thus, while a *de facto* life sentence for a single crime might raise concerns under *Graham* and *Miller*, a long consecutive term-of-years sentence for multiple crimes does not, especially when—like all the class members in this lawsuit—the offender is afforded an opportunity for early release.

### 4. Named plaintiffs who have been released have no live controversy and are not adequate representatives of the class or subclasses.

One additional point with regard to the subclasses bears mention. In creating the subclasses, this Court determined that named plaintiffs Heredia, Jones, Orosco, Nash, Pheil, Guarnero, and Yang would represent the homicide offender subclass and that named plaintiff Doyle would represent the

nonhomicide offender subclass. (Dkt. 113:7–8.) Since this Court issued the order creating the subclasses, Heredia, Doyle, Pheil, and Yang have been granted parole and released. (DPFOF ¶¶ 1, 2, 6, 8.)

The release of these individuals moots their claims for injunctive relief because any relief ordered by the Court could not benefit them. They have no live controversy and should be dismissed from the case. *See Loertscher v. Anderson*, 893 F.3d 386, 392–93 (7th Cir. 2018) ("In an action seeking injunctive relief, the requirement of a live controversy 'ordinarily means that, once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot.'") (citation omitted). This is particularly problematic with respect to named plaintiff Doyle. While there are other named plaintiffs who could adequately represent the subclass of homicide offenders, Doyle was the only named plaintiff representing the subclass of nonhomicide offenders. Doyle's release on parole means that there is currently no named plaintiff with a sufficient interest in the outcome of the case to "fairly and adequately protect the interests" of the nonhomicide subclass. Fed. R. Civ. P. 23(a)(4); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

### 5. Lower courts that have addressed this issue generally affirm Defendants' positions and those that do not are unpersuasive.

Several lower courts—including the Fourth Circuit—have rejected any application of *Graham*, *Miller*, and *Montgomery* to parole, and affirmed

the constitutional soundness of extending discretionary parole systems to *Miller*-affected individuals. The Fourth Circuit addressed this issue in *Bowling v. Dir., Va. Dep't of Corr.*, 920 F.3d 192 (4th Cir. 2019). There, a juvenile offender sentenced to life with parole alleged that the Virginia Parole Board's repeated denial of parole violated his constitutional rights. *Id.* at 194–96. The court declined to extend the *Graham* line of cases "to juvenile homicide offenders sentenced to life with parole" and "beyond sentencing proceedings." *Id.* at 197. Noting a case split about the application of "*Miller* and its lineage to sentences that are practically equivalent to life without parole," the court declined to impose special procedures on "a juvenile offender who has and will continue to receive parole consideration." *Id.* at 198. Moreover, the Fourth Circuit found that Virginia's parole standard—which permits consideration of numerous factors, including public safety, character, personal history, release plans, and attitude—provided a meaningful opportunity for release by permitting "the Parole Board to fully consider the inmate's age at the time of the offense, as well as any evidence submitted to demonstrate his maturation since then, and account for the concern at the heart of *Graham* and *Miller*." *Id.*

Other courts have come to similar conclusions. For instance, following a detailed analysis of *Miller* and *Montgomery*, the Washington Supreme Court held that these cases only require consideration of youth and its attendant characteristics at sentencing, and that extending parole under generally

applicable parse standards remedies a *Miller*–affected sentence. *State v. Scott*, 416 P.3d 1182, 1185–89 (Wash. 2018); *see also State v. McCleese*, 215 A.3d 1154, 1166 (Conn. 2019) ("Not only was *Miller*'s reasoning limited to sentences that do not include parole eligibility, but its holding was as well."). And decisions from other federal district courts reinforce this analysis. *See, e.g.*, *Wershe v. Combs*, No. 1:12-CV-1375, 2016 WL 1253036, at *4 (W.D. Mich. Mar. 31, 2016) (stating that *Graham* was not intended to "upend parole systems" and rejecting claim that *Graham* authorized federal review of parole systems and decision-making); *Thomas v. Stitt*, No. CIV-20-0944-D, 2020 WL 7489763, at *3 (W.D. Okla. Dec. 21, 2020) ("Plaintiff's claim that Oklahoma's parole procedures are unconstitutional fails because neither *Miller* nor *Montgomery* expanded existing parole procedures for persons convicted as juveniles.").

These decisions are persuasive because they follow the analysis of the Supreme Court. In *Montgomery* the Court unequivocally identified the extension of parole as a remedy for *Miller*-affected sentences, and there is no reason the Court would "glibly identify a constitutionally adequate remedy under the eighth amendment" if its intent was to require an entirely new parole system for juvenile offenders. *State v. Williams-Bey*, 144 A. 3d 467, 480 (Conn. Ct. App. 2016). That is because "when a juvenile is eligible for parole, the punishment is no longer irrevocable," and the rationale of *Graham* and

*Miller* are severely diminished if not rendered completely inapplicable. *McCleese*, 215 A.3d at 1165.

The handful of lower court cases that diverge from this reasoning are unpersuasive. For example, *Office of Prosecuting Attorney for St. Louis County v. Precythe*, involved a constitutional challenge to the "remedial parole review process" that Missouri enacted as a post-*Montgomery* remedy for mandatory life without parole sentences. 14 F.4th 808, 812–13 (8th Cir. 2021), *vac'd & reh'g en banc granted* (8th Cir. Nov. 18, 2021). While a three-judge panel of the Eighth Circuit agreed with the district court that the remedial process violated the rights of the inmate class, that opinion has been vacated, and rehearing *en banc* is pending. *Id*. at 808, 812. Regardless of the outcome on rehearing, the Missouri parole system at issue in *Precythe* differs significantly from Wisconsin's. To start, the parole system at issue was not the system for granting parole to parole-eligible inmates, like in this lawsuit; rather, it was the system created as a post-*Montgomery* remedy for life without parole sentences. *Id*. at 812. That system afforded affected individuals a one-time parole hearing after serving 25 years of their life sentences, after which the individuals would either be granted parole or denied parole without another opportunity for review. *Id*. (quoting Mo. Rev. Stat. § 558.047(1)). Further, the Missouri system at issue prevented inmates from presenting— and the parole board from considering—evidence of maturity and

rehabilitation by prohibiting inmates from reviewing their parole files and by providing only cursory parole decisions. *Id.* at 818–19. As discussed in section II. below, that is nothing like Wisconsin's parole system.

Other decisions that have applied the *Graham* line of cases to parole have been based on similar differences that gave rise to plausible allegations that the state's parole system provided *no* realistic opportunity for release. *See Md. Restorative Just. Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, at *25–27 (D. Md. Feb. 3, 2017) (allowing Eighth Amendment claim to proceed on motion to dismiss, where plaintiffs alleged Maryland's parole system constituted a *de facto* life without parole sentence through an executive clemency-type system where the governor had "unfettered discretion"); *see also Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009, 1011 (E.D. N.C. 2015) (noting that the Eighth Amendment forbids a juvenile offender's sentence of life with parole to be "the functional equivalent of a life sentence without parole," and concluding that North Carolina's parole scheme—where juvenile offenders had *no* opportunity to be heard on the question of maturity and rehabilitation as "an entirely passive participant"— was unconstitutional).

These few cases that have extended the *Graham* line of cases to parole suffer from a central defect: they assume that the Supreme Court's mandate to consider youth and its attendant characteristics as sentencing factors

38

carries with it a constitutional entitlement to a particular parole standard. But that is not what the Court wrote. The *Montgomery* Court held that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole," and observed that "[e]xtending parole eligibility to juvenile[s]" in this manner "does not impose an onerous burden." *Montgomery*, 577 U.S. at 212. So, when the Court observed that "[a]llowing those offenders to be considered for parole ensures that juveniles . . . will not be forced to serve a disproportionate sentence," the point was that generally applicable parole systems like Wyoming's (and Wisconsin's) are sufficient to remedy a *Miller*-affected sentence. *See id.* The Fourth Circuit correctly interpreted *Montgomery* in this way. *Bowling*, 920 F. 3d at 197. But other lower courts departing from the Supreme Court's reasoning and are, therefore, unpersuasive, in addition to addressing different parole schemes, as summarized above.

In sum, for multiple, fundamental legal reasons, the Eight Amendment claims fail.

### B. Wisconsin's parole system does not violate the Due Process Clause because Plaintiffs do not have a cognizable liberty interest in release on parole.

Plaintiffs next assert a procedural due process claim, which they say springs from their Eighth Amendment claim. From this they claim they are entitled to a myriad of procedural protections, untethered from the Supreme

Court's Eighth Amendment cases from which their liberty interest supposedly derives.

While *Graham*, *Miller*, *Montgomery*, and *Jones* do not support the procedural protections Plaintiffs seek, their due process claim fails for a more basic reason: they do not have a protected liberty interest in release on parole. Further, even if Plaintiffs had some cognizable liberty interest, the procedural protections needed to protect that interest would be limited to ensuring that their life with parole sentences are not converted to life without parole sentences in contravention of the Eighth Amendment. Plaintiffs' assertion of a far more sweeping standard that would require Wisconsin to make parole decisions solely based on maturity and rehabilitation—and adopt the procedures advocated by Plaintiffs—has no basis in the Constitution.

### 1. Class members have no liberty interest in release on parole.

The Fourteenth Amendment provides, in part: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Procedural due process claims involve a two-step analysis: first, the court must determine whether there is a liberty or property interest that has been interfered with by the state; and second, the court must determine whether the procedures attendant upon the deprivation were

constitutionally sufficient. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). Without a protected liberty or property interest, the plaintiff is not entitled to any procedural protections. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). Thus, if a plaintiff fails on the first step of the analysis, the court need not reach the second step.

"[A]n individual claiming a protected interest must have a legitimate claim of entitlement to it." *Ky. Dep't of Corr.*, 490 U.S. at 460. The Supreme Court has identified only two sources for protected liberty interests: the Due Process Clause itself and state law. *Id*. Plaintiffs do not claim to have a liberty interest derived from the Due Process Clause or Wisconsin law. Nor could Plaintiffs make such a claim. There is no constitutional or inherent right to parole. *Greenholtz*, 442 U.S. at 7. And discretionary parole systems—like Wisconsin's—do not create a liberty interest in parole. *See Grennier v. Frank*, 453 F.3d 442, 446 (7th Cir. 2006) (explaining that there is no "liberty or property interest in the prospect of parole under Wisconsin's discretionary system").

Plaintiffs instead claim that the Eighth Amendment is the sole source of a newly recognized liberty interest that attaches to parole hearings. (Dkt. 61 ¶¶ 66, 403.) But there is no legal basis for Plaintiffs' assertion that the Eighth Amendment could be the textual source of their liberty interest: "There is no right under the Federal Constitution to be conditionally

released before the expiration of a valid sentence." *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011).

Even if the Eighth Amendment could be the textual source for a liberty interest, the Supreme Court cases addressing the Eighth Amendment in this context—*Graham*, *Miller*, *Montgomery*, and *Jones*—do not create a liberty interest. In addition to the flaws in Plaintiffs' Eighth Amendment claim as discussed in section I.A., none of the Supreme Court cases addressing juvenile sentencing include a Fourteenth Amendment due process claim; their holdings are grounded solely in the Eighth Amendment. *Graham*, 560 U.S. at 58–75, 82; *Miller*, 567 U.S. at 479–80; *Montgomery*, 577 U.S. at 206–12; *Jones*, 141 S. Ct. at 1313. And even under the Eighth Amendment, the Supreme Court makes very clear that juvenile offenders are *not* entitled to release; they are entitled only to an *opportunity* for release consideration. *See Graham*, 560 U.S. at 75 (stating that the state "is not required to guarantee eventual freedom" nor it is required "to release [the juvenile] offender during his natural life"). Neither the Eighth Amendment, nor the cases interpreting it, confer a liberty interest in release on juvenile offenders sentenced to life with the possibility of parole. Plaintiffs' due process claim fails on this basis alone.

2. **Even if the Supreme Court's Eighth Amendment cases could apply to parole, they would be limited to ensuring that parole systems do not result in the imposition of life without parole sentences on juvenile offenders.**

Even if the Eighth Amendment could be the textual source for a liberty interest, the Supreme Court cases addressing the Eighth Amendment in this context do not require the broad procedural protections claimed by Plaintiffs. Nor are those protections required by the Supreme Court's cases addressing parole.

The Supreme Court's juvenile sentencing cases present discretionary parole a remedy for sentences that violate the Eighth Amendment but leave it to the states to decide how to implement that remedy. The Court has emphasized that states have been left to "in the first instance, to explore the means and mechanisms for compliance," *id.*, and "develop[e] appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," *Montgomery*, 577 U.S. at 211 (alteration in original) (citation omitted). Plaintiffs' laundry list of procedural steps they claim are somehow required under the Supreme Court's juvenile sentencing cases cannot be reconciled with that express direction.

Nor can Plaintiffs' argument be reconciled with the Supreme Court's cases addressing parole. When a state creates a liberty interest in parole, the

procedures required to protect that interest are "minimal." *Swarthout*, 562 U.S. at 220. All that is required is an opportunity to be heard and a statement of reasons why parole was denied. *Id.* (citing *Greenholtz*, 442 U.S. at 16). The statement of reasons need not recite evidence. It only needs to "adequately inform[ ] [the inmate] of the grounds for the decision and also enable[ ] a court of review to determine whether parole has been denied for impermissible reasons." *Solomon v. Elsea*, 676 F.2d 282, 286 (7th Cir. 1982).

As discussed below in section II., parole hearings offer a meaningful chance for release by "[e]xtending parole eligibility to juvenile offenders." *See Montgomery*, 577 U.S. at 212. In conducting parole reviews of eligible inmates, the Commission considers factors relevant to maturity and rehabilitation, including the nature of the underlying crime, conduct while in prison, efforts in programming, release plans, and risk to the public. *See* Wis. Admin. Code PAC § 1.06(16). (DPFOF ¶¶ 23, 50–72.) Inmates are interviewed and may present information and materials that they feel demonstrates that release would be appropriate. (DPFOF ¶¶ 35–37.) After the interview, the Commission issues a written decision, explaining why parole was granted or denied. (DPFOF ¶¶ 40–41, 106–07.) Under this system, 50 percent of all juvenile offenders sentenced to life or long sentences with parole have been released over the last ten years. (DPFOF ¶ 49.)

Thus, even assuming for argument's sake that *Graham* and *Miller* give rise to a liberty interest in parole, the procedural protections necessary to protect that interest need only ensure that parole systems do not act as a backdoor way to impose life without parole sentences forbidden by the Eighth Amendment. Wisconsin's parole system does nothing of the sort. It provides all the procedural protections required by the Supreme Court. Thus, even if Wisconsin had a constitutional defect to remedy—which it does not, because it never imposed the sentences forbidden under *Graham* and *Miller*—its parole system would be a sufficient cure.

Plaintiffs cannot establish either step in the due process analysis, and their claim should be dismissed.

## C.   Wisconsin's parole system does not violate the Sixth Amendment because prisoners are not entitled to Sixth Amendment protections during parole reviews.

The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. Citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, Plaintiffs claim that their Sixth Amendment right to a jury trial has been violated because parole officials have increased their sentences based on

45

facts that should have been found by a jury. (Dkt. 61 ¶¶ 409–14.) Specifically, Plaintiffs assert Defendants are increasing Plaintiffs' mandatory minimum sentences in violation of the Sixth Amendment by denying parole on the ground that Plaintiffs have not served sufficient time, even after Plaintiffs reach their parole eligibility dates. (Dkt. 53:3–4 (citing Dkt. 44:5).)

This claim fails for a simple reason: the Sixth Amendment does not apply to parole. And Plaintiffs' attempt to extend the Sixth Amendment to parole is based on a faulty premise—that an offender's parole eligibility date is his mandatory minimum sentence—and would lead to absurd results. No reasonable jury could find in favor of Plaintiffs on this claim.

### 1. The Sixth Amendment and the *Apprendi* line of cases do not apply to parole.

In a line of cases beginning with *Apprendi*, the Supreme Court established procedural limits on imposing certain enhancements of criminal punishments at sentencing. In *Apprendi*, the Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 525 (citation omitted); *see also Ring v. Arizona*, 536 U.S. 584 (2002) (holding that facts increasing punishment beyond the maximum authorized by a guilty verdict must be proven beyond a reasonable doubt). The "'statutory maximum' for *Apprendi* purposes is the

maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely v. Washington*, 542 U.S. 296, 303 (2004). Notably, *Blakely* teaches that indeterminate sentencing schemes do not violate the Sixth Amendment by invading the province of the jury, so long as the defendant is sentenced within the statutory maximum. *Id*. at 308–09. Finally, *Alleyne v. United States* extended *Apprendi* to mandatory minimum sentencing, holding that any fact that "aggravates the legally prescribed range of allowable sentences" is an element that must submitted to the jury. *Alleyne v. United States*, 570 U.S. 99, 114–15 (2013).

The Sixth Amendment, as interpreted in the *Apprendi* line of cases, does not apply to parole. By its express terms, the Sixth Amendment applies in "all criminal prosecutions." U.S. Const. amend. VI. But parole is not part of a criminal prosecution. *See Morrissey*, 408 U.S. at 480. "Parole arises after the end of the criminal prosecution, including imposition of sentence." *Id*. And there is no right to a jury trial or to proof beyond a reasonable doubt in a parole hearing. *See United States v. Knights*, 534 U.S. 112, 120 (2001) (holding "trial rights of a jury and proof beyond a reasonable doubt" inapplicable in probation revocation proceedings). Unsurprisingly, courts that have addressed the issue have consistently held that the Sixth Amendment does *not* apply in this context. *See Rush v. Kane*, No. C 05-4143 CRB, 2007 WL 4166032, at *7 (N.D. Cal. Nov. 19, 2007) (Sixth Amendment and *Apprendi* inapplicable to

parole denial based in part on board's characterization of offense); *Genniro v. Salazar*, No. SA CV 08-0543-JVS(E), 2008 WL 4962861, at *8–9 (C.D. Cal. Oct. 20, 2008) (collecting cases).[11]

The Sixth Amendment is inapplicable here. Parole is not part of the criminal prosecution, and parole decisions do not alter the sentence the offender received. That alone dooms Plaintiffs' Sixth Amendment claim.

### 2. An offender's parole eligibility date is not his minimum sentence.

Plaintiffs' claim also suffers from additional fundamental problems. For one, their Sixth Amendment theory is based on the faulty premise that their parole eligibility dates are their minimum sentences.

Class members here all received indeterminate sentences of life or a term of years that Plaintiffs deem to be akin to life. (Dkt. 53:11–12; 61 ¶¶ 394–95.) Indeterminate sentences in Wisconsin "have the effect of a sentence at hard labor for the maximum term fixed by the court, subject to the power of actual release from confinement by parole by the department." Wis. Stat. § 973.013(1)(b). The relevant statutes, thus, refer only to the maximum penalty

---

[11] *See also, e.g.*, *Villareal v. Swarthout*, No. CIV S-11-2499 GEB GGH P, 2011 WL 5104472, at *2 (E.D. Cal. Oct. 26, 2011); *Dodson v. Mohr*, No. 2:18-CV-0908, 2018 WL 4518018, at *3–4 (S.D. Ohio Sept. 20, 2018) ("Plaintiff's [Sixth Amendment] argument about fact finding is inapplicable to parole proceedings."); *Reynolds v. Virginia*, No. 7:17-CV-00517, 2019 WL 691793, at *3–4 (W.D. Va. Feb. 19, 2019) ("neither the Sixth Amendment nor *Alleyne* applies to parole because 'parole is not part of a criminal prosecution.'") (citation omitted).

and the parole eligibility determination. *See* Wis. Stat. §§ 939.50, 973.013(1), 973.014(1). And, notably, for homicide offenders, life is both the minimum and maximum penalty that the court can impose: "A defendant convicted of a crime for which the minimum penalty is life shall be sentenced for life." Wis. Stat. § 973.013(1)(b).

Contrary to Plaintiffs' argument, parole eligibility is not the same as a minimum sentence such that a denial of parole results in an increase in the minimum sentence. With an indeterminate sentence, a prisoner has no *right* to a lesser sentence by release on his parole eligibility date; he is entitled only to a parole hearing where the Commission, in its discretion, determines whether he is suitable for release. *See Blakely*, 542 U.S. at 309. When an inmate is denied parole, he does not receive an increased minimum sentence; his sentence is entirely unchanged.

To illustrate, the penalty for first degree intentional homicide is life imprisonment. Wis. Stat. §§ 939.50(3)(a), 940.01(1) (1995–96). Life is both the minimum and maximum penalty authorized by the jury's verdict, subject only to parole—a suspension of part of the prescribed prison term as an "act of grace." *See United States v. Haymond*, 139 S. Ct. 2369, 2377 (2019) (describing parole) (citation omitted). Thus, when class members here were denied parole, the Commission did not increase their minimum sentence. The Commission

simply denied partial suspension of the existing term of life imprisonment. Such action does not implicate the Sixth Amendment. *See id*.

Plaintiffs' suggestion that a denial of parole goes beyond what the sentencing court determined was a proportional length of incarceration is pure invention. Defendants have not used any fact to increase class members' sentences beyond the sentences imposed by the sentencing courts. *Apprendi* and its progeny do not apply here, and Plaintiffs' Sixth Amendment claim fails for that additional reason.

### 3.    Applying the Sixth Amendment and the *Apprendi* line of cases to parole would lead to absurd results.

Plaintiffs' novel theory would apply not only to juvenile offenders, but to *all* parole eligible offenders, and would lead to absurd results.

First, it would require a jury finding before deferring parole consideration for all offenders, but not before a Court removes the possibility of parole altogether for juvenile homicide offenders. *See Jones*, 141 S. Ct. at 1316 n.6. That makes no sense.

Second, it would require a jury finding when the Commission provides reasons for its decision, but not when it is silent. For example, if the Commission cited to facts not found by a jury in concluding that release would

depreciate the seriousness of the offense,[12] its decision would violate the Sixth Amendment. But if the Commission was silent as to the facts supporting the same conclusion, there would be no violation.

The Seventh Circuit rejected a similar theory in the context of procedural due process. *See Grennier v. Frank*, 453 F.3d 442, 446 (7th Cir. 2006). In *Grennier*, the court concluded that classifying an inmate as a sex offender, when he had not been convicted of a sex offense, and conditioning parole on participation in sex offender treatment did not implicate a liberty interest protected by due process. *Id.* at 444. In concluding that no hearing was required before denying parole on that basis, the court explained that "[a]ny other understanding" would "require a hearing whenever a parole board gives reasons for its decision, but not when it remains silent." *Id.* at 446. Thus, the court reasoned, calling for a hearing on "any of the parole board's other subsidiary factual beliefs"—like the fact, not found by the jury, that the offender mutilated the victim's body—would "make no sense." *Id.*

---

[12] Plaintiffs do not explain why their theory would be limited to "facts about the underlying crime" being used to support the "seriousness of the offense" factor. (Dkt. 97:22 (citation omitted).) It would not be. Plaintiffs' theory would apply to *any* fact not found by a jury and relied on by the Commission as a basis for denying parole. So, for example, under Plaintiffs' theory, there would need to be a jury finding any time the Commission relied on a contested prison conduct report or a challenged program or classification decision in denying parole. That cannot be what the Sixth Amendment requires.

The same holds true here. It cannot be that the Sixth Amendment requires the Commission to base its decision on only those facts found by a jury. Such a conclusion would lead to bare bones parole decisions that do not take into consideration the myriad of facts in the inmate's record or provide guidance for future reviews. Plaintiffs' theory that the Constitution requires jury involvement in parole consideration is absurd and should be rejected.

In sum, all of Plaintiffs' claim fail as a matter of law.

## II.   Even if the Supreme Court's juvenile sentencing cases apply in this context, parole-eligible class members are receiving regular and meaningful parole reviews.

Based on precedent, the Eighth Amendment requires only that the sentencer consider a juvenile homicide offender's youth and attendant characteristics before sentencing him to life without parole. *Miller*, 567 U.S. at 483. As discussed, that has no application here. But even if the cases reach beyond sentencing, Plaintiffs' Eighth Amendment claim still fails because Wisconsin's parole system affords class members regular and meaningful parole reviews.

### A.   *Graham* and its progeny require only the possibility of release, consistent with the traditional understanding of discretionary parole.

Plaintiffs contend that class members must be afforded a "realistic and meaningful opportunity for release upon demonstrated maturity and

rehabilitation." (Dkt. 61 ¶ 398.) But neither *Graham* nor subsequent Supreme Court cases describes the standard the way Plaintiffs do.

*Graham* requires that juveniles convicted of a nonhomicide crime must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," *Graham*, 560 U.S. at 75, in contrast to the "irrevocable judgment" of life without parole, *id.* at 74. Consistent with this distinction, a "meaningful opportunity to obtain release" does not mean immediate release. *Id.* at 75. Had the Supreme Court meant that juvenile offenders—whatever their sentence—were entitled to release upon demonstrating maturity and rehabilitation, it would have said so. Instead, as discussed above, it explained that "extending parole eligibility to juvenile offenders" would remedy unconstitutional life without parole sentences. *Montgomery*, 577 U.S. at 212. And it gave no indication that it was using the term "parole" in a way that diverged from how discretionary parole has been understood by the Court for over four decades. *See Greenholtz*, 442 U.S. at 13 (finding that "[l]ike most parole statutes," Nebraska's standard "vests very broad discretion in the Board"). The Supreme Court's requirement of "some meaningful opportunity to obtain release" can be satisfied in the precise way the Court declared: parole consideration. *Graham*, 560 U.S. at 75.

Relatedly, "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," *id.*, does not mean that the gravity

of the crime must be deemed irrelevant when considering a juvenile offender for parole. That is because the Court has expressly pointed to *discretionary* parole systems as a method of remedying unconstitutionally irrevocable sentences, *Montgomery*, 577 U.S. at 212 (citing Wyo. Stat. Ann. § 6–10–301(c)), which have long been understood by the Court as permitting consideration of the underlying offense. *See, e.g.*, *Greenholtz*, 442 U.S. at 11 (noting parole system at issue considers several factors, including whether release "would depreciate the seriousness of his crime").

Having dispensed with what "opportunity to obtain release" does not mean, what it does mean is relatively simple. "Opportunity" means "a good chance for advancement or progress."[13] In other words, the Supreme Court indicated that juveniles must be given the chance to go to the parole authorities, show that they have matured and been rehabilitated, and advance toward release. *See Montgomery*, 577 U.S. at 212 ("[P]risoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored.").

---

[13]   *Opportunity*, Merriam–Webster Online, https://www.merriam-webster.com/dictionary/opportunity.

**B.    Wisconsin's parole system provides a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.**

Wisconsin's parole system provides exactly what the Supreme Court contemplated: it gives juvenile offenders an opportunity to go before the Commission, show that they have matured and been rehabilitated, and advance toward release. The applicable procedures allow parole eligible inmates to demonstrate maturity and rehabilitation, and the substantive parole standard requires the Commission to consider personal development.

**1.    The parole procedures allow the inmate to demonstrate maturity and rehabilitation.**

The procedures applicable to parole review give the eligible inmate an opportunity to show the Commission what he has accomplished and why he is a good candidate for parole.

To start, the inmate has ample notice and opportunity to prepare for and present information at his parole interview. He is given many months' notice of the month during which he will be reviewed, and he is given several weeks' notice of the actual date of the interview. (DPFOF ¶¶ 27–30, 38.) The individual can begin preparing long before the interview by reviewing his institution file—which includes the documents considered by the Commission—and submitting any information he wants to the Commission for consideration. (DPFOF ¶¶ 33–35.) During the interview, the individual is

encouraged and expected to discuss any information relevant to parole consideration, including his conduct record, program participation, personal development, and goals for the future. (DPFOF ¶¶ 35–37.) The interview may also include discussion of the underlying crime, including the individual's reasons for and part in committing the crime, mitigating factors, feelings about the crime, and understanding of victim impact. (DPFOF ¶¶ 37, 55.)

Next, the Commission's written decision provides a detailed explanation of the reasons for the decision, citing to information in the institution file, statements made during the interview, and the relevant parole factors. (DPFOF ¶ 40.) The Commission tells the inmate what he should work on during the deferral period and may endorse a particular custody level or program, indicating its planned course of action for the inmate. (DPFOF ¶¶ 40–41, 106.) For example, the Commission may state that it endorses minimum custody for an individual because it would like to monitor him in a less restrictive setting to see how he might perform in the community. Or the Commission may indicate that it would like to see an individual complete a particular program to gain skills needed upon release. (DPFOF ¶ 107.)

BOCM considers the Commission's comments and endorsements, among numerous other factors set forth in Wis. Admin. Code DOC §§ 302.11 and 302.13, in determining security classification and program needs. (DPFOF ¶¶ 83, 86, 87, 91–92, 108.) Plaintiffs contend that this dynamic denies class

members a meaningful opportunity for release because class members cannot be considered seriously for parole until they complete certain programs and spend time in minimum and community custody, but they cannot gain access to programs or reduced security levels until they are being seriously considered for parole. (Dkt. 61 ¶¶ 69–87.) This argument has two major flaws.

First, parole eligible class members are not prevented from accessing rehabilitative programming or reduced security. They can be considered for program enrollment or reduced security regardless of their deferral length and without an endorsement from the Commission. (DPFOF ¶¶ 108, 111.) The Commission's comments and endorsements simply give an indication of the Commission's expectations for progress during the deferral period and may serve as a guide in allocating scarce program and institution resources. (DPFOF ¶¶ 102, 109, 111.) For example, inmates who are closer to release are given preference for minimum and community custody because of limited institution bed space and community resources. (DPFOF ¶¶ 88, 89.) Similarly, inmates who are closer to release may be given priority for certain programs, especially programs that build skills for successful reentry into the community and are more useful when completed closer to release. (DPFOF ¶ 100.)

Second, the Commission does not require an individual to serve time in minimum custody or complete all assigned programs before granting parole. (DPFOF ¶¶ 64, 67.) The Commission may consider these factors—and that

makes sense because spending time in reduced custody demonstrates an ability to maintain positive conduct in a less restrictive setting and provides an indication of how the individual will perform in the community—but they are not required. (DPFOF ¶ 64.) This plays out in practice. For example, in the past ten years, nine juvenile lifers have been released directly from medium or maximum security institutions, without having served time at minimum security institutions. (DPFOF ¶ 49.) And as for programming, former named plaintiff Carlos King was released to parole, even though he had an unmet program need, because he otherwise satisfied the criteria for release and his program need could be addressed in the community. (DPFOF ¶ 121, Ex. 512.) Thus, while BOCM and the Commission have different and independent responsibilities and authority, the agencies work together to afford inmates the opportunity to gain skills and insight into their criminal behavior which are needed to support a crime-free life upon release to the community. (DPFOF ¶ 105.)

The procedures for parole consideration—including those related to accessing programs and reduced custody—provide a meaningful opportunity for release and in no way prevent inmates from demonstrating rehabilitation. Parole eligible individuals are afforded notice and an opportunity to prepare for and present evidence at their parole interviews. And they have an opportunity to participate in programs and reduced custody, which, while not

required, may reduce their risk and make them more attractive candidates for release. There can be no question that Wisconsin's parole procedures provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" and are, therefore, constitutionally sufficient. *Graham*, 560 U.S. at 75.

### 2. The Commission considers maturity and rehabilitation as part of the parole factors.

When an individual reaches his parole eligibility date, he is eligible to be considered for parole and may be released if the factors set forth in Wis. Admin. Code PAC § 1.06(16) are satisfied. (DPFOF ¶¶ 52–53.) While the administrative rule does not explicitly use the terms "maturity" and "rehabilitation," the Commission nevertheless considers maturity and rehabilitation when assessing the related factors set forth in the rule. (DPFOF ¶ 51.)

### a. Sufficient time.

One factor the Commission considers is whether the individual "has served sufficient time so that release would not depreciate the seriousness of the offense." Wis. Admin. Code PAC § 1.06(16)(b). (DPFOF ¶ 54.) In assessing this factor, the Commission considers the nature of the crime and length of sentence, the individual's reasons for and part in committing the crime, and mitigating factors such as the individual's age at the time of the offense, among

other things. (DPFOF ¶ 55, Ex. 500.) This factor thus establishes a baseline for assessing maturity, rehabilitation, and progress during incarceration. For example, individuals who committed their crimes as juveniles generally have greater potential for growth during their incarceration. (DPFOF ¶¶ 56–57.)

### b.    Institution adjustment.

Another factor the Commission considers is whether the individual "has demonstrated satisfactory adjustment to the institution." Wis. Admin Code PAC § 1.06(16)(c). (DPFOF ¶ 59.) In assessing this factor, the Commission considers positive changes in behavior during incarceration, the number and type of conduct reports, and security classification. (DPFOF ¶ 60, Ex. 500.)

In reviewing the individual's conduct record, the Commission does not independently assess whether the individual committed the infraction or whether the disposition was appropriate; those decisions are made by prison officials and are subject to administrative and certiorari review. (DPFOF ¶ 61.) The Commission simply reviews the number and type of conduct reports, the length of time since the individual's last conduct report, and the individual's progress over time. (DPFOF ¶ 62.)

In reviewing security classification, the Commission considers an individual's progress through the various institution security levels of maximum, medium, minimum, and community custody. (DPFOF ¶ 63.) As noted above, the Commission does not require an individual to have reached

minimum or community custody before granting parole. But showing an ability to maintain positive conduct in a less restrictive setting is one way—among others—for an inmate to demonstrate maturity and rehabilitation. (DPFOF ¶ 64.)

### c.     Program participation.

The Commission considers whether the inmate "has participated in and has demonstrated sufficient efforts in required or recommended programs." Wis. Admin. Code PAC § 1.06(16)(e). (DPFOF ¶ 65.) In assessing program participation, the Commission considers the individual's involvement in programs and treatment, education, and work history. (DPFOF ¶ 66, Ex. 500.) While program participation is yet another way to show rehabilitation, risk reduction, and preparation for release, the Commission does not require completion of all assigned programs before granting parole. (DPFOF ¶ 67.)

The administrative rule itself provides flexibility in terms of program participation, requiring only that the inmate "demonstrate[ ] sufficient efforts in required or recommended programs *which have been made available*." Wis. Admin. Code PAC § 1.06(16)(e) (emphasis added). The inmate need only show that he has "gained maximum benefit from programs," "can complete programming in the community without presenting an undue risk," or "has not been able to gain entry into programming and release would not

present an undue risk." *Id*. Thus, even if the inmate has not been able to enroll in a particular program, he can nevertheless show that he could complete the program in the community or would not otherwise present an unreasonable risk to the public.

### d.     Release plan.

The Commission also considers whether the individual "has developed an adequate release plan." Wis. Admin. Code PAC § 1.06(16)(f). (DPFOF ¶ 68.) In assessing this factor, the Commission considers the availability of a stable residence upon release, family support, and plans for employment or attending school. (DPFOF ¶ 69.) An appropriate release plan—with a place to live, employment, or other support—demonstrates maturity, foresight, and an understanding of what it takes to be successful upon release.

### e.     Risk to the public.

Finally, the Commission considers whether the individual "has reached a point at which the commission concludes that release would not pose an unreasonable risk to the public and would be in the interests of justice." Wis. Admin. Code PAC § 1.06(16)(h). (DPFOF ¶ 70.) This is central to what the Commission is responsible for assessing: whether, based on all the available information, the individual is likely to re-offend if released to the community. *See* Wis. Admin. Code PAC § 1.04. (DPFOF ¶ 72.)

In assessing risk, the Commission considers prior convictions, incarcerations, periods of supervision, and revocations; treatment needs; security classification; the individual's age now and at the time of the crime; and whether the individual has demonstrated good judgment and control. (DPFOF ¶ 71.) These considerations are relevant to assessing whether the individual has matured and been rehabilitated such that he can safely and successfully return to the community.

*****

Wisconsin's parole standard does not simply permit the consideration of an offender's personal development, it mandates it. And while the Commission also considers a complex of factors in making parole decisions—consistent with the traditional and prevalent understanding of parole—there can be no doubt that assessment of whether an inmate has matured and been rehabilitated is integral to the analysis. Assuming the line of cases apply in the first place, no reasonable jury could conclude that Wisconsin's parole procedures and standard violate the Constitution as applied to class members.

### C. Parole-eligible class members in fact have some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

Class members who have reached parole eligibility are all moving through the parole process toward release. They have regular parole reviews where they have an opportunity to show that they have matured and been

63

rehabilitated. For each inmate, the Commission considers the relevant parole factors—which include assessment of personal development—to determine whether the individual can be safely reintegrated into the community. Thus, assuming *Graham* and its lineage apply to parole, these examples demonstrate that class members have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75.

### 1. Victoriano Heredia.

Former Plaintiff Victoriano Heredia had regular and meaningful parole reviews during his incarceration. He was convicted of first-degree intentional homicide as a party to a crime and was sentenced to life in prison, with eligibility to seek parole in 2010, after serving only 13 years and four months of his sentence, the lowest possible amount of incarceration time for his crime. (DPFOF ¶ 1.)

When he came up for parole review in 2018, the Commission considered his family support and program participation—which included earning his high school degree, completing numerous primary and voluntary programs, and maintaining a job—but concluded that these factors were outweighed by other considerations, including a major conduct report for use of alcohol issued just a few weeks before the review and a minor conduct report for possession of contraband. (DPFOF ¶ 112, Ex. 503.) The Commission denied Heredia release on parole and deferred his next consideration for 36 months, concluding

that his institution conduct was not satisfactory and that he had not served sufficient time and posed an unreasonable risk to the public. (DPFOF ¶ 112, Ex. 503.)

At his next review in October 2020, the Commission again denied release—based on the time and risk factors and the fact that Heredia had an unmet primary program need—but deferred his next consideration for only nine months and endorsed a reduction in custody, noting his "sustained period of acceptable conduct" during the previous deferral period. (DPFOF ¶ 113, Ex. 504:2.) In July 2021, the Commission gave Heredia a six-month deferral to allow time for a pre-release investigation and "participat[ion] in some brief but valuable community-based employment." (DPFOF ¶ 122, Ex. 517:2.) Those goals were met during the deferral period, and Heredia was granted parole and released to the community on February 1, 2022. (DPFOF ¶¶ 1, 123, Exs. 516, 518.)

### 2.   Barney Guarnero.

Plaintiff Barney Guarnero has also received regular parole reviews and is progressing toward release. He pled guilty to first-degree reckless homicide and first-degree reckless injury with a dangerous weapon and was sentenced to 60 years in prison, with eligibility to seek parole in 2011. (DPFOF ¶ 7.) When Guarnero was reviewed in November 2014, he had unmet program needs and poor institution conduct—including 25 minor and 16 major conduct reports,

the most recent being a major conduct report earlier that year. Based on this, along with the nature and severity of his crime and risk to the public, the Commission denied release and deferred his next consideration for 36 months. (DPFOF ¶ 114, Ex. 505.)

Guarnero's conduct improved during the deferral period, and while he continued to have unmet program needs, he received progressively shorter deferrals at his next two reviews in 2017 (24-month deferral) and 2019 (12-month deferral). (DPFOF ¶¶ 115–16, Exs. 506, 507.) Guarnero subsequently completed his program needs, and at his review in December 2020, the Commission deferred his next consideration for only seven months and endorsed reduced custody with minimum community placement, reasoning that he would benefit from "exposure to the community in reduce[d] level of custody" given "[his] age at the time of [his] offenses and that the entirety of [his] adult life has occurred while incarcerated." (DPFOF ¶ 117, Ex. 508:2.)

Guarnero received relatively short deferrals at his next two reviews in June 2021 (six-month deferral) and December 2021 (four-month deferral). (DPFOF ¶¶ 124–25, Exs. 519–20.) Guarnero had not yet been transferred to minimum community custody at the time of those reviews. (DPFOF ¶¶ 124–25, Exs. 519–20.) Due to the delay, the Commission indicated at the December 2021 review: "In the event that transfer has not occurred, that your

proposed release plan is approved, and that you continue to satisfactorily meet other parole criteria, the Commission anticipates proceeding with next steps in the release process, regardless of custody level." (DPFOF ¶ 125, Ex. 520:2.)

### 3.    Brian Pheil.

Finally, former Plaintiff Brian Pheil had regular opportunities to go before the Commission to demonstrate his personal development and progress. Pheil was convicted of first-degree intentional homicide, armed robbery, burglary, and theft as a party to crimes committed in 1987 when he was 17 years old. He was sentenced to life in prison, plus 35 years to be served concurrently, with eligibility to seek parole in 2005. (DPFOF ¶ 6.)

In 2017, the Commission denied Pheil release on parole and deferred his next consideration for 30 months based on the nature and severity of his crimes, need for programming, bad behavior while in prison, and risk to the public. (DPFOF ¶ 118, Ex. 509.) In describing Pheil's crime, the Commission noted that he "played a key role in the vicious killing of a 60 [year old] man that involved beating the victim on the head with a fire extinguisher, choking him with the cord of a vacuum cleaner, stabbing him [with] a knife, cutting his throat, and discharging a fire extinguisher in his nose and mouth." (DPFOF ¶ 118, Ex. 509:2.) Pheil continued to exhibit violent behavior in prison, receiving multiple major conduct reports for fighting, battery, and possessing

a utility knife blade. (DPFOF ¶ 118, Ex. 509.) One of his fights occurred just a few months before his parole review. (DPFOF ¶ 118, Ex. 509.)

Pheil's conduct improved considerably during the deferral period, and he completed primary and other programming. (DPFOF ¶ 119, Ex. 510.) At his next review in January 2020, the Commission considered these accomplishments, along with mitigating factors like his "chaotic upbringing," but concluded that the nature of his crime and risk to the public warranted an 11-month deferral. (DPFOF ¶ 118, Ex. 509.) At this next two reviews in December 2020 and August 2021, Pheil received deferrals of eight months and three months, respectively, so he could "be exposed to the least restrictive environments and the opportunities for reacclimation to the community" prior to release and to complete a pre-release investigation. (DPFOF ¶¶ 120, 126, Exs. 511:2, 521:2.) At his next review, Pheil was granted parole, and he was released to the community on December 16, 2021. (DPFOF ¶¶ 6, 127, Exs. 516, 522.)

*****

The record conclusively demonstrates that class members are being provided an opportunity—a good chance for progress toward—release, as required. Class members are afforded an opportunity to come before the Commission to demonstrate their development and growth, and the

Commission, in turn, provides a thorough written explanation for its decision. That is all that could be required for constitutional purposes. And to the extent any class member thinks a particular decision is incorrect or unfair, he has a readily available remedy: common-law certiorari review of the decision in state court. *See Hamlin v. Vaudenberg*, 95 F.3d 580, 585 (7th Cir. 1996) (certiorari review is an adequate remedy for alleged due process violations); *State v. Goulette*, 65 Wis. 2d 207, 222 N.W.2d 622, 626 (1974) (Wisconsin affords judicial review of parole decision by issuance of a common law writ of certiorari).

Some class members have not yet completed Wisconsin's parole requirements. But that does not mean that they never will or that Wisconsin has made it impossible for them to do so. The fact that eight named plaintiffs—along with fully half of all juvenile lifers in the last ten years—have been paroled shows that release is not just an abstract possibility, it is a reality. Both for multiple legal reasons and based on the on-the-ground reality, Defendants are entitled to summary judgment on all claims.

# CONCLUSION

This Court should grant summary judgment in favor of Defendants on all claims and dismiss the case.

Dated this 1st day of April 2022.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Karla Z. Keckhaver
KARLA Z. KECKHAVER
Assistant Attorney General
State Bar #1028242

COLIN A. HECTOR
Assistant Attorney General
State Bar #1120064

BEAUREGARD W. PATTERSON
Assistant Attorney General
State Bar #1102842

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6365 (KZK)
(608) 266-8407 (CAH)
(608) 266-9488 (BWP)
(608) 294-2907 (Fax)
keckhaverkz@doj.state.wi.us
hectorca@doj.state.wi.us
pattersonbw@doj.state.wi.us