IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

VICTORIANO HEREDIA, DUJUAN NASH,
JOSEPH OROSCO, BARNEY GUARNERO,
BRIAN PHEIL, TERRANCE PRUDE,
JUMAR JONES, and DENG YANG, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

CHRISTOPHER BLYTHE, Chairperson and
Commissioner of the Wisconsin Parole Commission;
JENNIFER KRAMER, Commissioner of the Wisconsin
Parole Commission; DOUGLAS DRANKIEWICZ,
Commissioner of the Wisconsin Parole Commission;
KEVIN CARR, Secretary of the Wisconsin Department
of Corrections; and ANGELA HANSEN, Director of the
Bureau of Classification and Movement, in their official
capacities,

Defendants.[1]

OPINION and ORDER

19-cv-338-jdp

---

Plaintiffs represent a class of Wisconsin prisoners serving long sentences for crimes committed when they were minors. The central question in the case is how the Constitution limits the authority of the Wisconsin Parole Commission to grant or deny parole to those who committed crimes as juveniles.

The traditional view is that the Constitution places few limits on a state parole board's discretion. Plaintiffs say that view is outdated in light of *Graham v. Florida*, 560 U.S. 48 (2010). *Graham* held that the Eighth Amendment prohibits life without parole sentences for juveniles who committed crimes other than homicide, because such a sentence would be grossly

---

[1] The court has substituted the current chairperson of the commission in accordance with Federal Rule of Civil Procedure 25.

disproportionate to the offense. Building from this basic principle, plaintiffs contend that the commission may not deny them parole for any reason other than their failure to demonstrate maturity and rehabilitation, and that defendants must provide them the resources they need to meet that standard by their first parole eligibility date. Plaintiffs contend further that they are entitled to a range of procedural protections in connection with parole hearings, including counsel, experts, in-person interviews with the commission chairperson, and advanced notice of any information that the commission may rely on to deny parole.

Plaintiffs assert claims under the Eighth Amendment, the Fourteenth Amendment, and the Sixth Amendment. Plaintiffs sue the parole commissioners, the secretary of the Wisconsin Department of Corrections, and the director of the Bureau of Classification and Movement, contending that the latter two defendants fail to meet their constitutional obligations to help plaintiffs demonstrate maturity and rehabilitation by their parole eligibility date. Both sides move for summary judgment. Dkt. 120 and Dkt. 126.

Plaintiffs make a good case that Wisconsin's parole system uses imprecise standards that are sometimes applied capriciously, and that offenders are not provided much help in achieving and demonstrating maturity and rehabilitation. Plaintiffs show that there are many ways that the parole system could be improved to make it fairer, more consistent, and grounded in a better understanding of youthful offenders.

But the Constitution does not require Wisconsin to have an ideal parole system. The Constitution establishes a minimum, beyond which lies unusual cruelty. The role of the court here is simply to determine whether Wisconsin's parole system meets the constitutional minimum as established by Supreme Court precedent. And the Supreme Court has made it clear that parole is fundamentally a discretionary determination within the purview of the

executive and legislative branches of state government. Nothing in *Graham* or any other controlling case undermines that basic understanding. *Graham* prohibits life sentences for juvenile offenders under some circumstances, but it doesn't empower the courts to scrutinize every decision that affects a juvenile offender's chances of parole, nor does it impose exacting procedural requirements on parole officials. And—a point critical to plaintiffs' central theme— nothing in *Graham* prohibits the commission from considering the seriousness of the offense and the consequences to the victims in making parole decisions.

Those convicted of serious crimes as juveniles commonly serve long sentences in Wisconsin, and parole is not guaranteed. But plaintiffs have not shown that, as a class, they face de facto life sentences without a legitimate opportunity for parole at some point. They have not shown that defendants refuse to allow plaintiffs to progress toward parole, or that they fail to consider plaintiffs' youth when making parole decisions. Under these circumstances, plaintiffs are not entitled to class relief under any of their constitutional theories. The court will grant defendants' motion for summary judgment and deny plaintiffs' motion.

## BACKGROUND

### A.  Overview of the parole process

Plaintiffs are a class of Wisconsin prisoners who committed crimes when they were under the age of 18, received a sentence of at least 470 months, and are eligible for release under parole supervision or will be eligible at some point. Wisconsin abolished parole in 2000 for crimes committed after December 31, 1999, and in its place enacted a determinate sentencing scheme that includes a fixed term of imprisonment and a fixed term of supervised

release. *See* Wis. Stat. § 973.01 and § 973.014; *State v. Yakich*, 2022 WI 8, ¶ 33, 400 Wis. 2d 549, 970 N.W.2d 12. The class includes only prisoners sentenced under the indeterminate system, so all class members committed their crimes before 2000.

Under the indeterminate system, prisoners become eligible for parole after serving 25 percent of their sentence, or six months, whichever is greater. *See* Wis. Stat. § 304.06(1)(b) (1997–98). If prisoners received a life sentence with the possibility of parole, the default rule is that they are eligible for parole after 20 years, which may be reduced to approximately 13 years and four months with good time credits; but the sentencing court may also set a later initial eligibility date. *See State v. Borrell*, 167 Wis. 2d 749, 765 & n.6, 482 N.W.2d 883 (1992) (citing Wis. Stat. § 973.014, § 302.11, and § 304.06).

State statutes impose few substantive requirements on parole decisions. The commission must consider statements offered by the victim, the district attorney's office, and the sentencing court, *see* Wis. Stat. § 304.06(1)(e), and the commission may not grant parole unless the prisoner "has adequate plans for suitable employment or to otherwise sustain himself or herself," *id*. § 304.06(2). The primary guidance for the commission comes from Wis. Admin. Code § PAC 1.06(16), which sets for the following criteria for making a parole decision:

> (a) The inmate has become parole or release to extended supervision eligible under s. 304.06, Stats., and s. PAC 1.05.
>
> (b) The inmate has served sufficient time so that release would not depreciate the seriousness of the offense.
>
> (c) The inmate has demonstrated satisfactory adjustment to the institution.
>
> (d) The inmate has not refused or neglected to perform required or assigned duties.

(e) The inmate has participated in and has demonstrated sufficient efforts in required or recommended programs which have been made available by demonstrating one of the following:

    1. The inmate has gained maximum benefit from programs.

    2. The inmate can complete programming in the community without presenting an undue risk.

    3. The inmate has not been able to gain entry into programming and release would not present an undue risk.

(f) The inmate has developed an adequate release plan.

(g) The inmate is subject to a sentence of confinement in another state or is in the United States illegally and may be deported.

(h) The inmate has reached a point at which the commission concludes that release would not pose an unreasonable risk to the public and would be in the interests of justice.

The commission construes § PAC 1.06(16) as requiring the prisoner to satisfy all the criteria before being released.

Section PAC 1.06 applies to both adult and juvenile offenders. The commission has no special policies or procedures for parole applicants who were juveniles at the time of their offense.

Prisoners receive their first parole interview during the month before their parole eligibility date. At least 15 days before the interview, prisoners receive a notice that elaborates on the criteria that the commission may consider, including the prisoner's age, both at the time of the parole decision and at the time of the offense. Dkt. 124-1. The notice lists numerous other factors, including the offender's reason for committing the crime, the offender's part in the crime, and any other mitigating or aggravating facts related to the crime.

The notice states that the commission may consider documents in the prisoners' institutional files and that the prisoners will have the opportunity during the interview to

"provide information that is relevant, material, and not unduly repetitious, including the opportunity to comment on perceived errors of material fact in the record." Prisoners are asked to submit a release plan, but that form instructs prisoners not to attach any documents.

The interview is conducted by one commissioner. After the interview, the commissioner may either deny release or recommend granting release. If release is recommended, the chairperson must approve that recommendation. If release is denied, the commissioner gives the prisoner a document called a "parole commission action" that provides the reasons for denial along with a date for the next opportunity to be considered for release. The document lists general reasons for the decision based on the criteria in § PAC 1.06(16), and it also includes detailed "committee comments" that elaborate on those reasons. The chairperson reviews decisions that defer reconsideration for more than 12 months.

## B. Named plaintiffs

Plaintiff Victoriano Heredia was convicted of first-degree intentional homicide as party to a crime committed in 1997 when he was 17 years old. He was sentenced to life in prison, with eligibility to seek parole in 2010. He was granted parole and released in February 2022.

Plaintiff Dujuan Nash pleaded guilty to reckless homicide and mutilating a corpse for crimes he committed in 1999 when he was 17 years old. He was sentenced to 50 years in prison, with eligibility to seek parole in 2012. After Nash's last parole hearing, the committee deferred consideration for nine months, reasoning that Nash needed to spend more time in a reduced custody setting to help the committee evaluate Nash's risk for release. Dkt. 129-34.

Plaintiff Joseph Orosco pleaded guilty to first-degree intentional homicide for a murder he committed in 1996 when he was 16 years old. He was sentenced to life in prison, with eligibility to seek parole in 2018. The committee has denied Orosco parole multiple times, but

the parties did not submit the committee's written decisions for Orosco, and Orosco doesn't identify in his declaration why he was denied parole.

Plaintiff Barney Guarnero pleaded guilty to first-degree reckless homicide and first-degree reckless injury with a dangerous weapon for crimes he committed in 1997 when he was 17 years old. He was sentenced to 60 years in prison, with eligibility to seek parole in 2011. He was granted parole and released in 2022.

Plaintiff Brian Pheil was convicted of first-degree intentional homicide, armed robbery, burglary, and theft as a party to crimes committed in 1987 when he was 17 years old. He was sentenced to life in prison, plus 35 years to be served concurrently, with eligibility to seek parole in 2005. He was granted parole and released in December 2021.

Terrance Prude was convicted of five counts of armed robbery with threat of force for crimes committed in 1999. He was sentenced to 20 years on four of these counts, consecutive, for a total of 80 years. On the fifth count, he received an imposed and stayed sentence of 20 years, with a term of 20 years' probation. He became eligible for parole in 2019.

After Prude's last parole hearing, the committee deferred consideration for 18 months. The decision notes that Prude was 17 years old at the time he committed his crime, that he didn't have "proper guidance," and that he believes he has matured. The committee gave multiple reasons for the deferral, including: (1) he has received numerous conduct reports; (2) he has a documented history of involvement with security threat groups; (3) he hasn't completed needed programming; and (4) more time is warranted "based on the nature and severity" of his crimes. Dkt. 129-86.

Plaintiff Jumar Jones pleaded guilty to three counts of armed robbery as party to a crime and one count of felony murder for crimes he committed in 1995 and 1996 when he was 17

years old. He was sentenced to 105 years in prison, with eligibility to seek parole in 2022. The parties don't say whether Jones received a parole hearing in 2022, or, if he did, what the outcome of the hearing was.

Plaintiff Deng Yang pleaded guilty to first-degree intentional homicide for a crime he committed in 1997 when he was 15 years old. He was sentenced to life in prison, with eligibility to seek parole in 2011. He was granted parole and released in September 2021.

Since 2010, the commission has released 88 out of 176 prisoners who met the class definition at the time of release. But no class member was released at his first parole eligibility date.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

The court will begin by clarifying the scope of the claims and the relief that plaintiffs are seeking. Plaintiffs are not seeking immediate release, and they are not challenging the statutes governing the timing of their eligibility for parole or the policies and practices related to the frequency of their parole hearings.[2] Rather, plaintiffs challenge the procedures and criteria used by the parole commission when making decisions whether to grant parole, as well

---

[2] The court made a preliminary determination in the order screening plaintiffs' complaint that plaintiffs may bring their claims under 42 U.S.C. § 1983 rather than in a habeas petition because plaintiffs are seeking a change in parole procedures rather a release from prison. Dkt. 3, at 2 (citing *Wilkinson v. Dotson*, 544 U.S. 74, 76 (2005)). Defendants don't challenge that determination now, so they have forfeited that issue. *See Polzin v. Gage*, 636 F.3d 834, 838 (7th Cir. 2011) (question whether action was properly filed under § 1983 rather than as a habeas petition can be waived).

as the process leading up to parole decisions, and they contend that they are entitled to new hearings without the alleged defects.

Plaintiffs assert three claims. First, plaintiffs contend that defendants are violating the Eighth Amendment by denying them parole for reasons unrelated to maturity and rehabilitation and imposing barriers to satisfying the prerequisites for release. Defendants contend that the Eighth Amendment imposes no requirements on parole decisions relating to plaintiffs. Alternatively, defendants say that the only requirement is to give plaintiffs an opportunity to show maturity and rehabilitation, something Wisconsin's parole process already does.

Second, plaintiffs contend that defendants are violating their right to due process by denying them parole without providing additional protections such as a lawyer, an expert on child psychology, and advance notice of any documents or facts the commission may rely on to deny parole. Defendants contend that a denial of parole doesn't implicate the Due Process Clause. Alternatively, defendants say that due process requires only that plaintiffs receive an opportunity to be heard and a statement of reasons, which Wisconsin prisoners already receive.

Third, plaintiffs contend that defendants are violating their Sixth Amendment right to a jury trial by relying on information about the seriousness of their offense to deny parole. Defendants deny that the Sixth Amendment has any bearing on parole decisions.

Because this is a class action, the question before the court isn't whether every parole hearing of every class member is valid. Plaintiffs made this point clear in the context of seeking class certification, as the court observed in the order certifying the class: "[P]laintiffs aren't challenging the decision to deny them parole; they are challenging the validity of the standard used to make parole decisions." Dkt. 53, at 7. The court also observed that plaintiffs will have

to demonstrate "the existence of a uniform practice" to obtain class relief. *Id.* at 8. So the court will not consider whether individual parole decisions of class members were unconstitutional, only whether defendants are generally applying an unlawful standard.

## A. Released class representatives

Before discussing the merits of plaintiffs' claims, the court briefly addresses an important procedural issue, which is that the claims of four named plaintiffs are now moot because they have been granted parole. *See Koger v. Bryan*, 523 F.3d 789, 804 (7th Cir. 2008) (prisoner's claim for injunctive relief about treatment in prison is moot once prisoner is released). The released plaintiffs are Victor Heredia, Barney Guarnero, Brian Pheil, and Deng Yang. Defendants ask the court to dismiss those plaintiffs on mootness grounds, Dkt. 121, at 33, and plaintiffs don't contend that there is a live controversy between defendants and those four class representatives. Accordingly, the court will dismiss the claims of Heredia, Guarnero, Pheil, and Deng as moot.

## B. Cruel and unusual punishment

The Eighth Amendment prohibits the government from "inflict[ing]" "cruel and unusual punishments." The first question presented by plaintiffs' claim is whether the Eighth Amendment places any limits on parole decisions regarding juvenile offenders. If it does, the next question is what those limits are.

Plaintiffs' Eighth Amendment claim rests largely on *Graham v. Florida*, 560 U.S. 48 (2010), in which the Supreme Court held that "the Eighth Amendment forbids the sentence of life without parole" for "a juvenile offender who did not commit homicide." *Id*. at 74. In reaching that conclusion, the Court relied on previous cases applying a proportionality principle under the Eighth Amendment, especially *Roper v. Simmons*, 543 U.S. 551 (2005), in

which the Court held that the Eighth Amendment prohibits the death penalty for a juvenile offender under any circumstance.

Since *Graham*, the Court has provided little guidance about other possible Eighth Amendment limitations on punishing juvenile offenders who committed nonhomicide crimes. The only other case addressing that issue was *Virginia v. LeBlanc*, 137 S. Ct. 1726 (2017), which involved the habeas petition of a juvenile offender convicted of rape and sentenced to life in prison. Virginia had abolished parole, but in its place, the state had established a "geriatric release" program that allowed older inmates to receive conditional release under some circumstances. Applying the deferential standard required by 28 U.S.C. § 2254(d), the Court held that it wasn't unreasonable for the state court to conclude that the geriatric release program was consistent with *Graham* because the program "employed normal parole factors," even though it required the offender to wait more than 40 years before applying. *LeBlanc*, 137 S. Ct. at 1728–29.

The Court also addressed how the Eighth Amendment applies to the sentences of juvenile offenders who committed homicide in *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016). Lower courts have disagreed about the scope of *Miller* and *Montgomery*, but this court need not wade into that debate because the Supreme Court itself resolved it recently in *Jones v. Mississippi*, 141 S. Ct. 1307 (2021). Specifically, *Jones* construed those cases as holding only that "an individual who commits a homicide when he or she is under 18 may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment." *Id.* at 1311. The Court rejected contentions that the Eighth Amendment requires sentencing courts "to make extra factual findings before sentencing an offender under 18 to life without parole"

or "to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth." *Id.* at 1323.

In light of the Supreme Court's different treatment of juvenile offenders who commit homicide and nonhomicide crimes, this court created subclasses for the two types of offenders. Dkt. 117, at 7. The court will consider the subclasses' Eighth Amendment claims separately.

### 1. Juvenile offenders convicted of nonhomicide crimes

*Graham*'s holding is limited to a prohibition on *sentencing* a juvenile offender to life *without* parole. *Graham* says nothing about Eighth Amendment limitations on *parole decisions* relating to juvenile offenders who were sentenced to life *with* the possibility of parole or who were sentenced to a lengthy term of years with the possibility of parole. In other cases, the Supreme Court has described parole as a discretionary decision that isn't protected by the Constitution in the absence of substantive limits imposed by state law. *See, e.g., Swarthout v. Cooke*, 562 U.S. 216, 220 (2011); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). For this reason, defendants contend that *Graham* has no application outside the sentencing context and, even at sentencing, it applies only to sentences of life without parole.

In arguing to the contrary, plaintiffs rely on a statement in *Graham* that "the State must . . . give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 75. Plaintiffs construe this statement to mean that the Eighth Amendment applies to every parole decision juvenile offenders receive after reaching their parole eligibility date and imposes the following limitations and requirements on defendants when making those decisions:

(1) defendants may not deny parole to juvenile offenders for any reason other than a failure to demonstrate maturity and rehabilitation—including any reason related to the seriousness of the offense;

(2) the state's parole procedures must cabin the discretion of the decisionmakers and expressly require them to consider the factors identified in *Miller* as relevant to sentencing juvenile offers, including "immaturity, impetuosity, and failure to appreciate risks and consequences . . . the family and home environment that surrounds [them] . . . the extent of [their] participation in the conduct and the way familial and peer pressures may have affected [them]," *Miller*, 567 U.S. at 477–78;

(3) in anticipation of juvenile offenders' parole eligibility date, defendants must ensure that offenders can satisfy any prerequisites to a grant of parole that are related to showing maturity and rehabilitation, including programming, reduced security classification, work experience, savings, community relationships, and an adequate release plan.

Plaintiffs also appear to be challenging defendants' judgment regarding what qualifies as sufficient rehabilitation. Plaintiffs criticize several parole denials that relied in part on what plaintiffs view as minor misconduct. *See* Dkt. 127, at 24–25 and Dkt. 166, ¶¶ 166–72.

Plaintiffs' strongest argument is that *Graham*'s prohibition on sentencing juvenile offenders to life without parole would have little meaning if the Eighth Amendment has *no* application to parole. If defendants are correct, a court could sentence a juvenile offender to life with the possibility of parole, but then parole officials could give the offender the functional equivalent of a life sentence without parole by categorically refusing to grant him parole regardless of the circumstances and require him to remain in prison until his death, no matter how long he lived or how strongly he demonstrated that he was reformed. Several courts have

13

made this point, and defendants don't respond to it, even though plaintiffs cited those cases in their briefs. *See Maryland Restorative Just. Initiative v. Hogan,* No. CV ELH-16-1021, 2017 WL 467731, at *21 (D. Md. Feb. 3, 2017); *Wershe v. Combs,* No. 12-CV-1375, 2016 WL 1253036, at *3 (W.D. Mich. Mar. 31, 2016); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015); *Greiman v. Hodges*, 79 F. Supp. 3d 933, 944 (S.D. Iowa 2015); *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 772–73 (Iowa 2019).

The Court of Appeals for the Seventh Circuit hasn't directly addressed the question whether *Graham* has any bearing on parole. *Sanders v. Eckstein*, 981 F.3d 637 (7th Cir. 2020), is the closest the court has come. The case involved a Wisconsin juvenile offender who filed a habeas petition to challenge a set of consecutive sentences that added up to 140 years. The court began its analysis by stating that "the Eighth Amendment prohibits not only de jure life sentences [for juvenile offenders], but also de facto life sentences—a term of years so long as to equate for all practical purposes to a life sentence." Applying the deferential standard required by 28 U.S.C. § 2254(d), the court denied the petition because the petitioner is eligible for parole in 2030—when he will be 51 years old—and it wasn't unreasonable for the Wisconsin Court of Appeals to conclude in that situation that the petitioner had a meaningful opportunity for release. *Sanders*, 981 F.3d at 643.

The court of appeals noted the petitioner's belief that "the deck is stacked against his receiving parole in 2030." *Id.* at 644. The court declined to consider that issue, reasoning that "[n]ow is not the time for Sanders to advance this argument." *Id.* But the court pointed to a statement during oral argument by the lawyer for the state that the petitioner "will have a future opportunity to challenge that outcome in state court, including by raising claims

grounded in *Graham*, *Miller*, or another Supreme Court precedent that may enter the U.S. Reports in the intervening years." *Id.*

*Sanders* supports plaintiffs' claim in two respects. First, the court concluded that *Graham* applies not just to de jure life sentences, but also to de facto life sentences, which suggests that courts should focus on the likely effect of a sentence and not just its label. Second, the court kept the door for open for Eighth Amendment challenges to individual parole decisions, which undermines defendants' categorical view that *Graham* has no bearing on parole.

This only gets plaintiffs so far. It is one thing to say that the Eighth Amendment can apply to a parole decision. It is quite another to contend, as plaintiffs do, that the Eighth Amendment imposes numerous requirements and restrictions in the parole context, not just on every decision whether to grant parole to a juvenile offender, but also on any decision that could possibly affect the offender's chances of being granted parole.

There are several reasons to question plaintiffs' expansive reading of *Graham*.

**Lack of support in *Graham*'s text.** The statement in *Graham* that plaintiffs rely on— that juvenile offenders must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"—is not central to the holding. Plaintiffs point to no suggestion in *Graham* or any other Supreme Court case that the Court was announcing a new standard for parole of juvenile offenders or using the phrases "meaningful opportunity" and "demonstrated maturity and rehabilitation" as terms of art for states and courts to apply under that new standard. Plaintiffs have extracted from a few words an elaborate new regime of parole for juvenile offenders. If the Court had meant to create that regime, it is reasonable to expect that the Court would have expressed its intent more clearly.

Other passages from *Graham* support the view that the Supreme Court wasn't creating a new parole standard. In the sentence that follows the one plaintiffs rely on, the Court wrote that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance" of giving juvenile offenders a meaningful opportunity for release. *Graham*, 560 U.S. at 75. This suggests that states retain substantial discretion to determine when and under what circumstances an offender may be released on parole. *See Wershe*, 2016 WL 1253036, at *4 (relying on this statement in *Graham* to conclude that "*Graham* does not allow courts to undertake a full review of the State's parole procedures and substitute its own judgment for the State's"). In another passage, the Court wrote that "[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity." *Graham*, 560 U.S. at 73. That sentence suggests the Court is saying only that a parole system is what gives an offender a meaningful "chance to demonstrate growth and maturity," not that the Court intended to create a new standard for considering a parole application by referring to a "meaningful opportunity" and "demonstrated maturity and rehabilitation." Finally, the Court stated a juvenile offender sentenced to life must have "some realistic opportunity to obtain release *before the end of that term*," *id.* at 82 (emphasis added), which suggests that the Eighth Amendment prohibits a de facto life sentence, not that every parole hearing a juvenile hearing receives is subject to Eighth Amendment review by federal courts.

**Graham's reasoning.**  Plaintiffs' Eighth Amendment argument is divorced from much of the reasoning of *Graham*. Plaintiffs rely heavily on the portions of *Graham* that discuss the characteristics of juvenile offenders that make a life sentence without the possibility of parole less appropriate. These characteristics include a "lack of maturity and an underdeveloped sense of responsibility," a greater susceptibility "to negative influences and outside pressures,

including peer pressure," and a greater "capacity for change." *Graham*, 560 U.S. at 68, 72–74. The Court also observed that "[l]ife without parole is an especially harsh punishment for a juvenile" because "a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." *Id.* at 70–71.

But *Graham* rested on much more than a conclusion by the Court that children are different and require more lenient treatment than adults. The ultimate question in *Graham* was whether a life sentence without parole is a disproportionate punishment under the Eighth Amendment for a juvenile offender who commits a crime other than homicide. The Court acknowledged its holdings from previous cases that the proportionality principle is "narrow" and "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 59–60 (quoting *Harmelin v. Michigan*, 501 U.S. 957 (1991)). The Court then applied the standard from those cases, which requires consideration of not just the characteristics of the offender but also of "objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue." *Id.* at 48. In concluding that there was a national consensus against sentencing juvenile offenders to life without parole, the Court cited evidence that nationwide there were only 109 juvenile offenders serving sentences of life without parole for nonhomicide offenses. *Id.* at 62.

Plaintiffs' Eighth Amendment argument fails to grapple with two key aspects of *Graham*. The first problem is that plaintiffs haven't even attempted to show that there is a "national consensus" that supports the type of parole regime they are advocating for. In fact, plaintiffs don't identify a single state that imposes all of their proposed limitations and requirements on parole decisions and only a smaller number of states that have adopted *any* of those limitations

or requirements. *See Jones*, 141 S. Ct. at 1315 (rejecting requirement that sentencing courts make a finding of "permanent incorrigibility" before imposing life sentence on juvenile offender for homicide in part because no one had identified "a single State that, as of that time, made permanent incorrigibility an eligibility criterion for life-without-parole sentences imposed on murderers under 18").

The second problem is that plaintiffs' proposals don't reflect the actual holding of *Graham*, which is that a *life sentence* is a disproportionate punishment for juvenile offenders if it doesn't allow for the possibility of parole. Plaintiffs don't explain why that narrow holding translates into a rule that gives juvenile offenders a limited right to release at their very first parole hearing, regardless of how little time they have served at that point. In Wisconsin, even a prisoner with a life sentence may be eligible for parole in as little as 13 years and 4 months. *See Borrell,* 167 Wis. 2d at 765 & n.6. Plaintiffs' proposal converts a limitation on life sentences to a constitutional requirement that juvenile offenders be released once they demonstrate maturity and rehabilitation, regardless of the length of the sentence. That view is inconsistent with the Supreme Court's repeated observation that the Eighth Amendment's disproportionality principle is narrow and affects only extreme sentences. *See, e.g., Ewing v. California*, 538 U.S. 11, 23 (2003). In *Montgomery*, 577 U.S. at 212–13, the Court suggested that states must give juvenile offenders "hope for some years of life outside prison walls," not that juvenile offenders have a qualified right to release on their initial parole eligibility date. *See also Miller*, 567 U.S. 460 at 477–78 (*Graham* "teach[es] that in imposing *a State's harshest penalties,* a sentencer misses too much if he treats every child as an adult" (emphasis added)).

Plaintiffs cite no cases in which a court has held that *Graham* applies to sentences of 20 or 30 years that don't allow the possibility of parole, and the court has uncovered none in its

own research. *See Jedlicka v. State*, 281 A.3d 820, 830 (Md. 2022) (50 years is "the threshold accepted by many states as the point at which a term of years crosses the line into a de facto life-without-parole sentence"). Plaintiffs don't explain why the Eighth Amendment would allow a 30-year sentence that doesn't allow for parole but at the same time require executive officials like defendants to grant parole after 13 years and 4 months. Parole officials generally have *greater* discretion, not less, than a sentencing court, as the court will discuss in the next section.

**Parole is discretionary.** The Supreme Court has emphasized in other cases that parole is a discretionary determination that may be informed by numerous factors. For example, in *Greenholtz*, 442 U.S. at 8, the Court stated that "there is no prescribed or defined combination of facts which, if shown, would mandate release on parole." Rather, "[t]he parole-release decision . . . is . . . subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release." *Id.* at 9. The Court went further, stating that a parole decision "turns on a discretionary assessment of a multiplicity of imponderables." *Id.* at 10 (internal quotation marks omitted).

This summary of the parole decision-making process is directly inconsistent with plaintiffs' view that the Eighth Amendment tightly circumscribes the criteria defendants may consider and prohibits them from considering the seriousness of the criminal offense. In fact, the Court expressly noted that part of a parole board's job is to "assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense." *Id.* at 8. *See also Swarthout*, 562 U.S. at 216–17 (upholding parole denial that was based on the "especially cruel and callous manner" of the offense); *California Dept. of Corr. v. Morales*, 514 U.S. 499, 502–03 (1995) (upholding parole denial that was based on "the heinous, atrocious, and cruel

nature of [the] offense"). *Graham* didn't express any disagreement with the Court's long-expressed understanding of the parole process; the Court didn't even cite *Greenholtz*. It would be unreasonable to infer such a significant departure from settled law without clearer guidance from the Court.

*Greenholtz* involved an interpretation of the Due Process Clause, but the Court has made similar observations in Eighth Amendment cases. For example, in *Ewing*, the Court declined to invalidate a sentence of 25 years to life for a repeat offender convicted of theft. The Court wrote that "the Constitution does not mandate adoption of any one penological theory," that "[a] sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation," and that "[s]electing the sentencing rationales is generally a policy choice to be made by state legislatures, not federal courts." *Id.* at 25. This court can discern no reason why the same observations wouldn't apply to parole decisions.

Plaintiffs say that cases like *Greenholtz* and *Ewing* aren't instructive because they are about adult offenders, not juveniles. And plaintiffs cite statements from the Supreme Court that "children are constitutionally different" and "cannot be viewed simply as miniature adults," *see, e.g.*, *Miller*, 567 U.S. at 471, 480, so it is appropriate to apply a different standard to juvenile offenders. But the Court has never suggested that juvenile offenders are different from adult offenders in the context of a parole decision. One reason for this may be that juvenile offenders are no longer juveniles at the time they become eligible for parole.

When a court is sentencing a juvenile offender, the court is evaluating the offender's conduct at the time of the crime, so it makes sense to focus on the offender's characteristics at that time, including his youth. But as plaintiffs repeatedly emphasize in their briefs, a parole board's job is different. Its evaluation is more forward-looking: it is an attempt to determine

20

whether the offender is ready for reintegration into the community, so it is less focused on culpability. Thus, the factors defendants consider when deciding a parole application may not vary significantly depending on the age of the offender at the time of the crime.

This is not to say that a juvenile offender's age is irrelevant to a parole determination. An offender's age and social history can provide context for the offender's current situation. And if the parole board does consider the offender's culpability, youth is relevant to that issue. But the important point is that a juvenile offender's circumstances are not so different from an adult offender at the time of a parole decision to support an inference without clearer evidence that the Court in *Graham* was communicating to lower courts that the Court's basic understandings of how parole operates don't apply to juvenile offenders.

**Other proportionality cases**. The Supreme Court's other cases applying the Eighth Amendment proportionality principle counsel against a conclusion that the Court's intent in *Graham* was to significantly change parole standards for juveniles. In concluding that a life sentence without parole was disproportionate for juvenile offenders, *Graham* compared the reasoning and outcomes of *Rummel v. Estelle*, 445 U.S. 263 (1980), and *Solem v. Helm*, 463 U.S. 277, 299–300 (1983), both of which involved harsh sentences for nonviolent offenders. In *Rummel*, the Court upheld a sentence of life with the possibility of parole, and in *Solem*, the Court invalidated a sentence of life without parole. The availability of parole was the key difference between the two cases, as *Graham* acknowledged. 560 U.S. at 70.

In upholding the sentence in *Rummel*, the Court didn't impose any special requirements on the state's parole system, despite a vigorous dissent contending that it should have. Justice Powell objected that the Court shouldn't rely on the possibility of parole to uphold the sentence because "parole is simply an act of executive grace" and the governor had "refused to grant

parole to 79% of the state prisoners whom the parole board recommended for release." *Rummel*, 445 U.S. at 293–94 (Powell, J., dissenting). The Court acknowledged that the defendant could not "enforce any 'right' to parole," but it was enough that parole is "an established variation on imprisonment of convicted criminals," and parole gave him the "possibility that he will not actually be imprisoned for the rest of his life." *Id.* at 280–81.

*Rummel* suggests that the Eighth Amendment doesn't create new standards for parole, even when the existence of parole is a necessary condition of upholding a sentence as constitutional. It is true that *Rummel* didn't involve a juvenile offender. But the case provides further evidence that courts should exercise restraint before interpreting ambiguous language in *Graham* as expansively as plaintiffs suggest.

**Limitations on *Graham* in subsequent cases.** Language in *Montgomery* and *Jones* provides strong support for a view that *Graham* did not impose numerous new limitations and restrictions on state parole officials. In the context of discussing the scope of *Graham* and *Miller*, the Court emphasized in *Montgomery* that "[e]xtending parole eligibility to juvenile offenders does not impose an onerous burden on the States" and that when "a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." 577 U.S. at 212. In *Jones*, the Court reiterated this view and relied on it to reject a requirement on sentencing courts to make findings of fact about how they considered a juvenile offender's youth before sentencing him to life in prison without parole. 141 S. Ct. at 1321.

Plaintiffs' proposed parole standard for juvenile offenders would contradict or at least be in tension with the Court's observation in *Montgomery* and its holding in *Jones* because that

standard would create significant new burdens on states. And those burdens would go far beyond the fact-finding requirement that the Court in rejected in *Jones*. It would constitutionalize any decision that could affect a juvenile offender's parole prospects, which, in turn, would lead to more litigation about those decisions.

Adopting plaintiffs' standard would invalidate not just Wisconsin's parole system, but the many other state parole systems that allow the parole board to consider seriousness of the offense. *See* Dkt. 121, at 29–30 (identifying a dozen states that allow consideration of this factor). Moreover, any time a juvenile offender was denied parole, there would be room to challenge the reasons relied on by the commission. Courts would have to distinguish between reasons based on lack of maturity and rehabilitation and reasons based on the seriousness of the offense, even though there can be significant overlap between the two types of reasons. For example, if the offender's crime was very serious, parole officials may demand a stronger showing of maturity and rehabilitation before taking the risk of releasing the offender into the community. Courts would have to untangle these reasons to determine whether officials violated the Eighth Amendment.

Even more significant, a juvenile offender could raise an Eighth Amendment challenge to any denial of a request for programming, a reduced classification, a job, or any other resource that may be relevant to a parole decision. It is simply untenable to suggest that such an overhauling of the parole process as it relates to juvenile offenders is consistent with a view that requires courts to "avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." *See Wershe,* 2016 WL 1253036, at *4 ("That *Graham* was not intended to upend parole systems is confirmed by the Court's later decision

in *Montgomery*, which noted that making juvenile lifers eligible for parole would not 'impose an onerous burden' on states.").

**Consequences of plaintiffs' position.** The reasons discussed above provide ample support for rejecting plaintiffs' proposed Eighth Amendment standard for making parole decisions related to juvenile offenders. But there is more. Another problem is that plaintiffs don't grapple with the consequences of their position, which would lead to either logical inconsistencies in Eighth Amendment jurisprudence or even more expansive changes in the parole process than what plaintiffs are currently proposing.

A key question that plaintiffs don't answer is why a juvenile offender's initial parole eligibility date is what triggers the Eighth Amendment's protections. If the court were to accept that view, it would mean that Wisconsin juvenile offenders who received a life sentence under the indeterminate system would have Eighth Amendment rights starting as early as 13 years and 4 months after they were first imprisoned, but juvenile offenders sentenced to a 25-year determinate sentence would not be protected by the Eighth Amendment at all. It would also mean that the Eighth Amendment would apply differently in different states, depending on whether or when that state made parole available for a particular sentence. Plaintiffs point to no other situation in which Eighth Amendment rights vary from state to state. So it makes little sense to make a parole eligibility date the trigger for Eighth Amendment protections.

Plaintiffs' response to this criticism might be to say that the parole eligibility date isn't the critical event. Plaintiffs suggest an even broader standard in their reply brief: "the state may not continue to imprison a juvenile offender once he or she has matured and rehabilitated." Dkt. 165, at 20–21. If that's correct, then there would no principled basis for distinguishing longer sentences from shorter sentences for the purpose of determining a juvenile offender's

24

right to parole. If the analysis turns on maturity and rehabilitation, then any denial of parole to any juvenile offender convicted of a nonhomicide crime would violate the Eighth Amendment, regardless of whether the sentence was for 1 or 100 years, if parole officials relied on any reason other than a failure to demonstrate maturity and rehabilitation.

The bottom line is that plaintiffs' proposed Eighth Amendment standard is inconsistent with multiple lines of Supreme Court precedent and isn't supported even by the cases that they rely on. The court declines to adopt it.

But this still leaves the question of what limitations, if any, the Eighth Amendment places on parole decisions related to juvenile offenders. The court concludes that the role of courts in policing those decisions is modest, but not meaningless. *Graham* says that the Eighth Amendment prohibits the state from sentencing juvenile offenders convicted of crimes other than homicide to life without parole. The court can discern no reason why executive officials should be immune from complying with that rule. Parole officials may not force a reformed juvenile offender to die in prison for no reason other than that they believe he should have been sentenced to life without parole. The parole process cannot be a sham. *See Graham*, 560 U.S. at 70, 82 (juvenile offender sentenced to life must have "some realistic opportunity to obtain release before the end of that term"; "remote" possibility not enough).

A broader rule simply isn't supported by *Graham* or any other Supreme Court precedent. *Graham* is about life sentences, so it cannot be reasonably construed to give juvenile offender a wide array of new rights simply because the offender has reached his parole eligibility date. Rather, *Graham* and its progeny don't limit parole officials unless there is substantial evidence that there is "too great a risk" that they are attempting to convert an offender's sentence to one of life without parole. *See Miller*, 567 U.S. at 480. Offenders could meet that standard with

25

evidence that parole officials have communicated by word or deed that they will never be paroled or will be refused parole for so long that they won't have an opportunity to "truly reenter society and have a meaningful life outside of prison." *See Kitchen v. Whitmer*, No. 18-11430, 2022 WL 2898633, at *12 (E.D. Mich. July 21, 2022) (internal quotation marks omitted).

As for the factors defendants may consider, *Graham* suggests that there is a point when the Eighth Amendment prohibits parole officials from refusing to grant parole solely based on the seriousness of the offense. Repeated denials for that reason alone even after the offender has served a lengthy term of imprisonment may be evidence that continued incarceration violates the Eighth Amendment because it is "totally without penological justification," *Hope v. Pelzer*, 536 U.S. 730, 737 (2002), and "results in the gratuitous infliction of suffering," *Gregg v. Georgia*, 428 U.S. 153, 183 (1976). But that would be a rare circumstance. Parole boards traditionally have had the discretion to rely on many factors when making a decision, including the seriousness of the offense, and *Graham* doesn't purport to cabin that discretion except in extreme cases when doing so will give the offender a de facto life sentence.

As for the type of process the Eighth Amendment requires, the most that could be plausibly argued is that a juvenile offender should have an opportunity to ask parole officials to consider information relevant to youth. *See Jones*, 141 S. Ct. at 1319–20 (stating in sentencing context that there may be an Eighth Amendment violation in sentencing context if the court "expressly refuses as a matter of law to consider the defendant's youth"). *Jones* rejected a view that states must have policies outlining how youth is to be considered or requiring findings of fact, even in the sentencing context. *Id.* at 1323. The court isn't persuaded that the requirements on parole officials are more onerous than the requirements on sentencing courts.

These general principles are enough to decide plaintiffs' Eighth Amendment claim. Plaintiffs have not adduced evidence of a uniform practice by defendants to give juvenile offenders de facto life sentences or of any policy or practice that would prevent offenders from asking the commission to consider facts relevant to youth. For example, plaintiffs don't allege that defendants consistently refuse to allow juvenile offenders to make progress toward release or deny parole because of the seriousness of the offense even when those offenders approach what could be reasonably considered a life sentence. And plaintiffs point to no examples in which defendants refused to consider mitigating circumstances related to the youth of an offender convicted of a nonhomicide crime.

In fact, plaintiffs say little of anything in their briefs or proposed findings of fact about class members who were convicted of nonhomicide crimes. The only class member convicted of a nonhomicide crime that plaintiffs discuss in their brief in chief is Marvin Ingram. But he was released on parole after serving 24 years of a 62-year sentence for robbery and sexual assault with the use of a dangerous weapon. Dkt. 124-12; Dkt. 129-15; Dkt. 165, at 20. Plaintiffs also refer to Sandy Farrior and Terrance Prude in their proposed findings of fact. At the time of Farrior's last parole hearing, he had served 15 years of a 46-year sentence for first-degree sexual assault. Dkt. 129-71. The commission deferred consideration for ten months, in part because he was still completing programming. *Id.* At the time of Prude's last parole hearing, he had served 20 years of an 80-year sentence for four armed robberies. Dkt. 129-86. The commission deferred consideration for 18 months, in part because of his numerous conduct reports that continued to the present, including for being involved with a security threat group. *Id.*

None of these decisions suggest that defendants are violating the requirements of *Graham.* The evidence submitted by defendants suggests the opposite. Contrary to plaintiffs'

contention, Wisconsin's parole system cannot be compared to clemency, which gives offenders only a remote chance of release. *See* Dkt. 165, at 8. Since 2010, the commission has released 88 out of 176 prisoners who met the class definition at the time of release. *Cf. Hayden*, 134 F. Supp. 3d at 1010 (finding Eighth Amendment violation in part because juvenile offenders were "rarely paroled" and no juvenile offender had obtained release in last four out of five years). This is strong evidence that there is no uniform policy or practice that is preventing juvenile offenders from being granted parole. Although there is a substantial number of class members who haven't been released, plaintiffs don't point to a policy or practice that is preventing those offenders from making progress toward that goal.

Plaintiffs' arguments related to juvenile offenders who committed nonhomicide crimes rest on the view that the Eighth Amendment constrains every parole decision for juvenile offenders and that defendants may not consider the seriousness of an offender's crime, regardless of how much time the offender has served at that point. The court has rejected both of these contentions, so the court will deny plaintiffs' motion for summary judgment and grant defendants' summary judgment motion on plaintiffs' Eighth Amendment claims related to juvenile offenders convicted of crimes other than homicide.

### 2. Juvenile offenders convicted of homicide

The court's conclusion regarding the juvenile offenders convicted of nonhomicide crimes dooms plaintiffs' Eighth Amendment claims related to class members convicted of homicide. *Graham* was limited to sentences for nonhomicide crimes. And *Jones* held that juvenile offenders *can* be sentenced to life without parole for homicide, so long as the sentencing court has discretion to consider the offender's youth. 141 S. Ct. at 1311. That is the case in Wisconsin because Wisconsin law doesn't require a court to sentence juvenile offenders to life

28

without parole under any circumstance, and none of the class members are serving sentences of life without parole. If it is permissible under the Eighth Amendment for a sentencing court to preclude the possibility of parole at the outset for a juvenile offender convicted of homicide, then it follows that the Eighth Amendment places few, if any, limitations on a parole board's decision whether to grant or deny parole to the same offender later. Plaintiffs' argument rests on the view that *Graham* should be extended to homicide crimes, but plaintiffs fail to reconcile that argument with *Jones*. Two circuits have expressly rejected plaintiffs' view, *see Brown v. Precythe,* 46 F.4th 879, 886 (8th Cir. 2022), and *Bowling v. Director, Virginia Department of Corrections*, 920 F.3d 192, 197 (4th Cir. 2019), and none have accepted it.

But even if *Graham* does apply to juvenile homicide offenders, plaintiffs still would not be entitled to relief in this case. Again, plaintiffs haven't adduced evidence of a uniform practice by defendants to impose life sentences on juvenile offenders, even those who have committed homicide. Defendants are routinely releasing such offenders, as shown by the experiences of the named plaintiffs themselves, several of whom have been released while this lawsuit has been pending. *See* Dkt. 57. Many of the prisoners convicted of homicide whom plaintiffs discuss in their briefs and proposed findings of fact have also been released. *See* Dkt. 166, ¶ 56a–c (referring to Joseph Roeling, who was released in June 2021, *see* Dkt. 124-15); Dkt. 166, ¶ 56d–e (referring to Barney Guarnero, who was granted parole in May 2022, *see* Dkt. 167-2); Dkt. 166, ¶ 60 (referring to Stuart Gwiazada, Carlos King, Thaddeus Karow, Craig Sussek, Deng Yang, and Roy Rodgers, who have all been released).

Defendants also point to numerous instances in which the commission has considered an offender's youth when making parole decisions, and plaintiffs cite no examples in which the commission refused to do so. *See, e.g.*, Dkt. 130-9 (noting the offender's "young age at which

[he] committed the offense" and that he grew up in a "chaotic" and "abusive" environment). *See also* Dkt. 154, at 41–42 (citing other examples). Plaintiffs say that the commission treats youth as "an aggravating factor," Dkt. 166, ¶ 97, but the examples they cite they don't show that the commission failed to consider youth appropriately. *See id.*, ¶ 124. Rather, those examples show concerns about the offender's ability to transition to independent living after release. *See id.* (quoting chairperson's statement that "minimum community custody is so valuable . . . , particularly for those who are convicted as juveniles, because they otherwise have no exposure to the community"); *id.* (quoting commissioner's statement that the offender needed "to see a lengthier period" of "working in a community setting" because the offender was "so young when [he] came into prison"). Nothing in *Graham* or *Jones* suggests that a parole board is required by the Eighth Amendment to ignore challenges that a juvenile offender may face outside prison. That isn't treating youth as an "aggravating" factor; it is considering whether the offender has the necessary life skills to succeed after release.

The court need not decide whether every parole decision related to a class member complied with the Eighth Amendment. As already discussed, this is a class action for injunctive relief, so plaintiffs' task was to show that defendants are violating the Eighth Amendment rights of the entire class or subclass. Plaintiffs haven't done that, so the court will grant summary judgment to defendants on all of plaintiffs' Eighth Amendment claims. The court does not now decide whether there may be individual offenders who can bring an as-applied challenge to a particular parole decision.

## C.  Due process

Under the Fourteenth Amendment, no state may "deprive any person of life, liberty, or property, without due process of law." Plaintiffs contend that defendants are depriving them

of a liberty interest by refusing to grant them parole and then failing to provide them due process of law. Specifically, plaintiffs say that they are entitled to the following procedural protections in the context of parole decisions:

- an attorney provided by the state;

- a notice that is provided more than 15 days before the hearing and includes any facts the commission may rely on to deny parole;

- an in-person interview with the chairperson of the commission;

- a request from the commission to the prisoner to provide information related to maturity and rehabilitation;

- any document that the commission may rely on to deny parole;

- a more detailed explanation of the reasons for denying parole; and

-  the right to call experts.

The Supreme Court has rejected the view that the denial of parole is a deprivation of liberty within the meaning of the Due Process Clause. This is because "[t]he natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right." *Greenholtz*, 442 U.S. at 7. The Court stated the rule even more emphatically in a more recent case: "There is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners." *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). A state can create a liberty interest in parole by placing substantive limits on its own discretion when deciding whether to grant or deny parole. *See Board of Pardons v. Allen*, 482 U.S. 369, 378 (1987). But Wisconsin hasn't done that. *See Grennier v. Frank*, 453 F.3d 442, 444 (7th Cir. 2006).

Plaintiffs acknowledge the general rule, but they contend that *Graham* created an exception for juvenile offenders. Specifically, they say that *Graham* requires a parole board to release juvenile offenders once they demonstrate maturity and rehabilitation, so that gives juvenile offenders a liberty interest in parole. And that liberty interest, plaintiffs say, entitles them to a panoply of procedural protections in the parole context, including the right to counsel and the right to present an expert opinion.

Plaintiffs' due process claim fails for three reasons. First, the claim relies on an interpretation of *Graham* that this court rejected when considering plaintiffs' Eighth Amendment claims. *Graham* is a prohibition on life sentences under certain circumstances; it doesn't require the immediate release of a juvenile offender upon a showing of maturity and rehabilitation.

Second, even if plaintiffs' interpretation of *Graham* were correct, the Court said nothing about the Due Process Clause or liberty interests in *Graham*, and it didn't purport to overrule any cases, so this court remains bound by *Greenholtz* and *Swarthout*, even if they are in tension with *Graham*. *See U.S. v. Blagojevich*, 612 F.3d 558, 562 (7th Cir. 2010) ("[T]he Supreme Court often reminds other judges that they must follow all of its decisions, even those that seem incompatible with more recent ones, until the Justices themselves deliver the coup de grâce."). Plaintiffs say that *Greenholtz* and *Swarthout* don't supply the relevant rule because they didn't involve juvenile offenders, but the rule articulated in those cases didn't create an exception for juveniles. And this court doesn't have the authority to create one.

Third, even if *Graham* did create a liberty interest for juvenile offenders, it wouldn't follow that plaintiffs would be entitled to the long list of procedural protections that they have identified. In cases in which the Court has concluded that a prisoner has a liberty interest in

parole based on state law, due process required "an opportunity to be heard and . . . a statement of the reasons why parole was denied." *Swarthout*, 562 U.S. at 220. Wisconsin already provides that, and plaintiffs don't contend otherwise. Plaintiffs' only basis for distinguishing those cases is again that they didn't involve juvenile offenders. But even under plaintiffs' theory of the case, plaintiffs' status as juvenile offenders is what gives them a liberty interest. It is not a basis for turning parole hearings into trials. Plaintiffs don't persuasively explain why their liberty interest in parole would be or should be more expansive than other group of prisoners who have a liberty interest in parole.

For all of these reasons, defendants are entitled to summary judgment on plaintiffs' due process claim.

## D. Right to jury trial

Plaintiffs' last claim is their most novel as well their farthest reaching because it would apply to all parole decisions and not just parole decisions related to juvenile offenders. The claim arises under the Sixth Amendment, which states that "[i]n all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury."

Understanding plaintiffs' theory under the Sixth Amendment requires some unpacking. The theory rests on a line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The defendant in that case was convicted of a gun crime that carried a maximum prison sentence of 10 years. But the trial court gave him a longer sentence under a statute that applied a sentencing enhancement if the court found that the defendant committed the crime with racial bias. The Supreme Court held that the enhancement violated the Sixth Amendment right to a jury trial, under which "any fact that increases the penalty for a crime beyond the

prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" or admitted by the defendant. *Id.* at 490.

       *Apprendi* was about statutory maximums, but the Court has also applied it to increases in a statutory minimum. *Alleyne v. United States*, 570 U.S. 99 (2013), involved a federal statute that imposed a five-year minimum sentence for using a firearm when committing a crime of violence and a seven-year minimum if the defendant brandished the firearm. The jury found that the defendant used a firearm, but the verdict form didn't ask about brandishing. *Id.* at 104. Instead, the district court found that the defendant had brandished the weapon and relied on that fact to sentence the defendant to seven years. *Id.* That violated the Sixth Amendment, the Court held, because *Apprendi* applies to any "increase [in] the prescribed range of penalties," so it "applies with equal force to facts increasing the mandatory minimum." *Alleyne*, 570 U.S. at 111–12.

       Plaintiffs contend that *Alleyne* applies to parole decisions and that defendants are violating plaintiffs' Sixth Amendment by denying parole based on the seriousness of their offense. Plaintiffs rely on the following premises: (1) plaintiffs' parole eligibility date is their mandatory minimum sentence; (2) the commission is denying parole based on facts about the seriousness of a class member's offense that weren't found by a jury; (3) by denying parole for this reason, the commission is increasing the class member's mandatory minimum.

       Plaintiffs' argument fails at their first premise. Plaintiffs cite no authority for the view that a parole eligibility date qualifies as a mandatory minimum sentence under *Alleyne* or that a parole decision has any bearing on an offender's Sixth Amendment right to a jury. The mandatory minimum at issue in *Alleyne* was the term of imprisonment established by statute *before* sentencing. By contrast, plaintiffs' parole eligibility date is determined as a *consequence* of

sentencing. Plaintiffs are comparing apples and oranges. When the commission makes a parole decision, it isn't changing the punishment prescribed by statute, it is only determining how much of the sentence prescribed by the sentencing court the prisoner must serve in prison. At the point a prisoner is being considered for parole, a "mandatory minimum," as that term was used in *Alleyne*, has no meaning.

This view is confirmed by *United States v. Haymond*, 139 S. Ct. 2369, 2373 (2019), which summarized the *Apprendi* line of cases as standing for the proposition that "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty." In plaintiffs' case, a jury already took their liberty (or they pleaded guilty); the commission's task is to decide whether to *return* liberty to plaintiffs before the end of their sentence.

Plaintiffs rely on *Haymond* for the proposition that *Apprendi* principles apply even after an offender is sentenced because *Haymond* applied those principles to invalidate a parole revocation. But *Haymond* provides no support to plaintiffs. The district court in *Haymond* did not simply revoke the offender's parole and return him to prison to complete his sentence. Rather, the statute at issue required the court to issue a *new* sentence of no less than five years based on *new* conduct, so the situation was virtually indistinguishable from a new conviction. *Id.* at 2379–80. Both the plurality opinion and Justice Breyer's concurrence emphasized this fact, reasoning that the Sixth Amendment wouldn't apply to an ordinary revocation because "the prison sentence a judge or parole board could impose for a parole or probation violation normally could not exceed the remaining balance of the term of imprisonment already authorized by the jury's verdict." *Id.* at 2377 (plurality); *see also id.* at 2386 (Breyer, J., concurring in the judgment) ("[T]he consequences for violation of conditions of supervised

35

release under § 3583(e), which governs most revocations, are limited by the severity of the original crime of conviction, not the conduct that results in revocation.").

The lesson from *Haymond* is that the Sixth Amendment doesn't apply to fact finding that doesn't increase a prisoner's original sentence. A denial of parole doesn't increase a sentence; it's a decision not to shorten the portion of the sentence that is served in prison. The *Haymond* plurality implicitly acknowledged this distinction when it repeated the Court's observation from previous cases that parole is an "act of grace." *Id.* at 2377.

Plaintiff also say that *Blakely v. Washington*, 542 U.S. 296 (2004), is "indistinguishable" from this case. Dkt. 165, at 12. But *Blakely* is no more similar to this case than *Apprendi*, *Alleyne*, or *Haymond*. The defendant had pleaded guilty to second-degree kidnapping with a firearm, and state-law imposed a 53-month maximum sentence on that crime. But state law allowed the trial court to increase the sentence if it found that the defendant had acted with "deliberate cruelty," among other things. *Blakely*, 542 U.S. at 299–300. The court made that finding and sentenced the defendant to 90 months. *Id.* at 300. The Supreme Court invalidated the sentence, concluding that it violated thew Sixth Amendment because it exceeded the 53-month maximum. *Id.* at 303–04.

Plaintiffs say that *Blakely* is controlling because the sentencing court's finding of "deliberate cruelty" is related to the seriousness of the offense, which is what plaintiffs are challenging in this case. But this misses the point. *Blakely* wasn't about the *type* of facts found by the court. All that mattered was that the court had increased the defendant's maximum sentence authorized by the conviction: "Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi* ) . . . or any aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence." *Blakely*,

36

542 U.S. at 305. Nothing defendants did in this case exceeded what was authorized by the jury verdict (or plea agreement), so the Sixth Amendment doesn't apply.

The court will grant defendants' motion for summary judgment on plaintiffs' Sixth Amendment claim.

CONCLUSION

The basic proposition underlying plaintiffs' claims is difficult to argue with: prisoners should be released on parole once they become rehabilitated, and corrections officials should try to help prisoners reach that goal however they can. But there is often significant daylight between what qualifies as good policy and what the Constitution requires. In this case, plaintiffs' proposals for reform can't be squared with any understanding of the Constitution adopted by the Supreme Court, past or present. If plaintiffs are to obtain relief, it will have to come from the political branches of government, which can make improvements based on policy considerations. But this court does not have the authority to displace Wisconsin's system of parole in the manner that plaintiffs suggest, regardless of the merits of the system they envision. Under current law, defendants are entitled to summary judgment on all of plaintiffs' claims.

ORDER

IT IS ORDERED that:

1. The claims of Victor Heredia, Barney Guarnero, Brian Pheil, and Deng Yang are DISMISSED as moot.

2. Plaintiffs' motion for summary judgment, Dkt. 126, is DENIED, and defendants' motion for summary judgment, Dkt. 120, is GRANTED.

3. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered November 2, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge